BRIAN D. BERRY, CA Bar No. 229893
brian.berry@ogletree.com
OGLETREE, DEAKINS, NASH,
 SMOAK & STEWART, P.C.
One Embarcadero Center, Suite 900
San Francisco, CA  94111
Telephone:    415.442.4810
Facsimile:    415.442.4870

Attorneys for Defendant
AMERICAN INSTITUTE FOR FOREIGN
STUDY, INC.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ISABELLA SAVINI MERANTE, individually and on behalf of all others similarly situated,<br><br>                Plaintiffs,<br><br>        vs.<br><br>AMERICAN INSTITUTE FOR FOREIGN STUDY, INC.,<br><br>                Defendant. | Case No. 3:21-cv-3234<br><br>**DEFENDANT AMERICAN INSTITUTE FOR FOREIGN STUDY, INC.'S NOTICE OF REMOVAL OF CIVIL ACTION TO FEDERAL COURT** |

**TO THE HONORABLE JUDGES OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, PLAINTIFF ISABELLA SAVINI MERANTE, AND PLAINTIFF'S ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT** Defendant AMERICAN INSTITUTE FOR FOREIGN STUDY, INC. ("AIFS" or "Defendant") hereby removes this action from the Superior Court of the State of California for the County of San Francisco to the United States District Court for the Northern District of California. AIFS removes this action pursuant to 28 U.S.C. §§ 1332, 1441(a) and (b), and 1446 for the reasons stated below.

**I.      STATEMENT OF JURISDICTION**

1.      This case is a civil action over which the Court has original diversity jurisdiction pursuant to 28 U.S.C. § 1332. It may be removed to this Court pursuant to 28 U.S.C. § 1441, because the parties are completely diverse and the amount in controversy exceeds $75,000. As set forth below, this case meets all of the diversity statute's requirements for removal.  Therefore, this Notice of Removal is proper.

**II.      SATISFACTION OF PROCEDURAL REQUIREMENTS**

2.      On or about March 15, 2021, Plaintiff Isabella Savini Merante ("Plaintiff") filed a Complaint in the Superior Court of the State of California for the County of San Francisco (the "Superior Court") entitled "*Isabella Savini Merante, individually and on behalf of all others similarly situated v. American Institute for Foreign Study, Inc., a Connecticut Company*," designated as Case No. CGC-21-590398 (the "Action").

3.      The Complaint alleges a single cause of action against AIFS: a claim under Labor Code Private Attorneys General Act ("Private Attorneys General Act, Labor Code § 2698, *et seq.*"), seeking civil penalties for alleged wage and hour violations, including (1) failure to pay minimum wages, (2) failure to pay overtime pay, (3) timely pay violations, (4) unlawful deductions and credits, (5) failure to provide meal breaks, (6) wage statement violations, and (7) recordkeeping violations, as well as attorneys' fees under California Labor Code § 2699(g).

4.      On March 31, 2021, AIFS's agent for service of process received a copy of the Summons and Complaint. A true and correct copy of the Complaint received by AIFS's agent is

attached to this Notice as **Exhibit A**. In accordance with 28 U.S.C. § 1446(a), in addition to the Complaint (attached at Exhibit A), true and correct copies of the other documents sent to AIFS in this action are attached to this Notice as **Exhibit B**.

5.      On April 30, 2021, AIFS timely filed its Answer to Plaintiff's Complaint in San Francisco County Superior Court. A true and correct copy of the Answer is attached as **Exhibit C**. *See* Declaration of Brian D. Berry ¶ 2.

6.      The above documents constitute all known pleadings, processes, and/or other documents received by AIFS or otherwise filed in this action to date.

7.      A defendant in a civil action has 30 days from the date that it is served with the summons and complaint to remove the action to federal court.  28 U.S.C. § 1446(b); *Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 347-48 (1999).

8.      As AIFS's agent for service of process received the Complaint on March 31, 2021, this Notice of Removal is timely filed. 28 U.S.C. § 1446(b).

9.      In accordance with Federal Rule of Civil Procedure 7.1, AIFS has filed its Disclosure Statement concurrently with this Notice of Removal.

III.      **BASIS FOR REMOVAL: DIVERSITY JURISDICTION**

10.      Under 28 U.S.C. § 1332(a)(2), federal district courts "have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between … citizens of a State and citizens or subjects of a foreign state…."

11.      The United States Supreme Court has held that a defendant seeking to remove a case to federal court under 28 U.S.C. § 1446(a) need only file a "notice of removal 'containing a short and plain statement of the grounds for removal.'" *Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 83 (2014). The Court further held that this language "tracks the general pleading requirement stated in Rule 8(a) of the Federal Rules of Civil Procedure" and that "[a] statement short and plain need not contain evidentiary submissions." *Id.* at 84, 87.

12.      As discussed below, AIFS may remove this case to this Court pursuant to 28 U.S.C. § 1441(a) because: (i) it is a civil action between a citizen of a State and a citizen of a foreign state,

1  and (ii) the amount in controversy exceeds $75,000, exclusive of interest and costs.

2        **A.**     **There is complete diversity between the Parties.**

3              **1.**     **Plaintiff is a citizen of a foreign state.**

4       13.     Although Plaintiff asserts in the Complaint that she is a resident of California, she is

5  a foreign national. Ex. A (Complaint) ¶¶ 5. As a participant in the United States Department of

6  State's au pair program, Plaintiff has a non-immigrant J-1 Visa, which has enabled her temporary

7  residency with a host family during the time she has participated in this cultural exchange program.

8  *See* Ex. A (Complaint) ¶¶ 10-11; 22 C.F.R. § 62; 8 C.F.R. § 214. Indeed, Plaintiff currently

9  remains in possession of a non-immigrant J-1 Visa as she continues to participate in the United

10  States Department of State's au pair program. *See* Declaration of Jean M. Quinn ("Quinn Dec.") at

11  ¶ 3.[1] Therefore, for purposes of diversity jurisdiction, Plaintiff is a citizen of a foreign state. *See,*

12  *e.g.*, *Talece Inc. v. Zheng Zhang*, Case No. 20-cv-03579-BLF, 2020 WL 5366633, at *3 (N.D. Cal.

13  Sept. 8, 2020); *Walker v. McCarty*, Case No. EDCV 19-627 JGB (SHKx), 2019 WL 3818218, at

14  *1-2 (C.D. Cal. Aug. 14, 2019).

15              **2.**     **AIFS is a citizen of the States of Delaware and Connecticut.**

16       14.     Under 28 U.S.C. § 1332(c), "a corporation shall be deemed to be a citizen of every

17  State and foreign state by which it has been incorporated and of the State or foreign state where it

18  has its principal place of business." A corporation's headquarters is presumptively the location of

19  its "principal place of business." *Hertz Corp. v. Friend*, 559 U.S. 77, 92-93 (2010) ("[I]n practice

20  [a company's principal place of business] should normally be the place where the corporation

21  maintains its headquarters—provided that the headquarters is the actual center of direction, control

22  and coordination, *i.e.*, the 'nerve center'").

23       15.     AIFS is incorporated in Delaware and it maintains its principal place of business in

24  Stamford, Connecticut. *See* Quinn Dec. at ¶ 2.

25       16.     Additionally, AIFS does not have its headquarters, executive offices, or principal

26  place of business in the State of California. *See id.*

27

28

---

[1]    The Quinn Declaration is attached to this Notice as **Exhibit D**.

17.     Accordingly, AIFS is a citizen of the States of Delaware and Connecticut.

18.     Therefore, Plaintiff is a citizen of a foreign state and APIA is a U.S. citizen, which satisfies the diversity requirement. *See* 28 U.S.C. § 1332(a)(2).

**B.     The Amount in Controversy Exceeds $75,000.**[2]

19.     In order to satisfy the $75,000 amount-in-controversy requirement, a defendant merely needs to establish that it is "more likely than not" that the amount in controversy in this action exceeds the jurisdictional minimum. 28 U.S.C. § 1332(a); *Sanchez v. Monumental Life Ins. Co.*, 102 F.3d 398, 404 (9th Cir. 1996). The requirement is satisfied here where the damages sought by Plaintiff "more likely than not" exceed $75,000, exclusive of interest and costs.

20.     As the Supreme Court has emphasized, "a defendant's notice of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold." *Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 89 (2014); *see also Valdez v. Allstate Ins.* Co., 372 F.3d 1115, 1117 (9th Cir. 2004). Indeed, a defendant is not obligated to "research, state, and prove the plaintiff's claims for damages." *Behrazfar v. Unisys Corp.*, 687 F. Supp. 2d 999, 1004 (C.D. Cal. 2009) (quoting *Korn v. Polo Ralph Lauren Corp.*, 536 F. Supp. 2d 1199, 1204-05 (E.D. Cal. 2008)).

21.     Once a defendant shows that the amount in controversy exceeds the jurisdictional amount, removal is presumed proper, unless Plaintiff shows that it is "legally certain that his recovery will not exceed the amount stated." *White v. FCI USA, Inc.*, 319 F.3d 672, 674 (5th Cir. 2003).

22.     In determining whether the jurisdictional minimum is met, the Court considers all recoverable damages and other monetary relief, including compensatory damages, special damages, punitive damages, attorneys' fees, and statutory penalties, including amounts recoverable as PAGA penalties. *See Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 347-48 (1977), superseded by statute in part and other grounds as stated in *United Food & Commer.*

---

[2]     AIFS addresses the allegations in Plaintiff's Complaint solely to demonstrate that the amount in controversy in the matter exceeds $75,000.00. In doing so, AIFS does not admit, and expressly denies, that Plaintiff is entitled to the damages alleged in her Complaint or that Plaintiff will be able to recover against AIFS on any of theory or cause of action.

*Workers Union Local 751 v. Brown Grp.,* 517 U.S. 544 (1996)); *Galt G/S v. JSS Scandinavia*, 142 F.3d 1150, 155-56 (9th Cir. 1998); *see also Brady v. Mercedes-Benz USA, Inc.*, 243 F. Supp. 2d 1004, 1009 (N.D. Cal. 2002) (explaining that penalties are properly included in calculating the amount in controversy); *Patel v. Nike Retail Servs., Inc.*, 58 F. Supp. 3d 1032, 1048 (N.D. Cal. 2014).

23. These damages and penalties include those that can reasonably be anticipated at the time of removal, not merely those already incurred. *Simmons v. PCR Tech.*, 209 F. Supp. 2d 1029, 1035 (N.D. Cal. 2002); *see also Celestino v. Renal Advantage Inc.*, Case No. C 06-07788, 2007 WL 1223699 (N.D. Cal. Apr. 24, 2007). Further, the Court may properly rely on the facts presented in the complaint, notice of removal, and any "summary-judgment-type evidence relevant to the amount in controversy at the time of removal." *Matheson v. Progressive Specialty Ins. Co.*, 319 F.3d 1089, 1090-91 (9th Cir. 2003); *see* 28 U.S.C. § 1332(a); *Gaus v. Miles, Inc.*, 980 F.2d 564, 566-67 (9th Cir. 1992).

24. Based on the allegations of the Complaint and the information set forth in the accompanying declarations, it is clear that the amount in controversy exceeds $75,000.[3]

25. Specifically, AIFS estimates the amount in controversy as follows:

### *PAGA Penalties Sought By Plaintiff*

26. Plaintiff seeks to recover civil penalties under PAGA for alleged violations of the following California Labor Code sections and regulations:

- Failure to pay minimum wages, in violation of Labor Code sections 1194 and 1197, the San Francisco Minimum Wage Ordinance, and the applicable IWC Wage Orders (*see, e.g.*, Ex. A, (Complaint) at ¶¶ 31-36);

- Failure to pay overtime pay, in violation of Labor Code sections 510, 1194, 1197, and 1454 (*see, e.g.*, Ex. A (Complaint) at ¶¶ 37-42);

- Failure to provide timely pay, in violation of Labor Code sections 204 (*see, e.g.*,

---

[3] Should Plaintiff or the Court challenge the amount-in-controversy allegations contained in this Notice of Removal, AIFS requests that the Court allow it to present additional evidence in support of its calculations. *See Dart Cherokee Basin Operating*, 574 U.S. at 89 ("Evidence establishing the amount is required by §1446(c)(2)(B) only when the plaintiff contests, or the court questions, the defendant's allegation.").

Ex. A (Complaint) at ¶¶ 43-48);

- Unlawful deductions and credits, in violation of Labor Code sections 221 and 224 and the applicable IWC Wage Order (*see e.g.*, Ex. A (Complaint) at ¶¶ 49-56);

- Failure to provide meal breaks, in violation of Labor Code sections 226.7 and 512 (*see, e.g.*, Ex. A (Complaint) at ¶¶ 57-61);

- Failure to provide timely, accurate, and itemized wage statements, in violation of Labor Code section 226(a) and the applicable IWC Wage Orders (*see, e.g.*, Ex. A (Complaint) at ¶¶ 62-64); and

- Failure to keep records in violation of Labor Code section 1174 and Wage Order No. 15, § 7 (*see, e.g.*, Ex. A (Complaint) at ¶¶ 65-68);

27.     PAGA claims are subject to a one-year statute of limitations. Cal. Civ. Proc. Code § 340; *Thomas v. Home Depot USA Inc.*, 527 F. Supp. 2d 1003, 1007 (N.D. Cal. 2007). The law further provides for an additional 65-day tolling period, representing the period during which a plaintiff must wait for the LWDA to provide notice of whether a plaintiff may pursue a civil action. Plaintiff filed her LWDA Notice (pursuant to Labor Code section 2699.3) on January 8, 2021. *See* Ex. A (Complaint) at ¶ 69. Thus, Plaintiff seeks to recover PAGA penalties for violations occurring during the period beginning on January 8, 2020 – a period that, through the date that Plaintiff's placement with her current host family in California is scheduled to conclude (i.e., May 12, 2021),[4] equates to seventy (70) weeks.

28.     For removal purposes, courts consider the PAGA penalties stemming only from a plaintiff's own PAGA claims. *See, e.g.*, *Mitchell v. Grubhub Inc.*, Case No. CV 15-05465-BRO (ASx), 2015 WL 5096420, at *6 (C.D. Cal. Aug. 28, 2015); *Patel v. Nike Retail Servs., Inc.*, 58 F. Supp. 3d 1032, 1048 (N.D. Cal. 2014); *Schiller v. David's Bridal, Inc.*, Case No. 1:10-cv-00616 AWI SKO, 2010 WL 2793650, at *8 (E.D. Cal. July 14, 2010) (concluding that "Plaintiff, by alleging PAGA penalties, has put 100% of the PAGA penalties in controversy").

---

[4] *See* Quinn Decl. at ¶ 3.

DEFENDANT'S NOTICE OF REMOVAL OF CIVIL ACTION TO FEDERAL COURT

29.     PAGA penalties are recoverable on a per-pay period basis.  As Plaintiff was paid on a weekly basis, there are 52 pay periods per year. *See* Ex. A (Complaint) at ¶¶ 20-21. As such, Plaintiff's claim includes at least 70 separate penalties for each provision of the Labor Code for which penalties are sought. Plaintiff seeks to recover $100 per pay period for an initial violation and $200 per pay period for each subsequent violation, for alleged violations of the Labor Code that do not specify a different amount. *Id.* at ¶ 30 (citing Labor Code § 2699(f)). Based on Plaintiff's own allegations, her total statutory PAGA civil penalties are at least **$135,750.00**:

| Complaint Citation | Labor Code Provision(s) For Which Penalty Sought | Penalty for Each Violation | Total |
|---|---|---|---|
| Compl. ¶¶ 31-36 (Failure to Pay Minimum Wages) | Labor Code §§ 1194, 1197 | $100 (initial violation) & $250 (each subsequent violation)<br><br>(1 x $100) + (69 x $250) | $17,350 |
| Compl. ¶¶ 37-42 (Failure to Pay Overtime Pay) | Labor Code § 510, 1194, 1197, & 1454 | $50 (initial violation) & $100 (each subsequent violation)<br><br>(1 x $50) + (69 x $100) | $6,950 |
| Compl. ¶¶ 43-48 (Failure to Provide Timely Pay) | Labor Code § 204 | $100 (initial violation) & $200 (each subsequent violation)<br><br>(1 x $100) + (69 x $200) | $13,900 |
| Compl. ¶¶ 49-56 (Unlawful Deductions & Credits) | Labor Code §§ 221, 224 | $100 (initial violation) & $200 (each subsequent violation)<br><br>(1 x $100) + (69 x $200) | $13,900 |
| Compl. ¶¶ 57-61 (Failure to Provide Meal Breaks) | Labor Code §§ 226.7 & 512 | $100 (initial violation) & $200 (each subsequent violation)<br><br>(1 x $100) + (69 x 200) | $13,900 |
| Compl. ¶¶ 62-64 (Failure to Provide Wage Statements) | Labor Code § 226(a) | $250 (initial violation) & $1,000 (each subsequent violation)<br><br>(1 x $250) + (69 x $1,000) | $69,250 |

| | | | |
|---|---|---|---|
| Compl. ¶¶ 65-68 (Failure to Provide Timely and Accurate Wage Statements) | Labor Code § 1174 | $500 | $500 |
| **Grand total for Plaintiff's Alleged PAGA Penalties**[5] | | | **$135,750** |

### *Attorneys' Fees*

30.     PAGA provides that "[a]ny employee who prevails in any [PAGA] action shall be entitled to an award of reasonable attorney's fees and costs." Cal. Lab. Code § 2699(g)(1).

31.     When "an underlying statute authorizes an award of attorneys' fees, either with mandatory or discretionary language, such fees may be included" in calculating the amount in controversy. *Galt G/S v. JSS Scandinavia*, 142 F.3d 1150, 1156 (9th Cir. 1998).

32.     The Ninth Circuit has recognized that courts may exercise their discretion to calculate fees using the percentage method. *See, e.g.*, *In re Mercury Interactive Corp. Secs. Litig.*, 618 F.3d 988, 992 (9th Cir. 2010). Under the percentage method, 25% "is the benchmark award for attorney's fees." *Coffin v. Magellan HRSC*, Inc., Case No. 19-cv-02047-BAS-NLS, 2020 WL 773255, at *7 (S.D. Cal. Feb. 18, 2020); *see also Minasyan v. Western Union Fin. Servs., Inc.*, Case No. 2:19-cv-1516-ODW-JPRx, 2019 WL 4688757, at *4 (C.D. Cal. Sept. 26, 2019) (referring to a 25% attorney's fee recovery as "standard" in a PAGA case).

33.     Here, using the standard 25% calculation for projected attorneys' fees, the amount of attorneys' fees at issue is **$33,937.50** (*i.e.*, $135,750 x 0.25 = $33,937.50).

34.     Thus, the total amount in controversy, inclusive of PAGA penalties ($135,750) and attorneys' fees ($33,937.50), is at least **$169,687.50**.

---

[5] Even if penalties for subsequent violations are calculated from the date Plaintiff filed her LWDA Notice, January 8, 2021, the total amount in controversy would still exceed the jurisdictional limits. Plaintiff's total statutory PAGA civil penalties would be at least $72,000.00 (calculated using 52 pay periods for the initial violation and 18 pay periods of subsequent violations). Using the standard 25% calculation for projected attorneys' fees, the amount of attorneys' fees at issue is $18,000. Thus, the total amount in controversy, inclusive of PAGA penalties ($72,000) and attorneys' fees ($18,000) would be at least **$90,000.00**.

35.     For these reasons, this case satisfies the $75,000 amount-in-controversy requirement and the Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1332 and 1441(a) & (b).

**IV.     VENUE**

36.     Venue lies in the Northern District of California pursuant to 28 U.S.C. §§ 1441(a), 1446(a) and 84(a). The action was originally filed by Plaintiff in the Superior Court of California, County of San Francisco. As that court is located within the boundaries of the Northern District of California, removal to this Court is proper.  *See* 228 U.S.C. § 1441(a); 8 U.S.C. § 84(a).

**V.     PRAYER FOR REMOVAL**

37.     WHEREFORE, because complete diversity exists between Plaintiff and AIFS, and because the amount in controversy exceeds the jurisdictional minimum for removal, this Court is vested with subject matter jurisdiction over this matter and the action is removable to this Court under 28 U.S.C §§ 1332(a) and 1441(a).

38.     This Notice of Removal will be promptly served on Plaintiff and filed with the Clerk of the Superior Court of the State of California in and for the County of San Francisco.

39.     Accordingly, AIFS prays that this civil action be removed from the Superior Court of the State of California, County of San Francisco, to the United States District Court of the Northern District of California.  In the event that this Court has a question regarding the propriety of this Notice of Removal, AIFS requests that it issue an Order to Show Cause so that the parties may have an opportunity to more fully brief the basis for this removal.

**VI.     RESERVATION OF RIGHTS**

40.     By removing this matter, AIFS does not waive, or intend to waive, any rights and defenses it has regarding the procedural, jurisdictional, and substantive issues of this matter. Specifically, but without limitation, AIFS does not admit or concede, and instead expressly denies, that this matter is or may be properly maintained as a PAGA action and that either Plaintiff or the purportedly similarly situated individuals are entitled to any relief whatsoever.

DATED:  April 30, 2021               OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.

                                     By:  /s/ Brian D. Berry
                                          BRIAN D. BERRY


                                     Attorneys for Defendant
                                     AMERICAN INSTITUTE FOR FOREIGN STUDY, INC.

                                                                          46986634.1

# EXHIBIT A



**Nichols Kaster**
ATTORNEYS AT LAW

**Kayla Stender**
Direct: (612) 256-3228
Fax: (612) 338-4878
kstender@nka.com

4600 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
(877) 448-0492

March 31, 2021

**VIA SERVICE OF PROCESS**
American Institute for Foreign Study, Inc. d/b/a Au Pair in America
In c/o Corporation Service Company d/b/a CSC – Lawyers Incorporating Service
2710 Gateway Oaks Drive, Suite 150N
Sacramento, CA 95833

*Re: Merante v. American Institute for Foreign Study, Inc. d/b/a Au Pair in America*
        *Case No. CGC21590398*

Dear Sir/Madam,

The following documents are being served upon you via personal service:

1. Complaint;
2. Exhibit A- Au Pair in America Contract;
3. Exhibit B- 2019 Host Family Guidelines Handbook;
4. Exhibit C- 2019 Program Support Policies;
5. Exhibit D- Merante PAGA Letter;
6. Civil Cover Sheet;
7. Case Management Order; and
8. Summons.

Regards,

*Kayla Stender*

Kayla Stender
Paralegal

Encls.

www.nka.com

MATTHEW C. HELLAND (SBN 250451)
*helland@nka.com*
NICHOLS KASTER, LLP
235 Montgomery Street, Suite 810
San Francisco, CA 94104
Telephone: (415) 277-7235
Facsimile: (415) 277-7238

PETER RUKIN (SBN 178336)
*prukin@rukinhyland.com*
RUKIN HYLAND & RIGGIN LLP
1939 Harrison Street, Suite 290
Oakland, CA 94612
Telephone: (415) 421-1800
Facsimile: (415) 421-1700

Attorneys for Plaintiff,
Isabella Savini Merante

ELECTRONICALLY
**F I L E D**
*Superior Court of California,*
*County of San Francisco*

**03/15/2021**
**Clerk of the Court**
BY: RONNIE OTERO
Deputy Clerk

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

### COUNTY OF SAN FRANCISCO

CGC-21-590398

| | |
|---|---|
| ISABELLA SAVINI MERANTE, individually and on behalf of all others similarly situated,<br><br>      Plaintiffs,<br><br>v.<br><br>AMERICAN INSTITUTE FOR FOREIGN STUDY, INC, a Connecticut Company,<br><br>      Defendant. | **CASE NO.:**<br><br>**(UNLIMITED CIVIL CASE)**<br><br>**COMPLAINT FOR CIVIL PENALTIES PURSUANT TO THE PRIVATE ATTORNEYS GENERAL ACT (LABOR CODE §2698, *et seq.*)**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Isabella Merante complains against American Institute for Foreign Study, Inc. d/b/a Au Pair in America ("Au Pair in America" or "Defendant") as follows:

### INTRODUCTION

1.    Plaintiff Isabella Merante brings this action under the California Labor Code Private Attorneys General Act, Labor Code § 2698, *et seq.* ("PAGA").  Through this action, Plaintiff Merante seeks to recover civil penalties on behalf of herself and other current and former au pairs for Defendant's violations of Cal. Labor Code §§ 201, 203-204, 221, 224, 226, 226.7, 510, 1174, 1194, 1194.2, 1194.5, the Industrial Welfare Commission Minimum Wage Order, and Industrial Welfare Commission Wage Order 15.

2.    Defendant recruits, trains, and employs in-home childcare workers who work in the United States on J-1 au pair visas. According to the United States Department of State, approximately 2800 J1 visa au pairs work in California each year. A significant portion of these California au pairs are recruited, trained, placed, and employed by Defendant. Defendant is an "employer" pursuant to Section 18 of the Labor Code and "employs" au pairs within the meaning of the Wage Order.

3.    Defendant's pay practices violated numerous provisions of Wage Order 15, the Minimum Wage Order, and the Labor Code. Defendant: (1) failed to pay minimum wage (Cal. Labor Code §§ 1194, 1194.2, and 1194.5; Minimum Wage Order); (2) failed to provide meal periods (Cal. Labor Code § 512); (3) failed to timely pay all wages owed (Cal. Labor Code § 204); (4) made illegal deductions from wages or took illegal credits against minimum wage, including for housing and meals (Cal. Labor Code §§ 221 and 224; Wage Order 15); (5) failed to maintain records showing hours worked, breaks taken, and value of room and board provided (Cal. Labor Code §§ 226, 226.17, 512 and 1174; Wage Order 15); (6) failed to provide lawful wage statements (Cal. Labor Code § 226; Wage Order 15) and (7) failed to pay overtime (Cal. Labor Code §§ 510 and 1194; IWC Wage Order 15).

4.    Plaintiff challenges Defendant's pay practices and seeks civil penalties for Defendant's violations of the California Labor Code, Minimum Wage Order and the Industrial Welfare Commission Wage Order.

**THE PARTIES**

5.      Plaintiff Isabella Merante resides in the City of Tiburon in the County of Marin, California. She has worked for Defendant as an au pair in California since May 2019. For approximately the first year of her employment, from May 2019 to June 2020, Plaintiff Merante worked for Defendant in San Francisco. Since then she has worked for Defendant in Marin County.

6.      Defendant American Institute for Foreign Study, Inc. d/b/a Au Pair in America is a Connecticut company doing business in California. Its principal place of business is in Connecticut.

**JURISDICTION AND VENUE**

7.      This Court has jurisdiction over all causes of action asserted herein pursuant to the California Constitution, Article VI, Section 10, which grants the Superior Court original jurisdiction in all cases except those given to other trial courts.

8.      Plaintiff seeks damages exceeding the jurisdictional minimum of this Court.

9.      Venue in the County of San Francisco is proper under California Code of Civil Procedure section 395.5 because a significant portion of the unlawful conduct at issue in this case occurred in the County of San Francisco. Specifically, Plaintiff Merante worked as an au pair in the City and County of San Francisco from May 2019 to June 2020. In addition, Defendant conducted and continues to conduct substantial business in this County and its liability arose, in part, in this County.

**FACTUAL ALLEGATIONS**

10.      Defendant recruits, train, and employs in-home childcare workers who work in the United States on J-1 au pair visas. According to the United States Department of State, approximately 2800 J1 visa au pairs work in California each year. A significant portion of these California au pairs are recruited, trained, placed, and employed by Defendant.

11.      Defendant employs au pairs in the United States, including Ms. Merante, by, among other things, preparing au pairs for their work in the United States, maintaining ongoing contact and supervising their work, and setting their terms and condition of employment,

3

1    including the right terminate or reassign them.

2         12.    Plaintiff signed an Au Pair in America Terms and Conditions agreement, which is

3    attached hereto as Exhibit A. That agreement provides Defendant "may refuse to accept [the]

4    application, or may reject/withdraw an application, at any stage with or without reason" and that

5    Defendant will train Plaintiff to work as an au pair through its Orientation. (Ex. A, pp. 1-2.)

6         13.    The agreement further provides that once in the United States the au pairs must

7    "maintain at least monthly contact with [her] Community Counsellor" and that "should a

8    problem arise with [her] Host Family…Au Pair in America may be able to re-match her." (Ex.

9    A, p. 2.)

10        14.    Defendant also controls the scope of the au pairs' responsibilities and working

11   conditions through detailed "Host Family Guidelines," attached hereto as Exhibit B.

12        15.    The Guidelines details Defendant's extensive role in the hiring and training

13   process. including meeting with the au pairs for in-person interviews to determine if it will

14   accept the au pair into the program. Defendant also controls how au pairs interact with potential

15   host families, requiring them to set up an account and message families through that account.

16   Defendant requires au pairs "keep [the] au pair services team updated" throughout the matching

17   process, and requires the host family confirm the match with Defendant. (Ex. B, p. 13.)

18        16.    Defendant extensively trains au pairs, requiring the au pair "attend an orientation

19   program" that has a "two-fold purpose," including providing "information of a basis level

20   regarding rules and regulations" and "cross-cultural issues, child development, child care safety

21   and emergency procedures, program guidelines and host family expectations." (Ex. B, p. 8.)

22        17.    The Guidelines further demonstrate the high level of supervision Defendant

23   exercises over Plaintiff and other au pairs. Defendant maintains contact with au pairs through its

24   Community Counselors who are "expected to help the au pair acclimate to the community and

25   monitor the activities of the exchange relationship to ensure they are in keeping with the intent of

26   the cultural exchange child care program established by Au Pair in America." (Ex. B, p. 17.) It

27   requires host families and au pairs initially meet with the Community Counsel to "discuss how

28   things are going so far and address any questions or concerns" and to review the au pair's

1   "schedule of duties and responsibilities." (Ex. B, p. 17.) It further requires the host family and au

2   pair make "ongoing contact" with the Counselor and requires the host family "inform the

3   Community Counsel if leaving the au pair and children in the home with another responsible

4   adult." (Ex. B, p. 17.)

5        18.    Defendant also determines whether an au pair's employment will be terminated or

6   continue. Defendant reserves the right to terminate au pairs from the program, and is involved in

7   setting the standards for requesting a rematch. (Ex. B, pp. 23, 31.) Defendant forbids families

8   from terminating the au pair immediately, instead requiring the host family continue "hosting

9   [the] au pair for a period of up to two weeks" before a rematch. (Ex. B, p. 23.) Further, through

10   its Program Support and Policies Defendant reserves the right to terminate the host families'

11   access to au pairs for violations such as not paying or reducing the au pairs minimum weekly

12   stipend or not allowing or reducing the au pair's free time. (Ex. C, p. 1.)

13        19.    The handbook further provides detailed instructions as to au pair's

14   responsibilities, including, among other things, "feeding, bathing and dressing your child,

15   planning your child's daily activities and playing with your child, supervising and babysitting

16   and transporting your child to school, the local pool or park." (Ex. B, p. 3.) Defendant further

17   dictates the tasks an au pair should not perform, including "[h]ousework or chores such as

18   vacuuming, mopping, dusting, pet care and total responsibility for cleaning your house is not part

19   of your au pair's responsibilities." (Ex B, p. 3.)

20        20.    Defendant sets tiered pay based on the au pair's level of childcare experience.

21   Defendant instructs host families to pay regular au pairs a minimum weekly "stipend" of $195.75

22   and sets the pay at a minimum of $250.00 for au pairs participating in their "Au Pair

23   Extraordinaire" program. (Ex. C, p. 3.)  The stipend does not include any payment for overtime.

24   On top of this systemic illegal underpayment, Defendant (1) fails to provide meal periods after

25   five hours of work; (2) takes deductions or minimum wage credits— including for meals and

26   housing—that are contrary to California law; (3) fails to keep records of time worked, breaks

27   taken, or meal and housing credits taken against minimum wage as required by California law;

28   (4) fails to compensate au pairs at all for training time; and (5) fails to provide wage statements

with required information about pay, deductions, and withholding.

21.     Ms. Merante was one of Defendant's au pairs in California, where she has worked since May 2019. For approximately the first year, from May 2019 to June 2020, Plaintiff Merante worked in San Francisco, California and received a weekly stipend of $200.00 per week. She would receive $15.00 additional for each hour she worked over 45. When she began with a new family in Tiburon, California she received $250.00 per week with no additional payments. She regularly works in the home for 10 hours in a day, and regularly works between 42-50 hours per week. She sometimes works over 10 hours in a day, and would sometimes work up to or over 55 hours. She regularly works more than 6 hours continuously without being fully relieved of duty for a meal period. Ms. Merante's agreement with Defendant provides that she may work up to 10 hours per day, and up to 45 hours per week. It does not provide for payment of overtime.

22.     Ms. Merante and other au pairs did not enter into any agreement to credit meals or lodging against Defendant's minimum wage obligations, as required by Wage Order No. 15. As such, the weekly stipend fell far below the minimum wage for the hours Ms. Merante worked. To the extent Defendant seeks credit for the value of any room or board without Ms. Merante's agreement such credit would be an unlawful repayment of wages to the employer and/or an unlawful deduction from wages.

23.     Although Ms. Merante and other au pairs were sometimes able to eat a meal while they were working, they remained on duty during those meals. Accordingly, Ms. Merante and other au pairs often worked work periods of five or more hours without being relieved from duty for a meal period.

24.     Upon information and belief, Defendant did not maintain any records of hours worked, breaks taken, or the value of room and board provided for Ms. Merante and other au pairs. Defendant did not provide Ms. Merante and other au pairs with any wage statements whatsoever, much less a wage statement itemizing wages earned, hours worked, rates of pay, the name and address of the employer, deductions taken, net wages earned, the inclusive dates of the period, or the name of the employee.

25.   Accordingly, Ms. Merante and other au pairs suffered from the systematic violations described above. Defendant's pay practices violate numerous provisions of Wage Order 15, the Minimum Wage Order and the Labor Code. Defendant has:

    1)   Failed to pay minimum wage.

    2)   Failed to pay overtime pay.

    3)   Failed to provide meal periods.

    4)   Failed to timely pay all wages owed.

    5)   Made illegal deductions from wages, or took illegal credits against minimum wage, including for housing and meals.

    6)   Failed to maintain records showing hours worked, breaks taken, and value of room and board provided.

    7)   Failed to provide lawful wage statements.

26.   Plaintiff alleges that these violations are ongoing and continuing and that they affected and continue to affect current and former au pairs who work or have worked for Defendant in California.

## CLAIM FOR RELIEF
### CIVIL PENALTIES UNDER LABOR CODE PRIVATE ATTORNEY GENERAL ACT
### (PRIVATE ATTORNEYS GENERAL ACT, LABOR CODE §2698, *ET SEQ.*)
### (REPRESENTATIVE ACTION)

27.   The allegations of each of the preceding paragraphs are re-alleged and incorporated herein by reference, and Plaintiff alleges as follows a claim of relief on behalf of himself and all other similarly situated, as described below.

28.   Plaintiff, as an aggrieved au pair/employee, brings this claim under California Labor Code §§ §§ 2698–2699 in a representative capacity on behalf of current and former au pair of Defendant subjected to the unlawful wage and hour practices alleged herein.

29.   The California Labor Code Private Attorneys General Act of 2004 ("PAGA"), California Labor Code § 2698 et seq., grants California employees the right to bring a civil action for the violation of any provision of the Labor Code on behalf of themselves and other current or former employees in order to recover civil penalties. PAGA is intended to assist in the

achievement of maximum compliance with state labor laws by empowering aggrieved

employees to act as private attorneys general in order to recover civil penalties for Labor Code

violations that would otherwise be prosecuted by the state. *See Arias v. Super. Ct.* (2009) 46 Cal.

4th 969, 980.

30.     PAGA permits an aggrieved employee to collect the civil penalty authorized by

law and normally collectible by the California Labor and Workforce Development Agency. To

address violations for which no penalty has been established, § 2699(f) creates a private right of

action for aggrieved employees and a default penalty in the amount of $100 for each aggrieved

employee per pay period for the initial violation, and $200 for each aggrieved employee per pay

period for each subsequent violation. *See* Cal. Lab. Code § 2699(f). Plaintiff hereby seeks to

collect these civil penalties for Defendant's Labor Code violations, as described below.

### Failure to Pay Minimum Wages

31.     The IWC Wage Orders, California Labor Code §§ 1194 and 11974, and the San

Francisco Minimum Wage Ordinance require employers to pay employees at least minimum

wage for all hours worked.

32.     IWC Wage Order No. 15, § 4(A) provides that "Every employer shall pay to each

employee wages not less than the following: (1) Any employer who employs 26 or more

employees shall pay to each employee wages not less than the following: (a) Ten dollars and

fifty cents ($10.50) per hour for all hours worked, effective January 1, 2017; (b) Eleven dollars

($11.00) per hour for all hours worked, effective January 1, 2018; (c) Twelve dollars ($12.00)

per hour for all hours worked, effective January 1, 2019; and Thirteen dollars ($13.00) per hour

for all hours worked, effective January 1, 2020.

33.     The San Francisco Minimum Wage Ordinance, San Francisco Administrative

Code, Chapter 12R.4, provides in relevant part that "(a) Employers shall pay Employees no less

than the Minimum Wage for each hour worked within the geographic boundaries of the City. (1)

Except as provided in subsection 12R.4(b), the Minimum Wage paid to Employees shall be as

follows: (A) Beginning on May 1, 2015, the Minimum Wage shall be an hourly rate of $12.25.

(B) Beginning on July 1, 2016, the Minimum Wage shall be an hourly rate of $13.00. (C)

Complaint for Penalties

Beginning on July 1, 2017, the Minimum Wage shall be an hourly rate of $14.00. (D) Beginning on July 1, 2018, the Minimum Wage shall be an hourly rate of $15.00. (E) Beginning on July 1, 2019, and each year thereafter, the Minimum Wage shall increase by an amount corresponding to the prior year's increase, if any, in the Consumer Price Index for urban wage earners and clerical workers for the San Francisco-Oakland-San Jose, CA metropolitan statistical area, as determined by the Controller." The San Francisco Minimum Wage beginning on July 1, 2019 was $15.59.

34.     Labor Code § 1197.1 provides in relevant part that: (a) Any employer or other person acting either individually or as an officer, agent, or employee of another person, who pays or causes to be paid to any employee a wage less than the minimum fixed by an applicable state or local law, or by an order of the commission, shall be subject to a civil penalty, restitution of wages, liquidated damages payable to the employee, and any applicable penalties imposed pursuant to Section 203 as follows:

> (1) For any initial violation that is intentionally committed, one hundred dollars ($100) for each underpaid employee for each pay period for which the employee is underpaid. This amount shall be in addition to an amount sufficient to recover underpaid wages, liquidated damages pursuant to Section 1194.2, and any applicable penalties imposed pursuant to Section 203.

> (2) For each subsequent violation for the same specific offense, two hundred fifty dollars ($250) for each underpaid employee for each pay period for which the employee is underpaid regardless of whether the initial violation is intentionally committed. This amount shall be in addition to an amount sufficient to recover underpaid wages, liquidated damages pursuant to Section 1194.2, and any applicable penalties imposed pursuant to Section 203.

35.     Defendant paid and caused Plaintiff and other au pairs to be paid less than less than the Minimum Wage for each hour worked.

36.  Under California Labor Code § 1197.1, Plaintiff seeks to recover a civil penalty of one hundred dollars ($100) for Plaintiff and each underpaid employee per pay period for the initial violation, and two hundred fifty dollars ($250) for Plaintiff and each underpaid employee for each subsequent violation.

**Failure to Pay Overtime Pay**

9

37.     The California Labor Code §§ 510, 1194, and 1197 require employers pay employees overtime compensation to non-exempt employees.

38.     California Labor Code § 1454 entitles domestic workers who are also personal attendants to overtime pay at a rate of one and one-half times the regular rate of pay for all hours worked over 9 hours in any workday or 45 hours in any workweek.

39.     By the course and conduct set forth above, Defendants violated Cal. Labor Code §§ 510,1194, and 1454 by failing to pay overtime pay to Plaintiffs and other au pairs when they worked in excess of 9 hours in a day or 45 hours in a week.

40.     With respect to violations of Labor Code §§ 510, 1194, and 1454, Labor Code §558 imposes a penalty of $50 for each aggrieved employee per pay period for the initial violation, and $100 for each aggrieved employee per pay period for each subsequent violation. Plaintiffs hereby seek recover of these penalties.

41.     Labor Code § 2699(a) provides that, "[n]otwithstanding any other provision of law, any provision of this code that provides for a civil penalty to be assessed and collected by the Labor and Workforce Development Agency or any of its departments, divisions, commissions, boards, agencies, or employees, for a violation of this code, may, as an alternative, be recovered through a civil action brought by an aggrieved employee on behalf of himself or herself and other current or former employees pursuant to the procedures specified in Section 2699.3."

42.     Pursuant to Labor Code §§ 558 and 2699(a), Plaintiffs seek to recover penalties for Defendants' violations of Labor Code §§ 510, 1194, and 1454.

**Timely Pay Violations**

43.     Labor Code § 204(a) provides as follows: "All wages, other than those mentioned in Section 201, 201.3, 202, 204.1, or 204.2, earned by any person in any employment are due and payable twice during each calendar month, on days designated in advance by the employer as the regular paydays. Labor performed between the 1st and 15th days, inclusive, of any calendar month shall be paid for between the 16th and the 26th day of the month during which the labor was performed, and labor performed between the 16th and the last day, inclusive, of any calendar

1    month, shall be paid for between the 1st and 10th day of the following month. However, salaries

2    of executive, administrative, and professional employees of employers covered by the Fair Labor

3    Standards Act, as set forth pursuant to Section 13(a)(1) of the Fair Labor Standards Act, as

4    amended through March 1, 1969, in Part 541 of Title 29 of the Code of Federal Regulations, as

5    that part now reads or may be amended to read at any time hereafter, may be paid once a month

6    on or before the 26th day of the month during which the labor was performed if the entire

7    month's salaries, including the unearned portion between the date of payment and the last day of

8    the month, are paid at that time."

9        44.    Labor Code § 204(b)(1) provides as follows: Notwithstanding any other provision

10   of this section, all wages earned for labor in excess of the normal work period shall be paid no

11   later than the payday for the next regular payroll period.

12       45.    Labor Code § 210(a) provides: "In addition to, and entirely independent and apart

13   from, any other penalty provided in this article, every person who fails to pay the wages of each

14   employee as provided in Sections 201.3, 204, 204b, 204.1, 204.2, 204.11, 205, 205.5, and

15   1197.5, shall be subject to a penalty as follows: (1) For any initial violation, one hundred dollars

16   ($100) for each failure to pay each employee. (2) For each subsequent violation, or any willful or

17   intentional violation, two hundred dollars ($200) for each failure to pay each employee, plus 25

18   percent of the amount unlawfully withheld. (b) The penalty shall either be recovered by the

19   employee as a statutory penalty pursuant to Section 98 or by the Labor Commissioner as a civil

20   penalty through the issuance of a citation or pursuant to Section 98.3. The procedures for issuing,

21   contesting, and enforcing judgments for citations issued by the Labor Commissioner under this

22   section shall be the same as those set forth in subdivisions (b) through (k), inclusive, of Section

23   1197.1.

24       46.    Labor Code § 2699(f) provides: For all provisions of this code except those for

25   which a civil penalty is specifically provided, there is established a civil penalty for a violation of

26   these provisions, as follows: (1) If, at the time of the alleged violation, the person does not

27   employ one or more employees, the civil penalty is five hundred dollars ($500). (2) If, at the

28   time of the alleged violation, the person employs one or more employees, the civil penalty is one

1   hundred dollars ($100) for each aggrieved employee per pay period for the initial violation and

2   two hundred dollars ($200) for each aggrieved employee per pay period for each subsequent

3   violation.

4        47.    The weekly stipend Plaintiff and other au pairs received failed to compensate

5   them at least the minimum wage for all hours worked. Accordingly, Defendant failed to timely

6   pay Plaintiff and other aggrieved employees their wages due within the intervals required by

7   Labor Code Section 204.

8        48.    Under California Labor Code §§ 210 and 2699, Plaintiff seeks to recover a civil

9   penalty of one hundred dollars ($100) for Plaintiff and each underpaid employee for the initial

10   violation, and two hundred dollars ($200) for Plaintiff and each underpaid employee for each

11   subsequent violation, for every pay period in which late payment occurred.

12   **Unlawful Deductions and Credits**

13        49.    Labor Code § 221 makes it unlawful for an employer to collect or receive from an

14   employee any part of wages paid to the employee.

15        50.    Labor Code § 224 prohibits any deduction from an employee's wages which is

16   not either authorized by the employee in writing or permitted by law.

17        51.    IWC Wage Order No. 15, § 10(C), provides, in relevant part, that "Meals or

18   lodging may not be credited against the minimum wage without a voluntary written agreement

19   between the employer and the employee."

20        52.    Defendant had no voluntary written agreement with Plaintiff or other au pairs to

21   credit meals and housing against Defendant's minimum wage obligations.

22        53.    Defendant's policy and practice of taking a credit against minimum wage

23   obligations for housing and meals violates Section 221, 224, and IWC Wage Order No. 15.

24        54.    Labor Code § 225.5 provides that, "In addition to, and entirely independent and

25   apart from, any other penalty provided in this article, every person who unlawfully withholds

26   wages due any employee in violation of Section 212, 216, 221, 222, or 223 shall be subject to a

27   civil penalty as follows: (a) For any initial violation, one hundred dollars ($100) for each failure

28   to pay each employee. (b) For each subsequent violation, or any willful or intentional violation,

two hundred dollars ($200) for each failure to pay each employee, plus 25 percent of the amount unlawfully withheld. The penalty shall be recovered by the Labor Commissioner as part of a hearing held to recover unpaid wages and penalties or in an independent civil action. The action shall be brought in the name of the people of the State of California and the Labor Commissioner and attorneys thereof may proceed and act for and on behalf of the people in bringing the action. Twelve and one-half percent of the penalty recovered shall be paid into a fund within the Labor and Workforce Development Agency dedicated to educating employers about state labor laws, and the remainder shall be paid into the State Treasury to the credit of the General Fund."

55.     Similarly, Labor Code § 2699(f)(2) provides for a civil penalty of one hundred dollars ($100) for Plaintiff and each aggrieved employee per pay period for the initial violation of Labor Code §§ 221 and 224.

56.     Accordingly, Plaintiff seeks to recover civil penalties as set forth above for Defendant's violations of Labor Code §§ 221 and 224.

### Failure to Provide Meal Breaks

57.     Cal. Labor Code § 512 provides, in pertinent part, as follows: An employer shall not employ an employee for a work period of more than five hours per day without providing the employee with a meal period of not less than 30 minutes," and "[a]n employer may not employ an employee for a work period of more than 10 hours per day without providing the employee with a second meal period of not less than 30 minutes."

58.     Cal. Labor Code § 226.7 states in part, "An employer shall not require an employee to work during any meal or rest or recovery period mandated pursuant to an applicable statute, or applicable regulation, standard, or order of the Industrial Welfare Commission."

59.     Defendant failed to provide Plaintiff and other au pairs with bona fide meal breaks when they were completely relieved from duty, because Plaintiff and other au pairs remained responsible for the care of the children while they ate their meals.

60.     By failing to provide Plaintiff and other au pairs with these meal periods, Defendant violated California Labor Code §§ 512 and 226.7.

61.     Under California Labor Code §2699(f)(2), Plaintiff seeks to recover a civil

1  penalty of one hundred dollars ($100) for Plaintiff and each aggrieved employee per pay period

2  for the initial violation of Labor Code §§ 226.7 and 512 for failing to provide meal periods, and

3  two hundred dollars ($200) for Plaintiff and each aggrieved employee per pay period for each

4  subsequent violation of Labor Code §§ 226.7 and 512 for failing to provide meal periods.

5  **Wage Statement Violations**

6  62.    Pursuant to Labor Code § 226(a) and Wage Order No. 15, § 7, Defendant is

7  required to provide—semimonthly or at the time of each payment of wages—itemized written

8  statements containing all information described in § 226 and IWC Wage Order No. 15,

9  including, but not limited to, the total hours worked by the employee.

10  63.    Defendant failed to comply with the Labor Code by knowingly and intentionally

11  failing to provide Plaintiff and aggrieved employees with accurate written statements showing

12  their actual and total hours worked.

13  64.    Under California Labor Code § 226.3 which provides for civil penalties for

14  violations of California Labor Code § 226(a), Plaintiff seeks a civil penalty of two hundred fifty

15  dollars ($250) for Plaintiff and each aggrieved employee per violation for the initial violation,

16  and one thousand dollars ($1,000) for Plaintiff and each aggrieved employee per violation for

17  each subsequent violation of Labor Code § 226(a) for failure to provide timely, accurate,

18  itemized wage statements.

19  **Recordkeeping Violations**

20  65.    Pursuant to Wage Order No. 15, § 7, Defendant is required to keep accurate

21  information with respect to each employee, including the following:  the total hours worked by

22  the employee, meal periods, total wages paid each payroll period, including value of board,

23  lodging, or other compensation actually furnished to the employee.

24  66.    Labor Code § 1174.5 provides that  "Any person employing labor who willfully

25  fails to maintain the records required by subdivision (c) of Section 1174 or accurate and

26  complete records required by subdivision (d) of Section 1174, or to allow any member of the

27  commission or employees of the division to inspect records pursuant to subdivision (b) of

28  Section 1174 , shall be subject to a civil penalty of five hundred dollars ($500).

67.     Defendant failed to comply with the Labor Code by knowingly and intentionally failing to provide Plaintiff and other au pairs with accurate written statements showing their actual and total hours worked, breaks taken, and value of room and board provided. In fact, Defendant neither maintains records of the hours worked by its workers, nor does it remit any semimonthly, itemized statement of hours worked and wages earned. Plaintiff seeks a civil penalty of $500 for this violation.

### Attorneys' Fees

68.     California Labor Code § 2699(g) further provides that any employee who prevails in an action for civil penalties is entitled to an award of reasonable attorneys' fees and costs. Plaintiff hereby seeks to recover her attorneys' fees and costs under this fee and cost shifting statute.

### Exhaustion

69.     On January 8, 2021, pursuant to California Labor Code § 2699.3, Plaintiff sent notice by certified mail to the Labor and Workforce Development Agency (LWDA) and Defendant of the specific provisions of the Labor Code that have been violated, including the facts and theories to support the violations. The LWDA received this notice on the same day, January 8, 2021. *See* Letter from Nichols Kaster, LLP to the LWDA and Defendant attached hereto as Exhibit D. The sixty-five-day time limit for the agency to respond has expired, such that Plaintiff has exhausted her administrative remedies.

### PRAYER FOR RELIEF

Based on the above allegations, Plaintiff respectfully requests entry of judgment on behalf of herself and other current and former employees against Defendant, as follows:

1.  For civil penalties under Labor Code § 2699 in an amount according to proof;

2.  For prejudgment interest and post-judgment interest as allowed by law;

3.  For attorneys' fees and costs, as authorized under Labor Code § 2699(g)(1);

4.  For such other and further relief as this Court deems just and proper.

### DEMAND FOR JURY TRIAL

Plaintiffs demands a trial by jury.

Dated: March 15, 2021

RUKIN HYLAND & RIGGIN LLP

By:/s/ Matthew C. Helland
Matthew C. Helland

MATTHEW C. HELLAND
NICHOLS KASTER, LLP
235 Montgomery Street, Suite 810
San Francisco, CA 94104

PETER RUKIN
RUKIN HYLAND & RIGGIN LLP
1939 Harrison Street, Suite 290
Oakland, CA 94612

ALEXANDER HOOD
TOWARDS JUSTICE
1410 High Street, Suite 300
Denver, CO 80218

Attorneys for Plaintiff

Complaint for Penalties

1

MATTHEW C. HELLAND (SBN 250451)
*helland@nka.com*

2

NICHOLS KASTER, LLP
235 Montgomery Street, Suite 810

3

San Francisco, CA 94104
Telephone: (415) 277-7235

4

Facsimile: (415) 277-7238

5

PETER RUKIN (SBN 178336)
*prukin@rukinhyland.com*

6

RUKIN HYLAND & RIGGIN LLP

7

1939 Harrison Street, Suite 290
Oakland, CA 94612

8

Telephone: (415) 421-1800
Facsimile: (415) 421-1700

ELECTRONICALLY
**F I L E D**
*Superior Court of California,
County of San Francisco*

**03/15/2021**
**Clerk of the Court**
BY: RONNIE OTERO
Deputy Clerk

9

10

Attorneys for Plaintiff,
Isabella Savini Merante

**CGC-21-590398**

11

12

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

13

**COUNTY OF SAN FRANCISCO**

14

15

ISABELLA SAVINI MERANTE,
individually and on behalf of all others
similarly situated,

16

Plaintiffs,

17

v.

18

19

AMERICAN INSTITUTE FOR
FOREIGN STUDY, INC, a Connecticut
Company,

20

21

Defendant.

**CASE NO.:**

**(UNLIMITED CIVIL CASE)**

**EXHIBIT TO COMPLAINT FOR
CIVIL PENALTIES PURSUANT TO
THE PRIVATE ATTORNEYS
GENERAL ACT (LABOR CODE §2698,**
*et seq.***)**

**DEMAND FOR JURY TRIAL**

22

23

24

25

26

27

28

Exhibit to Complaint for Penalties

# EXHIBIT A

## AGREEMENT: AU PAIR IN AMERICA TERMS & CONDITIONS

This Agreement sets out the terms and conditions of our professional relationship and details the services we will provide to you.  You acknowledge and understand that Au Pair in America is referred to as 'Program' regardless of whether you are participating in Au Pair in America, Au Pair Extraordinaire or eduCare In America) is a Cultural Exchange Program. The purpose of our Program is to foster global understanding through shared experiences and friendship with US host families and other Au Pairs. We are designated a J-1 Sponsor by the US Department of State and further information about J-1 Programs can be found at http://j1visa.state.gov/

I acknowledge that in order to provide services to me, AIFS needs to collect, use, share and otherwise "process" certain personal data which relates to me (including, but not limited to, my name, gender, contact details and country of residence, as well as photographs and/or videos that I provide) in accordance with its privacy policy. In particular, I acknowledge that AIFS may need to share some of my personal data with prospective host families and AIFS's associated companies in the United States of America, and its agents in my home country.

In consideration of the agreement of American Institute for Foreign Study Inc. (referred to hereinafter as 'AIFS'), to enrol me in one of its three cultural exchange programs-- Au Pair in America, Au Pair Extraordinaire or eduCare in America-- I hereby undertake and agree as follows:

**1. UNDERSTANDING OF THE PROGRAM**

a) I confirm that my command of English is sufficient to correctly understand all the provisions of this Agreement, the English language resource materials mentioned in this Agreement and to effectively communicate in the United States.

b)  I understand that failing to provide full and accurate responses to the questions whether asked in the Program application, or on the medical form, or during interview or on any ancillary documents, may result in the rejection of my application or termination from the Program. I hereby warrant that the information I provide in the completed application and during the application process is or will be complete and accurate. I also declare that all representations regarding qualifications gained and certificates and references provided, including photocopies, will be complete and genuine.

c) I understand that the Program may refuse to accept my application, or may reject/withdraw an application, at any stage with or without reason.

d) I certify that I have successfully completed my secondary school studies/training.

e) I declare that, if I have been convicted of a crime, I will include complete information about the conviction on my application or thereafter, as permitted by law. I understand that a prior conviction will not automatically exclude me from participation in the Program; that the Program will consider all circumstances surrounding the conviction, including the nature of the crime and my suitability for the Program.

f) I understand that if I am married, pregnant or have dependents, I may not be able to participate in the Program. I will have to discuss my circumstances with the Program, which will make a decision about my participation in accordance with all applicable laws and regulations.

g) I understand that my application and contents therein cannot be returned to me at any time.

h) I understand that, should I be convicted of a crime while in the United States, including driving under the influence of alcohol and/or drugs, I will no longer be able to participate in the Program. Under such circumstances, I understand that I must return home and will be responsible for the full cost of my flight and travel expenses home.

## 2. PROGRAM REGULATIONS

a) I understand that the US Department of State requires that all au pair sponsors ensure that all candidates are interviewed in person. I agree to meet with an official Program representative in my home country who will interview me in person even if we have already had a preliminary interview by Skype.

 b) As a participant in the Program, I will assist my host family with childcare services, for no more than 45 hours per week and no more than 10 hours per day, for a period not exceeding the 12 months granted under the terms of my visa. As a participant on the eduCare in America program, I will assist my family with childcare services, for no more than 30 hours per week and no more than 10 hours per day, for a period not exceeding the 12 months granted under the terms of my visa. However, if I successfully complete my first year of the Program and otherwise meet all legal requirements to remain in the US, I understand that I may apply to extend my participation as an au pair in the Program for a further mutually agreed period of 6, 9 or 12 months.

c) I will carry out my cultural exchange and other responsibilities, and will assist my Host Family with childcare, to the best of my ability and with due respect.  I also will take full advantage of the cultural opportunities available to me in the US. I will fulfil the educational requirements of the Program in accordance with the rules set out in the Program's brochure, website, agreements, written documents and online resources.

d) I agree that I will perform my duties as an au pair to the best of my ability and will hold harmless and indemnify AIFS, its staff, agents and all affiliated organisations from any damages, losses or claims resulting from my participation in the Program.

e) I understand that my participation in the Program precludes personal pets and that I cannot bring pets to Orientation or to my Host Family's home.

f)  I will only accept a placement with a host family whom I mutually select after an interview conducted in person, by telephone, or via internet based communications.

g)  I will complete all visa and screening requirements in accordance with United States laws and regulations as well as the instructions given to me by the Program and the US Department of State and I will be responsible for obtaining, and bringing to the United States with me, a valid passport, valid driving licence, international driving permit (or equivalent) and complying with all applicable vaccination and immunization requirements prior to departing for the United States.

h)  I will be present well in advance of the scheduled departure time for all flights and other transportation provided or arranged by AIFS. AIFS will not provide or be responsible for alternative transportation except in the case of illness or accident in accordance with its group insurance policy.

i) I understand that Program flights will depart from and return to designated airports. I agree to remain responsible for any costs prior to departure and upon my return. I must also make my own way to my designated US return airport at the end of the Program in time for my return flight and to pay any transportation costs from my Host Family location to the departure airport. AIFS is not responsible for airline baggage costs, airport taxes or airline fuel surcharges or any other costs or fees associated with my departure.

j) I will review and complete all pre-departure orientation materials and the online Pre-Departure Orientation program prior to departure. I will attend all sessions during Orientation after arrival in the United States.

k) I will abide by all applicable regulations and requirements of the United States and will comply with all applicable federal, state and local laws and regulations.

l) I understand that if I do not complete my original J1 au pair program successfully (successful completion of the program means completing the full duration of the program including any extension period, completing all the required educational components, adhering to the terms and conditions of the J1 visa, and exiting the USA within 30 days of completing the program), then I will not be able to participate on the Au Pair in America Return program, which allows previous participants the right to apply to become an au pair again if they have lived outside the USA for at least 2 years.

**3. INSURANCE**

Au Pair in America's insurance provider meets sponsor requirements (such as insurance solvency rating) as specified by the US Department of State. The Program holds money that you paid for insurance in a trust account to protect your interest.

**4. MEDICAL**

a) If not covered by the Program's insurance, I will arrange my own medical coverage for any pre-existing, ongoing medical condition.

b) I understand that if I wear braces and need follow up appointments whilst I am a participant in the Program, I will remain personally responsible for all related costs.

c) I understand that if I wear glasses or contact lenses, I will ensure that my eyes have been checked prior to my departure to the US and that I will remain personally responsible for all costs that relate to my eyesight and glasses or contact lenses.

d) I understand that should my physical or medical condition (including any pregnancy) prevent me from performing essential functions related to childcare, cultural exchange or educational requirements, or any other essential functions as an au pair, that I will no longer be eligible to participate in any of the Program.

### 5. CHILD PROTECTION

I fully understand that Au Pair in America is committed to child protection and the safeguarding of children and vulnerable adults.  I understand that AIFS will report any inappropriate behaviour toward children, or other specially protected individuals, to law enforcement and other appropriate authorities.  I agree to provide AIFS with references, criminal records checks, medical checks and other documents that may be required for participation in the Program. Au Pair in America believes that children should always be free from all abuse, neglect or maltreatment of any kind.  AIFS mandates that child protection and safety remain at the centre of all childcare assistance and au pair services, as well as all Program practices and procedures.

### 6. PROGRAM /CANCELLATION FEE

a)  I will ensure that I have reviewed and signed the Au Pair in America Fees Sheet given to me by my local representative, which advises me of all the costs that I may incur during the application process and my subsequent participation in the Program. This Sheet lists any local agency fees I may be expected to pay, any  third party costs, including for example medical check, criminal record check, US Embassy fee for the J1 visa, the Au Pair in America Program Fee, and additional expenses for when I am in the US. I understand that some or all of these fees may be subject to change and/or are non-refundable.

b)  I understand that I will receive an invoice requesting payment of my Au Pair in America Program Fee only when I have officially been placed with an Au Pair in America host family.  I understand that I will only be able to pay the Au Pair in America Program Fee via my secure, password-protected Au Pair in America Participant Site using the payment methods described.  I understand that neither Au Pair in America, nor any of its registered US host families, will ever ask me to wire or transfer money using a money transfer company, personal or cashier's check, or money orders.

c)  I understand that the Au Pair in America representative in my home country may charge me a local agency fee (which is separate from the Au Pair in America Program Fee) and that this local agency fee is governed by the local representative's terms and conditions.

d)  I understand that, in the event of late cancellation from the Program (after the visa application form has been issued) Au Pair in America and AIFS reserve the right to charge me a US$200 cancellation fee.

e)   As a participant in the Program, I understand that if I do not complete the full 12-month original term, then under certain circumstances (listed in the Au Pair Guidelines) I may be entitled to a pro-rata refund of the Program Fee.  This does not include insurance costs or any other supplementary or pro-rata payments for any ancillary services, including any fee paid to my recruiting agency. I accept that there is no program fee payable by me if I am approved for an extension of my stay under the Program. If I do qualify for the pro-rated refund, I will depart the United States promptly and file a refund claim to Au Pair in America's London office within 30 days of my departure or if already home, within 30 days of the refund offer. I will be responsible for the full cost of my air fare to my home country, unless otherwise agreed by Au Pair in America at their discretion.

**7. IN THE USA**

a) I understand that my host family will pay a weekly stipend to me each week, as well as during my two-week vacation; my host family also will provide me with a private room and three meals daily.  I understand that I am entitled to one full weekend off per month (comprising Friday evening to Monday morning) and that I will not seek to provide or be required to provide childcare assistance for more than 10 hours in any day or more than 45 hours in any week in the Au Pair in America and Au Pair Extraordinaire programs, or for more than 10 hours in any day or more than 30 hours in any week in the eduCare program.  I understand that my free time will be scheduled by mutual agreement with my Host Family.

b) I will co-operate fully with those ensuring that the Program complies with all State Department requirements and I agree to abide by any reasonable instructions they may give me.

c) I will maintain at least monthly contact with my Community Counsellor.

d) I understand that should a problem arise with my Host Family, depending on the circumstances, Au Pair in America may be able to re-match me with another family, but does not guarantee an alternate placement.

e) I understand that my visa status, State Department regulations, and my participation in the Program preclude any form of paid employment in the US during my stay.

f) I agree to comply with all applicable US and local laws concerning taxation.

g) While living with my Host Family, I will be responsible for all personal debts, such as telephone calls. In the event of an automobile accident, I may be liable for up to, but no more than, US$500 of the insurance deductible.

h) I agree that AIFS may take such actions as it considers necessary regarding my health and safety during my time in the Program, including securing medical treatment for me and transporting me to my home country. I release AIFS from any liability relating to the medical care received, related medical transportation, and agree to pay for any medical or transportation expenses that are not covered by insurance.

i) I understand that due to visa regulations, once in the USA, I cannot change between the Au Pair in America/Au Pair Extraordinaire programs and the eduCare program.

j) I understand that if, for any reason, I do not complete the required cultural exchange and educational hours, I will not be eligible to extend beyond my first year in the Program and that Au Pair in America will not issue me a Completion Certificate.

k) At the end of my stay I will depart the United States and return to my home country on or before the expiry of my 'duration of stay' as determined by US government agencies and will not attempt to return subsequently to the United States without a valid and current US visa if applicable to my home country.

**8. LEGAL**

a) I have read and understand the Au Pair in America information provided in the online resources, including AIFS's privacy policy, cookie policy, website terms of use and agree that their terms are incorporated in and made a part of this Agreement.

b) This Agreement shall be governed by the laws of the State of Connecticut. I agree that any dispute with or claim against AIFS, its staff, agents and all affiliated organizations, including those arising under this Agreement or my participation in the Program, which is not settled informally, will be exclusively resolved by binding arbitration, to be conducted in substantial accordance with the commercial arbitration rules of the American Arbitration Association. The location of the arbitration and identity of the arbitrator will be decided by mutual agreement, with the costs to be borne exclusively by the Program and the decision of the arbitrator shall be final. By accepting the terms of this Agreement, I agree that the U.S. Federal Arbitration Act governs the interpretation and enforcement of this Agreement and that I, Au Pair in America, and AIFS are each waiving the right to judicial and/or administrative agency resolution of disputes, any right to trial by jury, as well as the right to bring and resolve claims, either in an individual capacity or as a member of any class action, by any means and in any forum other than arbitration conducted by the American Arbitration Association.

c) I agree to abide by the above conditions should I legally extend my stay in the Au Pair in America, Au Pair Extraordinaire or eduCare in America program beyond the initial 12-month term.

I confirm that I have read the above terms and conditions of this Agreement, that it is accurate and complete in all respects, and that I agree to abide by their declarations and clauses by selecting 'I Agree'.

1

MATTHEW C. HELLAND (SBN 250451)
*helland@nka.com*
NICHOLS KASTER, LLP
235 Montgomery Street, Suite 810
San Francisco, CA 94104
Telephone: (415) 277-7235
Facsimile: (415) 277-7238

2

3

4

PETER RUKIN (SBN 178336)
*prukin@rukinhyland.com*
RUKIN HYLAND & RIGGIN LLP
1939 Harrison Street, Suite 290
Oakland, CA 94612
Telephone: (415) 421-1800
Facsimile: (415) 421-1700

5

6

7

8

9

10

Attorneys for Plaintiff,
Isabella Savini Merante

11

ELECTRONICALLY
**F I L E D**
*Superior Court of California,*
*County of San Francisco*

**03/15/2021**
**Clerk of the Court**
BY: RONNIE OTERO
Deputy Clerk

**CGC-21-590398**

12                    **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

13                              **COUNTY OF SAN FRANCISCO**

14

15

16

17

18

19

20

21

22

| | |
|---|---|
| ISABELLA SAVINI MERANTE, individually and on behalf of all others similarly situated, | **CASE NO.:** |
| Plaintiffs, | **(UNLIMITED CIVIL CASE)** |
| v. | **EXHIBIT TO COMPLAINT FOR CIVIL PENALTIES PURSUANT TO THE PRIVATE ATTORNEYS GENERAL ACT (LABOR CODE §2698, *et seq.*)** |
| AMERICAN INSTITUTE FOR FOREIGN STUDY, INC, a Connecticut Company, | **DEMAND FOR JURY TRIAL** |
| Defendant. | |

23

24

25

26

27

28

Exhibit to Complaint for Penalties

# EXHIBIT B



# 2019  Host Family Guidelines Handbook

## Table of contents

**Introduction**
Introduction and important contacts | 2
Your Obligations as a Host Family | 2

**Child Care Expectations**
Your Expectations | 3
Child care responsibilities | 3
  Your child's upbringing | 3
  Changing needs | 3

**Living with a Young Adult**
Living with a young adult | 4
Realistic expectations | 4

**Communication and Cultural Differences**
Communication and cultural differences | 5
  American communication styles | 5
  The art of cross-cultural communication | 6
Fundamental qualities for a successful relationship | 6
  Mutual respect | 6
  Cooperation | 7
  Flexibility | 7

**Your Au pair's Arrival**
Your au pair's arrival | 8
  Learning about your au pair | 8
  Orientation | 8
  The first few hours | 9
  The training period | 9
  Coping with arrival fatigue | 12
  Your au pair culture shock | 12
  Overcoming culture shock | 13
  Host family's culture shock | 13

**Program Regulations and Legal Requirements**
Program regulations | 14
  On-duty schedule | 14
  Weekly Stipend | 14
  Social Security cards | 15
  I-9 Forms | 15
  Your au pair's vacation | 15
  Educational component | 15

**The Relationship with Your Community Counselor**
A three-way relationship: | 17
*Your Community Counselor's Involvement*
Effective methods for problem solving | 18
  Communication is the key to success | 18

**Troubleshooting Possible Problem Areas**
Possible trouble areas | 19
  Duties and hours | 19
  Driving | 20
  Changing circumstances | 20
  Family vacations/business trips | 20
  Au pair's traveling outside the U.S. | 20
  Illness | 21
  Personal liability insurance | 21
  Medical emergencies | 21
  Phone, computer and e-mail use | 21
  Personal debts | 22
  Car use, insurance and accidents | 22
When your match cannot continue | 23
Private discussions | 24
Sexual Harassment Policy | 24
Incompatibility | 24

**You're Au Pair's Departure**
Returning home | 25
  Your au pair's returning flight arrangements | 25
  Visa extensions | 25
  Important contacts | 26

**Addendum**
A—Exchange Visitor Program Regulations | 27
B—Visa information | 30

**Resources and useful links** | 32

---

### How to Search this Handbook

For easier browsing or to jump to different sections of the document, use the commands below:

**On a PC** – Control + F key
**On a Mac** – Command + F key

# Introduction

## Introduction and Important Contacts

This handbook will help you prepare for the arrival of your au pair, the training and support you will need to give your au pair and serve as a resource throughout the year long exchange.

Your family and your au pair have become a part of a cluster or group of others within your community who are enrolled with one of our programs. The cluster acts as a support system.

Your Community Counselor is our program's field representative and is there to provide information and guidance to all members of the cluster. Your Community Counselor interviewed you and through orientation will help prepare you for the arrival of your au pair.

Your Community Counselor will work with you to coordinate travel arrangements for your au pair to get to your home. He/she will maintain regular contact, help organize social activities for the au pairs in the cluster, assist your au pair with the educational component of the program and act as facilitator if conflicts arise between you and your au pair.

**Note:** For purposes of clarity, we will use the pronoun "him" to describe your child(ren), and the pronoun "her" to describe your au pair.

## Your Obligations as a Host Family

As a host family with Au Pair in America you have agreed to comply with the following program rules and regulations. Throughout this document we will explain each of these in detail and offer guidance that we hope will help get you off to the best possible start with your new au pair. You have agreed to do the following:

- limit child care responsibilities to 45 hours a week if participating in the au pair/Extraordinaire program or 30 hours per week for the Educare program
- Scheduled on duty hours will not exceed 10 hours per day or extend more than five and a half days per week
- The au pair must have one full weekend off each month
- At least one parent will be home during the first 3 days after the au pair has arrived in your home
- If the host family will be away overnight, the parent must arrange for an alternate responsible parent to be in the house if coverage time exceeds the 10 hour a day limit for the au pair.
- Never leave an au pair in sole charge of an infant under 3 months of age
- Provide automobile insurance coverage as required

if the au pair is to be driving

- Pay the au pair the current stipend weekly
- Provide the opportunity for the au pair to attend monthly cluster meetings
- Maintain monthly contact with the community counselor
- Facilitate the opportunity for your au pair to register and take the required educational classes
- Treat the au pair like a member of your family
- Participate in an annual host family day event facilitated by the community counselor
- Sign an agreement with the au pair upon matching that outlines days and hours of child care to be provided

# Child Care Expectations

## Your Expectations

The first crucial step to a successful and mutually satisfying year with your au pair is for you, the host parent, to determine what you expect from your au pair.

There are two specific areas of responsibilities your care provider will have—child care duties and the upbringing of your child(ren).

## Child Care Responsibilities

The child care responsibilities you assign might include, depending on the child's age, feeding, bathing and dressing your child, planning your child's daily activities and playing with your child, supervising and babysitting and transporting your child to school, the local pool or park. You will have to think about what kinds of activities you would like your child to do when you are away and convey that to your au pair.

Child care will be your au pair's primary responsibility. Additionally she will be able to help you with chores that relate to your children. The extent to which she can help you with child-related chores will depend on how active your child is and how much of her attention he requires. If she spends most of her day playing with your child and making sure he is happy and safe, she may not have much time to devote to chores. She may not have as much practice as you have watching your child and getting child-related chores done at the same time, and she may be worried your child will get into trouble while she is folding his laundry! Your child's safety and happiness will always come before a neat house. Your au pair can help you by tidying the kitchen after she feeds the children, making the children's beds, doing the children's laundry and tidying up after the children.

Housework or chores such as vacuuming, mopping, dusting, pet care and total responsibility for cleaning your house is not part of your au pair's responsibilities.

*Refer to Program regulations for specifics on appropriate responsibilities for your au pair.*

### The child care questionnaire

Your au pair will receive a questionnaire at Orientation and will be encouraged to complete it with you. The questions are intended to serve as discussion points to help facilitate your training during the first few days after her arrival. Consider how you will respond by reviewing a copy of the questionnaire included in this packet.

### Your Child's Upbringing

Your au pair will also play an important part in your child's upbringing. It's important that she follow your philosophy on child rearing, your rules about manners and your methods for disciplining. You will have to think carefully about your ideas on these subjects so that you will be able to clearly explain them. How do these philosophies translate into action? Special note regarding disciplining actions: As you explain your approach to child discipline please keep in mind that au pairs are instructed during their orientation program that hitting or smacking a child is unacceptable.

### Changing Needs

Your child care needs may change over the course of the year. Is another child on the way? Will you be going on vacation? Will your child be in school for part or all of the day? What activities will your child be involved in during the summer and how will your au pair's involvement differ during the school year? When will your au pair be taking classes and what transportation arrangements will you be making? Flexibility will be important as you plan schedules over the course of the year.

# Living with a Young Adult

## Living with a young adult

It's important to remember that your au pair is an adult, but she is a young adult. Her behavior will be appropriate for her age group. When she first arrives everything about your home and community, even your language and the manner in which you do things will be unfamiliar and strange to her. She will require guidance, support and friendship.

## Realistic expectations

The most important thing to remember is not to expect any more from your au pair than you would of yourself. Ann Muscare and Wendy Wardell Morrone describe parents' expectations in their book entitled, Child Care That Works—How Families Can Share Their Lives with Child Care and Thrive:

> "It may comfort you to know that most parents have trouble striking the right tone. In general, parents begin by expecting caregivers to be more consistent than humanly possible. You want a caregiver who will never scream about spilled food or cry after a day with a whiny child or commit any of the other parenting sins that you have been known to commit yourself upon occasion. On the other hand, you may want a care giver to do all the good things that you do—make a fuss about a pretty dress, hug and kiss lavishly, ooh and aah when spoon succeeds in finding mouth…If you have a single care giver, she'll be tired by evening, just as you would be."[1]

Another important thing to remember is that, even though your au pair will be living with you, she will not be available every minute. Don't throw away your list of babysitters! You may still need to call on them.

It is important that you let your au pair know when she will be on-duty and when she will be off duty and have time to herself. Just as you need a break, so too will your au pair. These breaks will be important from the very start when her struggle with a new culture and a new language will be tiring her out just as much as taking care of your child!

Establish an on-duty schedule for your au pair that considers her ability to effectively care for your children and keep them safe and happy. Her on-duty schedule must not exceed 10 hours per day, 45 hours per week for standard and Extraordinaire participants; 10 hours per day, 30 hours per week for EduCare au pairs.

### Sharing your living space

Your au pair will be living in your home and sharing living space with you. Consider what areas of the home she may have full access to and areas that she may not. Tell your au pair if there are room(s) you consider your private space and in turn respect the privacy that your au pair would expect in her room.

Physical contact between the host family and au pair is strongly discouraged; while a brief hug and handshake may not be inappropriate depending on the circumstances; such conduct may make your au pair uncomfortable and should be avoided for that reason. The host father in particular should avoid any physical contact with the au pair and must scrupulously adhere to the Sexual Harassment policy set forth in this document.

<<<Back

# Communication and Cultural Differences

## Communication and cultural differences

The basis for developing a trusting relationship is communication. You may think, "It cannot be that difficult to explain how to take care of my child." In part, you are right. We communicate with each other every day. We tell each other what we think, how we feel, what to do, and in general, we are usually successful in getting the point across.

People from other parts of the world may not have the same basic assumptions about the world that we, as Americans, share. Once this common ground is taken away, communication becomes much more of a challenge. Words cannot simply be translated from one language to another without some of the meaning being lost because of cultural differences:

> "If we view languages only as communication tools, sets of words that can be exchanged for other sets and yield the same meaning, we court the role of 'fluent fools' as we translate words without their original cultural context. Language serves as a tool for communication, but in addition it is a system of representation for perception and thinking."

Most of us are familiar with obvious cultural differences. Americans do not take their shoes off when they enter a room, but some cultures do. Americans greet each other with a handshake, but the French kiss each other on the cheek. Most cultural patterns are so deeply ingrained in us that we never consider that there may be alternatives to the way we "naturally" act, feel and think.[3]

### American communication styles

The first step to being able to communicate with someone from another country is to recognize how our ways of communicating as Americans are unique. You may not think that the way we speak with each other is strange, but many of the au pairs do! Think about these comments from an au pair from the Netherlands.

> "Tell more about American habits: cooking, washing. And!! The way they speak with each other—even strangers. I needed one and a half weeks to know how to speak with people. Even to strangers, people here tell their deepest secrets! Also the way they meet each other I have never seen before."

She has intuitively hit on many of the things that Americans do that are not part of some other cultures.

### Informal & intimate

Initially, your au pair may be surprised at how casually you speak to people, no matter what your social relationship. Americans are brought up to believe that all people are equal, so we tend to ignore social differences when we speak. We encourage others to call us by our first names from the moment we meet them. (What will your au pair call you?) Even more surprising is our tendency to talk about personal experiences and feelings with people whom we have just met.

### Direct

Americans tend to be more direct than people from other countries. Think about when you call someone for a specific purpose. You quickly say hello and then get right to the point. Many au pairs find these traits disconcerting. First, most foreign languages are more formal than English. For example, most languages use two forms of the pronoun "you"—one to be used when talking to family and friends and the other to be used when talking to someone who is older or who has a higher social position. Europeans and others rely on the small talk that precedes the main point of a conversation to determine their relationship to the person with whom they are speaking. When this small talk is shortened to a few sentences and a "you" for your friend suddenly sounds no different than a "you" for your boss, your au pair may become very confused about where she fits in and how she should act. Secondly, the American habit of getting right to the point may also lead your au pair to mistakenly believe that you are being abrupt or harsh. Try to keep this in mind when speaking with your au pair and bring this habit to her attention.

### Judgmental

Some au pairs may mistakenly believe that their host families are being overly critical of them. Often, this surprises the host parents. They cannot imagine what they said that led to this belief. Americans do not realize that our language, by nature, calls for judgment. Most other languages do not. For example, Americans would ask, "How good is the food here?" The same question in many other languages would translate to "How is the food here?" An international visitor does not need to make any judgment about the food. Their question is completely objective. Americans, on the other hand, must make some kind of assumption about the quality of the food to ask the question.

Our language not only predisposes us to evaluate things, it predisposes us to evaluate things negatively. Americans tend to focus on what should not be done, rather than on what should be done. This habit stems from our belief that creativity is good, and conformity is bad. We are encouraged to decide for ourselves how we will act and what we will do. The creative process of making a decision is almost as valuable as the decision itself. Your au pair may feel that you are criticizing everything that she does simply because you're concentrating on what she shouldn't do instead of suggesting what she should! Be as positive as you can with your au pair.

### Questions and answers

Americans believe that the responsibility of communicating rests equally on the speaker and the listener. If we do not understand something that is said, we ask a question. If we disagree, we will share our point of view. This back and forth banter is typical of American conversation. Consequently, you may assume that your au pair has understood all that you have said because she has not asked you any questions. However, in some countries where social lines are more clearly defined, the act of posing a question is interpreted as a challenge to authority and is considered rude. A good example of this trait is the way classes are conducted in foreign universities. Students listen to the professor, but never speak. Encourage your au pair to ask questions. She will feel more comfortable if she knows that you will not think that she is being rude if she does.

### Non-verbal cues

Body language also plays an important role in cross-cultural communication. We pay a significant amount of attention to the way people act when they talk. Our tone of voice, gestures, facial expressions, the distance we stand from one another and the way we touch each other carry even more meaning than what we actually say. Think about how you encourage certain types of body language from your children. How often have you encouraged your child to look at you when he is speaking? Have you ever told your child that you do not like his tone of voice? Remember that, just as our styles of speaking are different from others around the globe, so too are the non-verbal clues that we use.

So far we have focused on how your au pair may interpret (or misinterpret!) what you say and how you act. Don't forget that you may be tempted to do the same thing. You may think that your au pair meant something that she never intended, simply because you translated her words or actions using your American point of view!

One of the biggest reasons that we, as Americans, are likely to misinterpret international visitors is because we rely so much on the inflection in our voices to determine the nature of a conversation. For example, when you ask someone how she is, and she replies "wonderful" with a rise in her voice, you are likely to think that she really does feel fine. On the other hand, if she says "wonderful" with no change in her voice, you will probably believe that she does not feel well or that she is being sarcastic.

This fact is important to recognize because people who are not Native American English speakers often do not change the inflection in their voices in the same way that we do. (Notice that we have made a distinction between American English and British English!) Typically, international visitors use the same inflection when they speak in English as they do when they speak in their own language.

### The art of cross-cultural communication

When your au pair says or does something that is confusing to you, try to understand the assumptions that she made that led to her behavior and how those assumptions differ from your own. First, you should try to isolate the action or the words that confused you without making any judgments. What was actually said or done? Then explain to your au pair how the event or words translate into American culture. How did you interpret the action? How did you and the members of your family react to what she said, and more importantly, why? You will probably find that her interpretation of the event is much different from your own.[3]

It's important to realize that communicating with your au pair may require more thought than would be needed if you were communicating with another American. You may find yourself in a hectic situation where it is easy to fall back on typically American ways of communicating, rather than "searching for messages" that your au pair will *understand*. She may be tempted to do the same thing. Take a moment now to think about how you could explain something to your au pair in words and actions that have the least chance of being misconstrued.

> *"She fit in very well. She explained her customs relative to ours and tried to learn and fit in with her surroundings. She was not afraid to discuss any questions or problems as they arose." – Host parent from Pennsylvania*

To fully understand one another; to keep fully apprised of your au pairs ability to effectively care for your children it is important to keep the line of communication between you and your au pair open. If daily schedules are very busy—plan specific times to talk.

## Fundamental qualities for a successful relationship

### Mutual respect

"Au pair" means "on par" or equal. Care for her as a full-fledged family member and treat her the way you and your family would like to be treated yourselves. Try to be sensitive to her feelings. Your au pair should treat you in the same way. A solid relationship is one that is built on mutual respect.

Treat your au pair with respect and your child will follow your example. If your child respects your au pair he will pay attention to her.

Many child development experts agree that treating your caregiver with respect is important for the development of your child's self esteem:

> *"If you give the message that your child care giver is inferior to you, it leaves the child wondering where he is in the pecking order. A child who needs love, time, concern and the certainty that his parents care for him may end up believing that because you are leaving him with an inferior person, that he too must be inferior."[4]*

<<<Back

Mutual respect is a vital part of the relationship for you, your au pair, and perhaps most importantly, your child!

### Cooperation

You and your au pair will share the responsibility of teaching your child many things over the course of the year. For example, your child may be ready to learn how to tie his shoes. Cooperation is important because it will allow the two of you to be consistent in the way you explain things to your child. Your child is likely to become frustrated and confused if you show him how to tie his shoes one way, and your au pair shows him another. It may become difficult for him to learn simply because you are not using the same words. If your child is an adolescent, your au pair may need your assistance on how to relate to him as a young adult and not treat him as a young child.

It's also important that you both expect the same kind of behavior from him and that you are consistent with how and when you discipline him. Sometimes, parents who feel badly about leaving their child with another person during the day are tempted to try to make up for it by letting rules slide when they are home. The time that they spend with their child is so short that they want it to be a good time—free from discipline. However, your child may learn to play you and your au pair off each other under these circumstances instead of learning how you would like him to behave all of the time. This, too, will make it difficult for your au pair to take care of your child.

It's your responsibility to determine what and how things should be taught and to communicate this to your au pair. It will be your au pair's responsibility to follow your lead, even if she does not share your ideas. Your continuing support is essential, even when you are tired!

### Flexibility

Building a good relationship will require parents and au pair to "give and take" on a daily basis. It will be important to listen to the needs of your au pair, to state your own needs clearly and to compromise in areas in which you can both feel comfortable. Some host families have described the au pair/host family relationship as marriage without dating. "Happily ever after" comes with hard work and flexibility.

Host parents and an au pair who take the time to communicate, listen and compromise to reach one another's expectations can build the foundation for a mutually respectful relationship. With that foundation in place you can effectively work together to ensure a safe and happy environment for your children.

## Your Au pair's Arrival

It's important that you and your family talk about your au pair's arrival before she comes to your home. When she arrives, your daily routine will be temporarily disrupted. Discussing this beforehand and expecting some resentment and irritability from your children will help everyone adjust. Think about what parts of your daily routine may be affected by having a young adult in your home. How will the issues of privacy, semi-nudity, and displays of affection be handled? How about, internet/phone usage, TV time and food supplies?

Take a moment to predict how your child may react to your au pair. How can you help him to adjust? What advice can you give that will help her befriend your child if he is not immediately receptive to her?  The transition will be easier if you can minimize the introduction of other new things at the same time.

### Learning about your au pair

Before your au pair arrives, communicate as much as possible. Describe your family, send her information about your community and extend a warm welcome. This will help allay her fears and those of her family. This should also be an opportunity to let her know more about all of you, your needs and expectations. Learn as much as you can about your au pair and her country. You can learn more about the country from which your au pair comes by accessing the Au Pair in America Host Family web site, **www.aupairinamerica.com**.

### Orientation

When your au pair first arrives in the U.S. she will attend an orientation program. We recommend that on the second day of her arrival that you send a message to welcome her.

The days at orientation prepare your au pair for entry into your family. There is a two-fold purpose for the orientation program. Your au pair needs information on a basic level regarding rules and regulations such as visas, hours, responsibilities and insurance. Through presentations by an experienced and highly skilled orientation team we cover cross-cultural issues, child development, child care safety and emergency procedures, program guidelines and host family expectations.

The program includes an eight-hour child care safety seminar taught in part by the American Red Cross as well as an in-depth child care and child development module which helps your au pair focus on your child's age-appropriate behaviors, activities and needs. Your au pair will arrive in your home with a child care survey that should be completed jointly with you within the first few days of her arrival. This Child Care Questionnaire will lend focus to your conversations with your au pair about your expectations regarding the care of your child(ren).

Au Pair in America partners with AAA, the nation's most trusted name in road safety, to offer an optional custom instructor led class specifically designed for au pairs. Host families can register their au pair and she will arrive at orientation a day early, and attend the AAA class before the main orientation begins.  For more information contact orientation@aifs.com

At Orientation your au pair will receive a training booklet. We suggest you ask her if you can review it so you will be more familiar with the information covered during her orientation.

One of the training modules focuses on "The Three No's," which are three very important guidelines that all au pairs must be observant of:

- Au pairs may not use drugs. We explain that possession of an illegal substance in the U.S. is a felony and that use of drugs will result in termination from the program.

- Au pairs may not abuse alcohol. We explain that the drinking age in the U.S. is 21 and discuss the dangers of drinking and driving or drinking alcohol while caring for your children—two actions that are prohibited.

- Au pairs may not abuse children.

  - We stress the importance of using words that will support a child's positive personal image and explain that verbal abuse or using words to hurt a child is not acceptable.

  - We explain that American families generally support a non-physical policy of discipline. Au Pair in America prohibits an au pair from hitting a child, even with permission from the host family. We also discuss the physical damage that could result from shaking a baby and discuss ways to get help if feeling stressed.

  - Finally, we stress no sexual abuse and discuss how Americans define sexual abuse, as this is different from country to country. In particular, we explain that taking pictures of naked children is considered pornography in the U.S.

Orientation is also a time to begin the developmental process of adaptation; self-awareness and integration that your au pair will need to successfully complete her year. While we cannot forecast what the experience will be for each au pair, we try to reduce potential problems by giving the au pairs information and problem-solving skills. We encourage au pairs to view themselves as part of a team with the host family in finding creative solutions for situations that may arise during the year.

Our goal is that your au pair arrives in your home feeling confident about her ability to adapt to the culture,

**<<<Back**

understand and meet your expectations and successfully complete this very important year in her life.

The Orientation program provided by Au Pair in America is only the beginning of the training your au pair will need to be successful. Training with you begins the day she arrives in your home and continues through the year as needs and expectations change.

### The first few hours

When your au pair arrives you will probably ask her if she would like something to eat or drink. You may engage in more polite conversation. Then you might show her to her room. The bed will be neatly made, and there will be clean towels in the bathroom. In short, you will treat her as you treat any guest.

But your au pair is not truly a guest, is she? At some point you will tire of playing the accommodating host. She will soon tire of playing the ever-polite guest.

You will have to break out of this pattern for very practical reasons. Your au pair will need to feel comfortable in her new surroundings before she can really hear and understand the important information you need to impart to her about the care of children, living in your home, and getting around the community. Au pair's needs differ and some suggestions to help her adjust are:

- Allow for rest
- Consider shopping for food items the au pair is accustomed to
- Plan a trip to the pharmacy for toiletries or other personal effects
- Contact with family back home may be important
- In the first few days especially, monitor the amount of instructions you give by your au pair's ability to absorb and understand the information

### The training period

You should consider the first month of your au pair's stay as a training period. From the beginning you should make your wishes clear and reiterate the things that you agreed upon during your telephone interview. Ruth S. Elliott, author of Minding the Kids recommends that you "amplify, explain, clarify, and take nothing for granted." If you see something that you do not like, discuss it immediately so that it can be changed.

The stress and anxiety of leaving one's home for a year to live in a strange culture can be overwhelming just as the stress and anxiety of accepting and adjusting to a young international visitor in your home can be overwhelming.

Host parents must be mindful of the minimum requirements for the following:

- That at least one parent or other responsible adult will remain with your au pair during her first three days in your home.
- If you have a newborn, you or another responsible adult must supervise your au pair until your baby reaches three months of age. She must not be left in charge of an infant under 3 months of age at any time.

These regulations are set as minimal standards and do not serve as a guarantee that your au pair can care for your children with confidence after that period of time. As a parent only you can assess the training required to feel confident that your au pair can appropriately care for your children.

The first few weeks in your home should be viewed as an opportunity for your au pair to begin to feel comfortable in her new environment and for you and your au pair to gain clear understandings of your expectations for the care of your children. It is also a time for you to gain insight into your au pair's expectations and for both of you to gain mutual respect and understanding of one another. Our experience shows that host families who invest time and energy in developing a relationship with their au pair during the first few weeks are more likely to have a successful long-term relationship.

Do not be concerned about giving lots of advice and direction to your au pair. The more you can tell her about your child and your home, the better she will be able to adjust. She will be anxious about her new surroundings in a new country and may need more assistance than you would normally have to give to someone caring for your child.

### *Organize the training you provide in your home and community*

We suggest you organize information about your child, home, and community into categories. Discuss each at separate times. Writing down simple instructions that your au pair can refer back to throughout the year may be useful. Be sure she can comprehend what you have written. Encourage your au pair to ask questions and listen when she offers her impressions. Expect to repeat instructions several times.

Categories of some basic information include, but are not limited to:

### *Your children... expectations for their care and safety*

- Age and stage of development of each child;

reference any key social, emotional, or physical attributes that may be important for the au pair to know to better understand each child.

- Handling of sibling rivalry and temper tantrums.

- Activities that each child enjoys; note any activities child may not engage in or may engage in under certain conditions.

- Favorite items (e.g. blanket, pacifier, stuffed toy) which may soothe an upset child or be a matter of habit for naptime.

- Daily routine and schedule – meals, play, homework, household chores

- Meals and snacks—what is and is not permitted

- Hygiene –toileting, bathing, disposal of diapers (there will be cultural differences)

- TV, online access and computer games – what is acceptable and what is not

- Visiting friends – both in and outside the home

- Maintenance of the child's room and clothes.

- Appropriate use of all baby and child equipment and safety devices

- Family rules of discipline and tips on how to effectively discipline the children [Note: au pairs are not to slap, hit or spank a child even if it is considered an acceptable form of discipline by you.]

- Illness – how to provide care; when to notify you and/or family doctor; administering medication; location and use of first aid supplies.

- Completion of an emergency medical authorization document (sample included in your confirmation packet and on the host family website under Health Info) for your child to leave with the au pair in the event of an emergency and the au pair is unable to contact you.

- Emergency procedures and medical care may be different in her country. Au pairs are told about the availability of 911 – review and/or convey what is appropriate in your community.

During this training period be sure to discuss appropriate methods of taking disciplinary action with your children. Whether you use a 'time out' approach or other method to resolve conflict, be clear about what action you expect your au pair to take and what actions would be unacceptable. Disciplinary actions vary from culture to culture and you cannot assume your au pair will be familiar with methods commonly used in the U.S.

Refer to the "Orientation" section of this document for information on what is discussed with your au pair during her orientation program.

***Review basic safety issues specific to community and home as it relates to the children***

- Access and use of pool

- Crossing street/playing in neighborhood—do's and don'ts

- Rules for use of bikes, skateboards, scooters, etc.

- Guidelines for computer and Internet use for children

- Emphasize where never to leave child unattended

- What to do in an emergency – post in prominent place emergency contact numbers including parent work numbers, doctors clearly indicating when and under what circumstances they are to be used.

A suggestion: Create a "directory" of important information. Include:
- your name

- your home address and home telephone number

- work address and cell and work telephone numbers

- the name of a nearby friend or relative who can help in an emergency

- police, fire, ambulance and poison control phone numbers

- the name and phone number of your child's pediatrician and dentist

- the name and phone number of the local taxi service

- auto insurance information

- the name and number of your auto mechanic

- names of service people who may come to your home (lawn care, pet care)

- your child's insurance company and policy number

- your child's birth date

- your child's allergies/special medications

An efficient way to do this is to type save it in your computer for future editing, print it and keep it on the fridge or a notice board in the kitchen. Your au pair will be able to take it down easily. This same information on a wallet size card may also be useful. Important phone numbers should be stored in your au pair's cell phone for quick easy access.

Give your au pair's name to the person in your office who answers the phone and make it clear that your au pair must be put through when she calls. Discuss with your au pair situations you feel would merit a phone call to you.

***Home and household rules***

Orient your au pair to physical space both in and outside home including:

- Door locks and alarm systems
- Escape routes in case of fire
- Dangerous areas/areas that are "off-limits" to your child or your au pair
- Fire alarms/smoke detectors/fire extinguishers (tell her how it sounds when the battery is dying and when smoke is actually detected.)
- Fuse box/circuit breakers
- Linen (towels/bedding for the children and for her)
- Flashlight
- Water/gas meters, thermostats, furnace
- Demonstrate appropriate care of all baby equipment and home safety devices

Appliances and gadgets (Many international visitors experience with these will be different)

- Microwave
- Clothes dryer
- Washing machine
- Garbage disposal
- Trash compactor
- Recycling procedures
- Phone
- Shower/bath
- Security System

Before your au pair uses any appliance make sure that you have instructed her on its use! It might be helpful if you write out detailed instructions and tape them to the appliance or security system.

Household rules the au pair will need to adapt to, including, but not limited to:

- Acceptable hours for coming and going; visitors including overnight visitations; phone calls; car usage
- Limits on noise levels in home
- Limits on use of TV/Computer/internet usage
- Family modesty practices
- Subjects au pair may not talk about with children
- Table manners children are expected to abide by
- Expectations of au pairs participation in family functions and holidays

### Privacy issues and sharing information on the internet

As the Internet becomes increasingly accessible on a global level, most of our au pairs subscribe to social networking websites such as Facebook and Twitter as well as others.  It is very common for au pairs to communicate with friends and family using email, text, Skype and blogs. During the course of their year and even before their departure to the United States au pairs may post information and photos about their host family online.

Prior to the au pair's arrival privacy issues are addressed during the interview in her home country and they are also referenced in the au pair handbook Guidelines for a Successful Year.  Every au pair receives a copy of this handbook after she has matched with her host family. At the orientation in Stamford au pairs are warned of the dangers of putting sensitive information on the Internet, especially anything pertaining to children including photographs of children.

Stamford staff and community counselors are educated about our privacy policy and aware of how upsetting it can be when host families or au pairs find that information has been shared without permission.  We strongly advise that you take some time to have a specific conversation with your au pair about this issue. Make sure you both understand what has been discussed and what is permissible.  We hope this will avoid any situations that may leave a host family or au pair feeling vulnerable and/or at risk.

### Community

Plan time to familiarize au pair with neighborhood and community resources, including but not limited to:

- Children's friend's parents and location of their homes
- Shopping center and pharmacy
- Walk-in medical clinic
- Public Library
- Children's schools / community center / playgrounds
- Post secondary institutions where au pair may attend classes
- Community Counselor's home
- Cultural places of interest
- Locations of particular interest to the au pair, i.e. places of worship/coffee shops
- Caution au pair about areas that may not be safe for her or your children.

During your familiarization assist your au pair with opening a bank account, attaining a Social Security card, library card, state driver's license and registering for classes at a post-secondary institution.

You should plan time during this "training period" when you, your au pair and your child can be together. This will give you the opportunity to teach your au pair how you would like things done and an opportunity for your au pair to observe and learn from you. It will also help your child to feel comfortable with your au pair, and give you the opportunity to see how the two of them interact.

It's important to praise your au pair whenever possible during this time and throughout the exchange. Your au pair will be glad that she is appreciated. It will help to establish a basis for communication at the beginning and also help to nurture the relationship during the exchange.

Schedule a regular time weekly when you can sit quietly together to discuss scheduling and other related issues. Explain that you would like to be aware of your child's accomplishments and how he is behaving. This will help to assure you that everything is going well. More importantly, it will be easier to talk about problems if discussions are a normal part of your routine.

### Coping with arrival fatigue

When your au pair arrives she may be suffering from arrival fatigue. Nancy King and Ken Huff define arrival fatigue in their book, *The Host Family Survival Kit*, as the combination of jet lag and the anxiety of feeling like a stranger in an unfamiliar place. Arrival fatigue may also result from language overload.

They recommend the following suggestions to help your au pair overcome arrival fatigue:

- Create a welcoming atmosphere for your au pair. A Welcome sign in her room or flowers can help her feel embraced by your family.  Encourage her to put pictures of her family and friends out and to make the room her own. (If she has sent pictures of her family to you, it would be nice if you framed them and put them in her room!)

- Encourage her to contact her family to assure them that all is well.

- Give her an easy schedule for the first several days. Be confident she can take charge of your children.

- Try not to overwhelm her with too much information. Ask about stomach upsets, especially diarrhea and constipation, and have medication available.

- Make a decision about what she will call you.

- Speaking and hearing English if she is not a native English speaker will add to her fatigue. Many times, international visitors become disappointed with their language skills when they make errors or cannot understand as well as they had anticipated. Try not to be critical of errors and resist the urge to complete your au pair's sentences. When giving directions repeat them using different words until she comprehends them. Speak simply, but not simple-mindedly. Do not raise your voice.

- Be sensitive to differences in food and explain mealtime customs. Don't ask your au pair to start first. She will need to follow your example so she's sure she's doing the "right" thing.

### Your au pair's culture shock

Imagine that you are visiting a city in the U.S. that you have never been to before. When you arrive, you check into your hotel. The bellhop brings your bags up to your room, and you tip him. You unpack, freshen up, and then go outside to hail a taxi. You jump in and give the driver the address of the restaurant where you would like to go. When you arrive, you order your favorite meal. After returning to your room, you may relax by reading the book or a magazine. You'll wake up the next morning, take a shower, and start your day all over again.

You will notice that even though you are in an unfamiliar place, many parts of your day are the same as if you were at home. Certainly, freshening up and taking a shower will be no problem. The plumbing and fixtures will be very similar to the ones at home. You'll be able to talk to the hotel clerk, the taxi driver and the waiter without thinking ahead of time about the words that you are going to use. You will be able to easily understand what they say. You'll understand what's on the menu and will be able to recognize the food on your plate. You will understand how to tip the bellhop and the waiter. You know that the way you act at home will be appropriate for this new city as well.

Now imagine that all of those things are suddenly unfamiliar. You're not sure how to turn the shower on or how the plumbing works! You can't understand what everyone around you is saying without really making an effort! You have to think hard about what you're going to say and maybe even practice before saying it! You're not sure what the meat on your plate is! Even the smallest task makes you anxious and self-conscious. This is exactly how your au pair will feel after she arrives. Everything that is familiar has been taken away from her. She is suffering from culture shock.

Culture shock occurs when your au pair realizes that the way she normally behaves and thinks is no longer working. Suddenly, the "right" way to behave—the way she learned to behave since she was very little—is challenged at every turn. How might your au pair cope with this? Nancy King and Ken Huff identify several symptoms of culture shock:

- She may lash out at an innocent remark.

- She may retreat to her bedroom and cry over nothing.
- She may mourn the loss of her friends and family.
- She may withdraw at times, become irritable, ignore rules, or become unusually shy or moody.
- She may describe confusing or threatening situations as "stupid" or "dumb." She may become overly critical of the way you, as an American, do things.
- Minor squabbles may take on giant proportions.
- She may find it difficult to have a normal conversation.
- She may have insomnia, overeat or become preoccupied with her own health, hygiene or safety.

Culture shock may occur quickly after arrival or may be delayed and occur two or more months into the exchange. Often an individual appears to be adapting well and then it strikes. This "culture fatigue," exhaustion from constantly adapting to "different" food, language and behavior, will manifest itself in some manner in almost everyone.

Many host parents underestimate the impact of culture shock on their au pairs. Since there are few physical symptoms, it's difficult for us to believe that it really exists. We tend to believe that our au pairs are exaggerating, and if they tried harder everything would be all right. What we must realize is that culture shock is a very real condition that can be difficult to overcome.

Some host parents resent their au pair's reaction to culture shock. *They mistakenly feel that their hospitality is not being appreciated. They interpret their au pair's withdrawal as personal rejection.* These feelings, coupled with the au pair's tendency to be defensive, can become a real barrier to establishing an open, honest and trusting relationship. Instead, you can take positive steps to help your au pair overcome her culture shock.

### Overcoming culture shock

The first thing that you can do is to anticipate culture shock. Expect the symptoms and reactions that we noted above. Have understanding, but don't assume guilt!

The second thing that you can do to help your au pair is to give her "time-outs:"—periods of quiet when all of the pressure from her surroundings and her duties are temporarily removed. During this time she will be able to calm herself and unscramble her mind so that she can function well and think clearly.[22] Give her a schedule so that she will be able to anticipate these breaks. Simply knowing that she will have a reprieve may help her to recover from culture shock. Encourage her to make

contact with her Community Counselor and other au pairs in the cluster.

Don't be alarmed by all that we have told you about culture shock. We are simply trying to prepare you for what might happen. Many au pairs adjust very quickly and hardly show any symptoms. In fact, only a small number of au pairs never recover from culture shock. The great majority is able to handle it very well and is able to enjoy their families soon after their arrival.

### Host family's culture shock

As a host family, you may experience a different form of culture shock. Remember that we usually do not give much consideration to the ways we do things. We assume that our way of living is "natural" and "right." Hosting an international visitor will suddenly make you aware that alternatives exist. As you begin to compare your lifestyle to your au pair's, you may feel protective and defensive of our American way of life. On the other hand, you may feel curious about her culture, challenged and appreciative of the way we live. No matter what you think, remember that you and your children are lucky to have the opportunity to learn so much about a different culture!

# Program Regulations and Legal Requirements

## Program regulations

The au pair program has been designated by The Department of State as an Exchange Visitor program, which enables it to use J-1 Exchange Visitor visa. Information about the Au Pair in America program and regulations effecting the program are outlined in the Au Pair in America brochure, and The Department of State-promulgated regulations can be found in Addendum A in this handbook. You should review them before your au pair arrives. In this section we mention some of the regulations to highlight their importance and to explain why they are necessary.

### On-duty schedule

The Department of State regulations governing au pair programs stipulate that a host family and au pair sign an agreement upon matching which affirms a mutual understanding of the hours of child care and responsibilities the au pair will have. It is likely that the actual schedule and nature of care provided will change during the course of the year, and this you should explain to your au pair. During your new match assessment your Community Counselor you will review the terms of the agreement that has been signed by both parties. You must adhere to the following guidelines established by The Department of State for all au pair programs:

- Your au pair is entitled to a minimum full day and one half day off per week. This may be on non-consecutive days, but must include a day of religious observance if requested by the au pair. A day and a half off means twenty-four hours in which the au pair does not work at all, plus twenty-four hours in which she works no more than half of her normal workday (not to exceed five hours).

- Your au pair is entitled to one weekend per month free (Friday evening to Monday morning).

- Your au pair is entitled to two weeks vacation with stipend for each 12-month stay to be arranged at a mutually agreeable time.

- Your au pair is allowed to be on duty for up to, but no more than 10 hours per day, for a maximum of 45 hours per week caring for and performing tasks related to the care of your children. EduCare au pairs can be on duty for no more than 10 hours per day, for a maximum of 30 hours per week.

- 'Unused' hours from one week cannot be banked and used for another week.

The au pair's responsibilities may include:
- Awakening the children, dressing infants and toddlers, bathing and playing with the children
- Preparing meals for the children, looking after their belongings, making the children's beds, doing their laundry and straightening their room

- Driving children to and from school, appointments or outings requested by the host family

- Caring for the children while the children sleep if a parent is not home. These hours count as part of the 10 hours per day, 45 hours per week for au pairs; 30 hours per week for EduCare au pair, maximum child care allowed if in sole charge.

- Caring for the children during travel if the au pair is required to accompany the family on a trip.

- The au pair's responsibility may include being home as needed while children are absent from school due to illness or holidays. With the EduCare program, due to the educational requirements and more limited child care hours, you need to come to a mutually acceptable agreement as to who will be responsible for your child's care in the event they need to stay home.

The au pair's responsibilities may not include:
- Housework unrelated to the children such as cleaning the home, doing the host parent's laundry, caring for pets or adult family members.

- Caring for a child aged less than three months unless another responsible adult is present

- Being responsible for the household or family pets while parents are absent.

- Sole responsibility for an extended period of time for weekend/business travel by host parents. A responsible adult must be in the home and the au pair must not be on duty for more than 10 hours per day. Host parents are asked to inform the Community Counselor if leaving the au pair and children in the home with another responsible adult.

### Weekly Stipend

As a government authorized program, policies are subject to modification as a result of legislative changes. Au pairs are compensated by the host family based upon 45 hours of child care services per week and paid in conformance with the Fair Labor Standards Act. EduCare au pairs are to be compensated at a rate that is 75% of the weekly rate established for the au pair program for up to 30 hours of child care services per week.  The minimum weekly federal stipend is $195.75 for standard au pairs for up to 45 hours per week and $146.81 for EduCare au pairs for up to 30 hours per week. The minimum weekly stipend is calculated at the federal minimum wage less a credit set by the Department of Labor for room and board.  Au pairs on the Au Pair Extraordinaire program are to be compensated at a weekly rate of no less than $250 as set by Au Pair in America for up to 45 hours of child care services.  Host families have the option to pay more than the required minimum standards.  Weekly stipend should be paid weekly and never be withheld.

## Social Security cards

The Social Security Administration will issue a working Social Security Card to an au pair participating in a Department of State authorized au pair program. To obtain the card, your au pair will need to have been in the United States for at least 4 business days prior to making the request, present her DS 2019 Form, her passport and her I-94 admission information with her application.

## I-9 Forms

I-9 Employment Eligibility Forms: The relationship between you and your au pair is considered by the government to be an employer/employee relationship as the au pair's weekly stipend is considered a wage. As with any employer/employee relationship, the I-9 form is required for all host families/au pairs participating in the program. As a host family you are required by law to keep a copy of the completed form for each au pair in your home, in your possession for three years from the date the au pair first arrived in your home. The document is for your records only and is not required to be mailed to Immigration or Au Pair in America.

## Worker's Compensation

Worker's Compensation may be required in certain states where au pairs are considered to be domestic workers. Please check with your insurance agent to determine whether this is required in your state.

## Tax information

Au pairs are subject to Federal Income and State Tax, depending on how much they earned in the prior calendar year. More information on au pair taxes and host family responsibility regarding tax issues can be found on the home page of the host family site on the Resources tab in the Essential Links section.

## Your au pair's Vacation

Your au pair is entitled to a minimum of two weeks off with stipend for each 12-month stay. Vacation time should be scheduled at a time convenient to both the au pair and the host family. A recommendation would be to schedule one-week in the first six months of the exchange and one week during the second six months. Whether planning your family vacation or considering plans your au pair may have for vacation, think about the following:

- Vacation is to be scheduled at a time mutually convenient and agreed upon to by both the au pair and the host family.

- If the vacation is to be broken up into daily

segments, the au pair should receive a day off for each day in her standard on duty week. In addition, she would still receive her weekly free time and one complete weekend (Friday evening until Monday morning) off each month.

- Do not assume that a family trip, which includes the au pair, is her vacation period. Vacation is completely free time for the au pair to use as she wishes. If both you and your au pair agree that you wish to vacation together, and the au pair has no child care responsibilities during the trip, then, of course, the au pair may accompany your family and choose that as her vacation time.

- If your au pair travels with your family as part of her child care responsibilities, it is strongly recommended that a schedule be discussed in advance which encompasses her 45 hours (or 30 hours for EduCare) child care limitation.

- Your au pair cannot assume that, in the event your family is out of town with the children, she has vacation and is free to leave the home. You may wish her to remain at home during this period. Under these circumstances, your au pair would be paid her weekly stipend, and these days would not count as vacation days. Before you leave for vacation, expectations should be discussed thoroughly.

- Encourage your au pair to ask for her vacation time as far in advance as possible. Help her appreciate that it may be difficult to arrange alternate child care arrangements without adequate notice and that you may be unable to grant a request due to schedules and an alternate date may need to be considered.

- There is no special provision for holidays in the Federal Regulations. While an au pair should not assume that she automatically has a holiday because the host mother or father is on holiday, discuss your expectations of her responsibilities in advance, keeping in mind that holidays provide a special opportunity for you to share American and special family traditions. We suggest you encourage your au pair to join you in your special holiday celebrations.

## Educational Component

One of the goals of our program is cross-cultural exchange. As a hosting family, you are required to give your au pair the opportunity and encouragement to take advantage of the educational and cultural benefits of your community. Her participation in community activities and educational opportunities is an important way for her to begin to develop friendships and begin to feel "at home" and involved.

The Department of State program regulations require au pairs to register and attend classes for no less than six

semester hours (or their equivalent) of academic credit at an accredited U.S. post secondary institution. This is approximately the equivalent of 80 classroom hours. EduCare au pairs are required to register and attend classes for no less than 12 semester hours (or their equivalent) of academic credit at an accredited U.S. post secondary institution. This is approximately the equivalent of 170 classroom hours. Institutions acceptable for fulfilling the educational component include public and private colleges and universities, two-year community colleges, or other local accredited institutions of higher learning provided the selected courses are the equivalent of college-level classes for which college credit hours can be earned.

Courses may include a diverse number of programs depending on the educational, cultural or career interests of each au pair. Au pairs may elect to audit courses at a credit granting institution.

As a host family, you are responsible for contributing up to $500 for an au pair and $1,000 for an EduCare au pair in tuition and related fees (books, etc.) per year toward education and provide transportation including gasoline, parking, or public transportation costs if applicable to and from the place of instruction.  The cost of transportation is in addition to the $500/$1,000 allocated to tuition and related fees.

We recommend that this amount be spread out during the year, e.g. 50% for the first six months and 50% for the second six months. If the cost of your au pair's courses exceeds the amount you are required to contribute she will be responsible for paying the remaining balance.

<<<Back

# The Relationship with Your Community Counselor

**A three-way relationship:**
*Your Community Counselor's involvement*

While you will be living "on par" with your au pair, you will also be in communication with the local Au Pair in America representative, your Community Counselor.

It is important to delineate the responsibilities of the three key parties, the host parents, the au pair and the Community Counselor. By defining the roles of each party the reasons for fostering relationships and maintaining open lines of communication can better be understood. This three-way relationship and responsibilities of each party may be visualized as:

- The host parents will be hosting their au pair and training and monitoring in the appropriate care of their children. This includes providing room and board and accepting and treating the au pair as a full-fledged member of the family.

- The au pair is expected to care for the children under the guidance and tutelage of the host parents and develop an understanding of the U.S. and its culture through immersion into American family life, community and educational opportunities.

- The Community Counselor is expected to help the au pair acclimate to the community and monitor the activities of the exchange relationship to ensure they are in keeping with the intent of the cultural exchange child care program established by Au Pair in America and the regulations established by Department of State for all au pair programs. To perform his/her duties properly, the Community Counselor will endeavor to maintain a balanced relationship between you and your au pair.

To maintain open communication among all three parties, you can anticipate being in touch with your Community Counselor at the following times and for these reasons:

### Host Family Orientation

If you are a new host family, before your au pair arrives, arrange a mutually convenient time to meet with your Community Counselor. Some Community Counselors plan orientation meetings to include several families who are expecting au pairs to arrive within the same period. Families who have been hosting au pairs for more than a year may also find it helpful to participate in an orientation session before their new au pair arrives.

Your Community Counselor can help you prepare for the arrival of your au pair in a way that will help ease the transition of learning to adapt to one another's life styles

and to live together in a way that will successfully meet one another's expectations.

### 48 Hour Contact

Your Community Counselor is required to check in with you and your au pair within 48 hours of your au pair's arrival to your home. This communication should be a conversation or exchange that confirms the au pairs arrival and addresses any initial concerns.

### New Match Assessment

Your Community Counselor will need to arrange a mutually convenient time to meet with you and your au pair within two weeks of her arrival to your home. The Community Counselor will discuss how things are going so far and address any questions or concerns. This meeting is also important to review the child care responsibilities and to reconfirm program guidelines. This is an opportunity for you and your au pair to discuss cross-cultural adaptation issues and seek clarification of issues or concerns you or your au pair may have. Under au pair program guidelines established by the Department of State this two-week meeting is a requirement. At this meeting your Community Counselor will want to review the schedule of duties and responsibilities to which you and your au pair have agreed.

### Ongoing contacts

After the New Match Assessment the community counselor will make ongoing contact with you and your au pair at a minimum of once a month. Encourage your au pair to attend a monthly cluster meeting or activity with the Community Counselor.

There must be more frequent communication between the sponsor organization and the host family if you are not the initial host family for the au pair. For the first two months after rematch, your Community Counselor will be contacting you and your rematch au pair twice monthly. Call your Community Counselor if you have questions or concerns during the month. Check with her/him regarding office hours as evenings and weekends are generally reserved for emergencies.

### Annual Host Family Day

Your Community Counselor will schedule an annual Host Family Day that is designed to help foster and promote understanding of cross-cultural issues. Your participation is a requirement of your program participation per federal regulations.

Community Counselors generally maintain standard hours during the week when they are readily available to assist you and/or your au pair. Your Community Counselor will share this information with you during your orientation session.

## Effective methods for problem solving

Every family hopes that their year will be trouble-free, and so do we at Au Pair in America. The staff of the Au Pair in America program has taken care to clarify for you and your au pair the program's guidelines and goals. We've given you the opportunity to personally select your au pair to ensure the most compatible match.

Child care, though, by nature is particularly sensitive to conflict. Your child is one of the most important people in your life, and you will be concerned about his care no matter who is taking care of him! Knowing what these issues are will help you to anticipate them and plan on how you will resolve them in advance. You will also realize that these conflicts are not a sufficient reason to start to search for another au pair. You will undoubtedly come up against them with someone else!

### Communication is the key to success

The most crucial step that you and your au pair must take to avoid problems is to talk to each other often and honestly! We cannot place enough emphasis on this point! Many families have found that a small problem had grown to major proportions simply because it had not been discussed in a timely manner.

Those most likely to have communication problems have a tendency to be indirect or vague when speaking, have a rigid right-wrong mentality, a low tolerance for stress and ambiguity or a tendency to deny or ignore problems when they arise. If you find that these traits describe you or your au pair be especially sensitive to them.

Don't let small incidents fester! Your au pair will be shocked and hurt if you suddenly snap at something that she has been doing since she first arrived in your home. More importantly, your anger and resentment will be completely out of proportion with the incident. If daily conversations with your au pair are a normal part of your routine, it will not be difficult to discuss problems. While leaving written instructions are often important and necessary, do not fall into a pattern of only communicating by written notes to your au pair. This is a frequent complaint by au pairs who wish to engage in conversations with their host parents.

Finally, be flexible and don't be afraid to compromise! As with any problem, stand firm on the issues that are most important to you, and compromise on others. When you compromise, your au pair will compromise too. Be creative in your resolutions. You may find an answer to your problem that you did not expect, but that will work just as well.

> *"We discussed it the first day and we agreed our expectations seemed the same. However, I think I had higher expectations for her help around the house. We had several discussions about it and resolved it."*
> *– Host parent from Massachusetts*

<<<Back

# Trouble Shooting Possible Problem Areas

## Possible Trouble Areas

### Duties and hours

One potential area for problems that may arise is conflict over your au pair's duties and hours. Her "on duty" schedule must not exceed 10 hours per day, 45 hours per week for the au pair standard and the Extraordinaire program, and 30 hours for the an EduCare au pair. Since your au pair will be living with you, you may be tempted to ask her to watch your child or do chores that you had not agreed upon earlier. Although your child's needs may change over the course of the year, your earlier discussions should have included these schedules as well. If you are exploiting your au pair by asking her to do chores that are not in keeping with the program guidelines, your au pair will feel abused, and resentful. We recommend a written schedule each week to avoid any misunderstanding about hours.

The au pair may not care for the children of other families unless it is part of an occasional play date with her host family child. An au pair may not take responsibility for a child from another family on a regular basis. Any play date or group activity including other children must be arranged with the full understanding of you, your au pair and the parents of other children involved.  She must have a contact number for a parent of a child participating in a play date in case of emergency. If an au pair is uncomfortable caring for a particular child, other than the children of the host family, she has the right to refuse to have the child under her supervision without an additional adult present. All agreements, benefits and guidelines provided by the organization pertain only to the au pair while she is caring for the host family's children. They do not apply to her care of any other child.

Your au pair is to do chores that are associated with taking care of your children. For example, she can do your child's laundry, make your child's bed, prepare meals for your child and clean up afterwards, keep your child's room neat and pick up his toys. Au pairs are not housekeepers, cooks, or maids. They are not responsible for house cleaning. They are not responsible for such duties as doing your personal laundry, yard work, caring for your pets, or cleaning your pool even for additional pay. Responsibilities do not include teaching host children how to drive or serve as the responsible adult with a non-licensed driver.

It is sometimes difficult to determine when your au pair is "on-duty" and when she is not. For example, she may be off-duty during dinner, but may want to help with the dishes. On-duty time is any time that the au pair is either actively or passively responsible for your child and is not free to do something of her own choosing. Obviously, any time that your au pair is alone with your child should be considered on-duty time. Any time that your au pair is responsible for the well being of your child should be considered on-duty time even if your child is asleep.

One way to avoid problems with duties and hours is to provide your au pair with a written schedule. This way there will be no question about when she is on and off duty. If conflicts do arise, you will be able to see how your au pair's actual schedule compares to her written schedule and make adjustments.

Host families must provide an on duty schedule that allows at least one full free day and one half day off per week.  The free day is to include the au pair's day of religious observance, if requested.  We suggest you discuss religious observance and holiday schedules with your au pair well in advance.  You may grant these days as extra vacation days or ask your au pair to assist the family in caring for the children for part of the day. Be sensitive to your au pair's need to have free time to celebrate her religious holidays.  Encourage her to share her country's national holidays and traditions with your family and include her in your holiday celebrations. This mutual exchange provides a special opportunity for you both to experience the holidays and special family traditions of another culture.

- Ironically, duties and hours may be a more difficult issue for parents who are at home during the day than for parents who are away. It may be confusing for the au pair to know when she should be taking care of your child if you are present all the time. Your child may also be confused about who is supposed to be taking care of him. To avoid this, discuss how child care will be divided between you. Clearly explain that your au pair will be on-duty when you are in the house and should exercise the same caution and sense of responsibility that she would if you were absent. If you are both taking care of your child, encourage him to seek your au pair's help as well as your own. If there are times when your au pair will have total responsibility for your child, make sure that your child understands this, so that he will know who to turn to for assistance.

- If an au pair is on duty less than 45 hours in a given week, the unused hours may not be applied to a future week.

- An au pair cannot be scheduled for extra child care hours or assume extra duties to earn extra money from her host family or any other family.

- An au pair may not engage in any outside employment.

## Driving

No matter how much driving experience your au pair may have had, she is now driving in a foreign country. She will need some practice to get used to driving your vehicle, get used to different rules of the road and become acquainted with your community. Advice on the driving practice period is available in our driving brochure Au Pairs Behind the Wheel. Your community counselor will also have advice about driving practice. We encourage host families to practice with their au pair until they are confident she can drive safely.

## Changing circumstances

As the year together continues, your au pair will start to meet other au pairs and Americans. The opportunity to befriend others her age is important. It will help her to overcome her culture shock, learn more about American life, and start to explore your community. A healthy environment for all of you is one that will include time together and time apart.

*"She struck a perfect balance between joining in yet also not being overly intrusive. She enjoyed her free time. She seemed genuinely interested in our lives."*
*– Host parent from Maryland*

Your au pair's new social life will bring with it some issues that you haven't yet had to think about. First, your au pair's friends will affect your child. Often, au pairs meet each other while they are taking care of the children at the local playground, pool or park. Many families find it helpful to introduce their au pairs to their friends' child care providers. Some families introduce their au pairs to their relatives and their friends' children.

Secondly, your au pair's new social life may make it necessary for you to set rules about coming home late at night, using the car and inviting guests into your home. It is very important to discuss these rules when your au pair first arrives and before they become an issue! An au pair who had lots of freedom will feel as though she is being held prisoner if rules are suddenly set. She may feel that you are being restrictive. Europeans, for example, are generally given more freedom at an earlier age than their American counterparts. You may have little experience in being a "parent" to a young adult and may need to call upon your own experience as a young adult.

When setting household rules, try to find out what rules your au pair was abiding by at home. If they differ drastically from your rules, discuss what cultural assumptions lie beneath them. You will likely find that the reasoning behind her parent's rules is different than your own. Some au pairs may have been living on their own already. We recommend you make it clear that you are not trying to hamper her social life, but that you want to make sure that she is safe while in the U.S.

## Family vacations/business trips

If you are planning to go on vacation or on a business trip and would like your au pair to accompany you discuss the arrangements in advance. Decide in advance when she will be on duty. If you haven't made it clear that you still need her help, it will be easy for her to feel as though she is "on vacation" too. Travel time is considered on duty hours if an au pair has child care responsibilities during the travel time.  Think about how you will divide child care responsibilities between you. Like an au pair who is caring for a child whose parent remains at home during the business day, your au pair may be confused about when she is on and off duty.

If you will be traveling to a place that poses new potential hazards for your child (such as the beach), point them out. Do not assume that your au pair knows about all the precautions that you would normally take in this new setting. Teach her just as you taught her about your home when she first arrived.

Finally, remember that you are still responsible for your au pair's meals even though you are on vacation. Your au pair is not responsible for paying for her share of the bill if you all go out to dinner.

If you will be traveling away from home, make sure your community counselor knows how you can be reached. It is important that the Community Counselor be able to contact your au pair in the event of an emergency.

### Au pair's traveling outside the U.S.

If your au pair travels outside the U.S. with you or alone it is essential that she ask the embassy/consulate of each country she plans to visit if additional visas are required. Also, it is very important that she check to see if the J-1 Visa (in her passport) will still be valid when she plans to re-enter the U.S. Your au pair will need to have her DS 2019 signed by an Au Pair in America Responsible Officer based in Stamford, Connecticut, for travel validation. Your Community Counselor can help explain this in greater detail.

The limit of time allowed for an au pair to travel outside the U.S. per State Department guidelines is three weeks. If an au pair remains outside of the U.S. for more than three weeks, it would violate Department of State regulations. An au pair should be able to rely on the support of her community counselor and Au Pair in America staff if there is a problem.

In addition, this program is an exchange program, for young foreign visitors to fully experience life in the U.S. The intent of this program is for the au pair to remain in the U.S. for most of her year. Traveling outside the U.S. for an extended period of time would not be in compliance with both the regulations and intent of the program.

                **<<<Back**

## Illness

During the time that your au pair is an active participant on our program she is covered by a medical insurance policy underwritten by The Insurance Company of the State of Pennsylvania.

Host families should help the au pair identify participating physicians and/or urgent care facilities that accept her insurance policy. A search feature is available on the Au Pair in America website under Resources for Current Au Pairs - Insurance.

Any specific questions about insurance coverage or claims can be addressed to a member of staff at 1-800-303-8120 ext. 5557.

At orientation your au pair will receive instructions on how to file a claim. However, your au pair may need your assistance since she may not have any experience in dealing with a private insurance company. Most international visitors are covered by their country's national health plan.

The basic medical insurance plan does not cover pre-existing conditions, routine dental work, work on teeth that have already been treated, eating disorders, pregnancy or mental illness among other conditions. Please review the au pair "Plan of Insurance" for full policy definitions.

If your au pair becomes ill or injured she may become homesick. Do not be alarmed by this, it is a common reaction. Do be prepared to arrange alternative care for your children during this time. The minimum weekly stipend is to be paid during these unavoidable periods.

If your au pair incurs a serious accident or illness which, in the judgment of Au Pair in America and with the advice of a physician, prevents the au pair from fulfilling child care responsibilities, Au Pair in America will make a reasonable effort to locate an alternate au pair for the host family. In such cases you are expected to host the au pair until appropriate arrangements can be made for your au pair.

## Personal liability insurance

Your au pair has personal liability insurance coverage for the period of time she is in your home. The personal liability benefit covers bodily injury and property damage as a result of the au pair's actions. The personal liability policy does not cover the au pair while operating a motor vehicle, boat or aircraft.

The insurance will pay a specified amount for medical expenses regardless of negligence resulting from an incident found to be caused as a direct result of an au pair's activities which results in bodily injury to a person other than the au pair.

The insurance will pay a specified amount per policy term for any necessary increase in living expenses that results from an incident caused by your au pair that causes damage to your primary place of residence.

If an incident found to be caused by your au pair results in a claim being paid under a valid and collectible homeowner's policy covering the insured location of your primary residence, the insurer will pay the host family the amount of your homeowner's policy deductible not to exceed $1,000 per au pair, per policy term.

We recommend that host families purchase additional life insurance in the form of an umbrella policy to provide for unforeseen occurrences.

## Medical emergencies

Medical emergencies should be handled for your au pair in the same way that they would be handled for any family member. Be sure to apprise your Community Counselor of any emergency medical care your au pair has received within a timely manner. Emergency room visits that are not deemed emergencies will be subject to a deductible.

If you are unable to reach your Community Counselor in a reasonable length of time (what is considered reasonable depends on the nature of the emergency) contact Au Pair in America in Stamford, Connecticut (800-928-7247). The office is open 9 a.m. to 5 p.m. EST, Monday through Friday. After hours, you will hear a recording that gives the number for an emergency-only answering service, which is to be used in the event of an emergency that cannot wait until contact can be established with the Community Counselor or during regular office hours.

## Phone, computer and e-mail use

Your au pair will likely want to call or e-mail home on a regular basis. We find communicating with family and friends at home is okay as long as your au pair does not use this as a substitute for resolving such issues as culture shock and homesickness. If contact becomes more frequent, you or your au pair may need to discuss it and seek advice from your Community Counselor.

When your au pair arrives discuss specific rules and appropriate use of phone and online communication, You may want to review with your au pair how she should answer the phone and take messages; rules for use of your home computer which may include restrictions on sites she may or may not access; limits on usage during on-duty hours; restrictions on use you impose for your children. Establish clear rules regarding computer/online use. Upon arrival, discuss with your au pair any restrictions you may have on accessing websites of questionable nature or content, downloading materials and appropriate use of the Internet.

Your au pair is expected to pay for all of her long distance phone calls, and Au Pair in America is very clear about this in all of the orientation materials your au pair receives. **Au Pair in America is not responsible for any phone bills or personal debts incurred by the au pair.**

Whether you decide to assume the cost of your au pair's phone expenses or you expect your au pair to pay for her own calls, it is important that you discuss with your au pair her responsibility toward the phone bill. Explain that phone bills are received monthly and clearly itemized.

We urge you to consider the options and put the best plan in place for you:

- Check your long distance carrier to determine when the cheap rates are in effect. We recommend Skype.

- Investigate other international discount calling plans. You can keep your existing service and add the plans, which all cost a nominal fee per month

- If providing a cell phone, review the plan and what is covered. We recommend unlimited texting since this is the primary use of communication between au pairs and their peers.

About two months before the end of your au pair's stay, have a discussion about phone charges incurred before your au pair's departure. Each au pair has different phone habits and shows varying levels of responsibility. You will know your au pair at this point in the year and should work out a mutually agreeable arrangement for the last month's phone usage to ensure that you receive payment for expenses incurred from your au pair.

## Personal Debts

Personal debts, credit cards and bank accounts Any personal debts incurred by the au pair while living with the host family are her responsibility and are to be settled between you and her.

Au Pair in America does not recommend host families allow the au pair to use their credit cards or bankcards under any circumstance. We also do not recommend you open a joint bank account or that you be a co-signer or are in any way responsible for an au pair's checking or bank account.

## Car use, Insurance and Accidents

Prior to your au pair's arrival decide what rules will be imposed on the use of your vehicles. Rules you impose are likely to depend on the community you live in and

- whether you require her to drive as part of her child care duties.

- access to reliable and safe public transportation. If you live in a rural or suburban community it is likely that you will need to allow your au pair access to the car for her personal use in order for the exchange to be successful.

Prior to giving your au pair the car keys:

- Arrange to have your au pair covered as a driver under your automobile insurance policy

- Explain the insurance coverage to your au pair and establish what her financial responsibilities will be in the event of an accident (further reference under Insurance below).

- Check to see that your au pair has an International Driving Permit or whether her country license is valid for use in the state. Prior to arrival, check with your DMV office regarding scheduling a driving test and the documents she will need to attain a driver's license. We recommend that your au pair attain a State driver's license and in certain states they may be required. Your local DMV office can best advise you.

- Instruct your au pair on correct use of seat belts and car seats.

- Drive, drive, drive with your au pair until you are comfortable with her driving abilities. The driving ability of the au pair should be carefully assessed before granting permission to operate your vehicle, for obvious safety reasons.

- Write out instructions for her to follow in the event of an accident, review them with her, and then leave them in the glove compartment of the car.

## Driving in Your Community

Your au pair will be accustomed to driving in her home country where road signs and even the side of the road she drives on are different. She will need time to adjust to driving in your community. Some tips to keep in mind as you help your au pair adapt:  Your family vehicle may be much larger than what your au pair is accustomed to; an automatic transmission may be a new experience for your au pair.

- Point out locations of road signals and be sure your au pair understands their meaning.

- Discuss speed limits on highways, residential streets, commercial zones and school zones.

- Discuss rules of driving in and around school buses—our rules of not passing a stopped school bus may not be a rule that applies in her country.

- Remind the au pair that she must never drive after drinking any alcoholic beverage, and that this absolute rule applies whether or not children are in the car. Emphasize that there is no "safe" amount of alcohol that can be consumed before driving,

<<<Back

because any amount can impair driving ability and police may arrest any driver who has any alcohol on their breath. An arrest will result in termination from the program.

- Give her a road map or provide a GPS device. It would be helpful to mark off select locations, such as schools, shopping areas, the local police station, library, and the Community Counselor's home.

- Point out areas in the community that are both safe and unsafe places to be day and/or at night.

- Discuss grade of gas used in your automobiles and location of gas stations

### Car Use Guidelines

Determine guidelines for car usage and discuss them in detail before your au pair begins driving. In considering what those guidelines will be, you must decide:

- Do you want your au pair to always ask to use the car?

- Are there limits on where she may drive, or particular roads she may not drive on?

- Who may she drive?  Your children?  Other children? Her own friends?

- Is there a curfew for the car?

- Who pays for gas when the car is used for the au pair's personal use?

- The au pair is not expected to be responsible for routine maintenance of the car.  Be very specific if you expect her to check the oil, tires, etc.

Note: Under program guidelines the host family is expected to provide transportation for the au pair to attend cluster meetings with her Community Counselor and attend her educational classes.  If the transportation is your automobile then gas is part of the cost to be absorbed by the family.

### Insurance

Arrange for your au pair to be covered under your automobile insurance carrier at your expense. Determine with your insurance provider whether she will be covered if driving under an international drivers license or specific country license or if she must obtain a state drivers license.  Determine whether there is any documentation the au pair needs to bring from home to send to your carrier.  Confirm with your au pair prior to her arrival that she has the necessary licenses and documentation required.

### Deductibles and Accidents

Discuss the auto insurance with your au pair to be certain that she understands:

- What a 'deductible' is

- How much the deductible is

- What you expect her to contribute in the event of an accident (up to a maximum of $500), and if you intend for the contribution to differ whether the accident occurs while using the car as part of her child care duties or while during her free time.

Most important, is to have this discussion before she begins driving and know that she understands her responsibilities in the event of an accident.

You can choose not to expect the au pair to pay any of the deductible or you can request that she share the cost with you. Au Pair in America recommends you share the cost, with your au pair paying up to $250.

Under the terms of your host family agreement you agree to provide automobile insurance coverage for your au pair and to have her listed as an operator on your insurance policy if you choose to be fully protected in the event of a motor vehicle accident. You agree to limit the claim against your au pair for uninsured damages resulting from negligent operation of a motor vehicle to a maximum of $500.

Give specific instructions to your au pair on what she should do in the event of an accident.  We recommend placing an envelope in the car marked "accident", which has specific procedures about what to do, whom to call, etc.  Review this as well as location of car registration, insurance identification card, car handbooks and any other documents you consider important.

*"I would recommend to any Host Family that they put into practice the rules of the road they are teaching their au pair. My au pair was quite surprised when I picked her up from Orientation, entered the highway and proceeded to pass a car on the right hand side.  She told me that was illegal in her country and thought it was in ours as well. Since that day, I have always tried to remember not to skirt around good driving rules and pass on the left, just as I would want my au pair to do at all times."*
*– Host Family from Connecticut*

### When your match cannot continue

There may be occasion where the match with your au pair cannot continue.  It is very important to discuss the details with your community counselor immediately if you think you may not be able to continue hosting your au pair for any reason. Your community counselor will be there to assist you with this process and select a new au pair and help transition the current au pair out of your home.

During the rematch process you will be expected to continue hosting your au pair for a period of up to two weeks. The rematch period begins on the day that you, your au pair and your community counselor agree that the match will not continue.

### Private discussions

No matter what the problem, your child should not be present when you need to settle an issue with your au pair. First, your child will never feel certain that the issue was satisfactorily resolved. Secondly, he may feel guilty or confused about being at the center of a problem. Finally, you will undermine your au pair's authority. Instead, speak to your au pair privately and encourage her to do the same if she has concerns to raise with you.

It's important to remember that developing a trusting relationship means riding out the rough times as well as the good:

"*You are not going to get perfection day in and day out. And, a relationship without conflict is not perfect—it's artificial. Like a fragile vase, one crack and it falls to pieces. The relationship that lasts is the one in which you learn to deal with conflicts as they arise and are satisfied with the results, even though they may not be what you imagined.*"

### Physical Contact

Physical contact between the host family and au pair is discouraged; while a hug or handshake may be appropriate depending on the circumstances, if such conduct makes the recipient uncomfortable it should be avoided for that reason. The host father and the au pair in particular should avoid any physical contact and everyone must scrupulously adhere to the Sexual Harassment policy set forth below.

### Sexual Harassment Policy

Sexual harassment is prohibited, and any complaints regarding such conduct will be investigated, and appropriate corrective action will be taken if warranted.

Sexual harassment, whether between people of different sexes or the same sex, is defined to include [but is not limited to] unwanted sexual advances, unwelcome requests for sexual favors, and other behavior of a sexual, lewd, offensive or suggestive nature. Such conduct, whether verbal or physical, may unreasonably interfere with an individual's right to live and/or study without being subjected to an intimidating, hostile, or offensive environment.

If you or a family member believes they are or have been sexually harassed by their au pair consider the following strategies:

- Say "no" to your harasser. Say it firmly without smiling and apologizing.
- Tell your harasser, in writing, that you object to this behavior.
- Describe the specific behaviors that are offensive or threatening, and keep a copy.

Report your concerns to the Community Counselor. We advise the au pairs to take this same action.

### Incompatibility

The first month that your au pair is with you is considered an adjustment period. If there is performance or adjustment problems that you believe may result in alternative placement, it must be brought to your Community Counselor's attention. Resolution of problems can only be solved when both you and your au pair understand the issues. Your Community Counselor can help facilitate this.

In the event that the match ends prematurely, the Host Family will owe the au pair the appropriate percentage of her vacation and educational allowance for the time she has been with your family. It is the host family's obligation to house the au pair for two weeks, if needed, to allow the au pair time to locate a new family or make plans to return to her home country.

For guidelines and information related to alternative placement, please refer to the Au Pair in America brochure, the Program Policies document and the Host Family Agreement and consult with your Community Counselor.

### Au Pair Fees and Accountability

Au pair in America pays interviewers, whether they pass or fail an applicant. Interviewers may charge a fee to an au pair for services; the amounts are governed by local market standards.

Au pairs pay a program fee to Au Pair in America, the amount varies.

## You're Au Pair's Departure

### Returning home

Before you realize it, your au pair will be packing her bags and heading home. Your au pair will be contacted several months in advance by the Au Pair in America staff to arrange her return transportation home.

Her departure will bring a variety of reactions from all of you: sadness because your new friend is leaving, some relief that you will be able to resume your old lifestyle, excitement and apprehension if you have chosen a new au pair. Your au pair may also feel sad about leaving and anxious about returning to her family and friends after her experience in America.

It's important for all of you to take time to reflect back on your time together and talk about what you have learned. Talking about your au pair's departure will help all of you when she leaves!

### Your au pair's returning flight arrangements

The various combination of U.S. departure cities and worldwide destinations in a range of dates, offer your au pair the flexibility of planning a travel schedule home from convenient locations in the U.S. that will complement her desired plans for travel in the U.S. in her travel month.

Au Pair in America will send her information regarding return flight arrangements approximately four months before the end of her year.

Au Pair in America strives to find the most convenient flights for our au pairs. During peak seasons, however, we may be restricted by flight availability within our contracts; this may mean longer layovers or more than one stop-over for an au pair. Au Pair in America is held to the same change and penalty fees as the general public, therefore, changes made after ticketing may not be possible or the au pair may incur a fee. Au Pair in America cannot guarantee requested flight dates, specific routing or flight time.

For certain destinations, Au Pair in America purchases airline seats in large blocks well in advance of departure dates. Seats that are not utilized are not refundable to Au Pair in America. Therefore, in the event the au pair chooses not to use the return portion of her international flight, the value of her flight is not refundable to the host family.

### Visa extensions

Au pairs may request a one-time program extension of six, nine or 12 months. They may extend their program with their current host family or request to extend with a new host family.

Approximately four months before the end of your au pair's year, you will receive a packet of information explaining the extension option, as well as materials to complete together with your au pair if you chose to extend your time together. Your au pair will also receive a mailing about the extension program with information on how to file for an extension with either her current family or a new host family.

In order to be considered for a program extension, federal regulations require an au pair must be in good standing with the program and must have completed her educational requirement. Proof that she has fulfilled her education must be sent to the Connecticut office before we will submit an extension request to the U.S. Department of State for approval.

It is important to clarify that a program extension allows au pairs to continue their participation in the program and extends the validity of their visa status in the U.S. It is not an extension of their J-1 visa, and this has implications on an au pair's ability to travel outside the U.S. during her extension term. The au pair exchange program is still technically a one-year program, and the J-1 visa which is issued to au pairs is valid for one year only. When an extension is approved by the U.S. Department of State, the au pair is issued a new DS 2019 form stating her extended program validity dates. Even though her visa may have expired, the au pair will still be in valid J-1 visa status through the extended program dates. It is important to note that the au pair may not be able to travel to certain areas outside the U.S. during her extension term, as a valid visa would be required for re-entry.

### Your au pair's return home

Under the terms of your Host Family Agreement you have agreed to relieve your au pair of her duties at the end of her contract, thus enabling her to return to her home country in accordance with the terms of her visa. An au pair cannot perform any child care duties in her travel month. It is also illegal to retain your au pair for child care on a student or a tourist visa.

Most host families find their children adjust well and enjoy the opportunity to meet new au pairs of different cultures each year, just as school teachers change from year to year.

<<<Back

**Important Contacts**

We hope this document gives you insight and answers to issues and concerns you may have during the year. Of course, there are many things we cannot describe. Every relationship is unique and the number of enjoyable, enriching, new experiences you can have are endless.

In the event you have concerns that you have not been able to resolve through communication with your local community counselor, you may contact your regional program manager in the Stamford, CT office to discuss the situation. You can find the telephone number and e-mail address of your Regional Program Manager by contacting the office toll-free at (800) 928-7247.  If you feel that you still require additional assistance, you may contact Ruth Ferry, the Director of Au Pair in America at (800) 399-5025, or by e-mail at rferry@aifs.com.

In addition, if you have any questions, complaints or incidents related to compliance with Department of State regulations for the Au Pair Program, you can go to **http://www.state.gov/**  for information or contact the Compliance Unit of the U.S. Department of State, Exchange Visitor Program Services at AuPairProgram@state.gov or at the address below:

Office of Private Sector Exchange Division
SA-44, 301 4TH Street SW
Washington, DC  20547
Telephone: 202.203.7939

As a host family, your advice and input are invaluable to us and the many families that will follow in your footsteps. As you proceed through the year, please take the time to write to us and let us know about your experiences. At year-end you will receive an evaluation form from us, which we encourage you to complete. As a host family, you will be the best source of advice and the most positive testimony to our program. We wish you much success this year.

<<<Back

# Addendum

Addendum A - Exchange Visitor Program Regulations

**United States Department of State**
**Bureau of Educational and Cultural Affairs**
**Exchange Visitor Program**
**Au Pair and EduCare Regulations**

[Code of Federal Regulations]
[Title 22, Volume 1]
[Revised as of April 1, 2002]
From the U.S. Government Printing Office via GPO Access
[CITE: 22CFR62.31]
[Page 306-310]
TITLE 22--FOREIGN RELATIONS
CHAPTER I--DEPARTMENT OF STATE
PART 62--EXCHANGE VISITOR PROGRAM

**Table of Contents**

Subpart B--Specific Program Provisions

62.31   Au pairs.
 (a) Introduction. This section governs Department of State-designated exchange visitor programs under which foreign nationals are afforded the opportunity to live with an American host family and participate directly in the home life of the host family. All au pair participants provide child care services to the host family and attend a U.S. post-secondary educational institution. Au pair participants provide up to forty-five hours of child care services per week and pursue not less than six semester hours of academic credit or its equivalent during their year of program participation. Au pairs participating in the EduCare program provide up to thirty hours of child care services per week and pursue not less than twelve semester hours of academic credit or its equivalent during their year of program participation.

(b) Program designation. The Department of State may, in its sole discretion, designate bona fide programs satisfying the objectives set forth in paragraph (a) of this section. Such designation shall be for a period of two years and may be revoked by the Department of State for good cause.

(c) Program eligibility. Sponsors designated by the Department of State to conduct an au pair exchange program shall;

(1) Limit the participation of foreign nationals in such programs to not more than one year;

(2) Limit the number of hours an EduCare au pair participant is obligated to provide child care services to not more than 10 hours per day or more than 30 hours per week and limit the number of hours all other au pair participants are obligated to provide child care services to not more than 10 hours per day or more than 45 hours per week;

(3) Require that EduCare au pair participants register and attend classes offered by an accredited U.S. post-secondary institution for not less than twelve semester hours of academic credit or its equivalent and that all other au pair participants register and attend classes offered by an accredited U.S. post-secondary institution for not less than six semester hours of academic credit or its equivalent;

(4) Require that all officers, employees, agents, and volunteers acting on their behalf are adequately trained and supervised;

(5) Require that the au pair participant is placed with a host family within one hour's driving time of the home of the local organizational representative authorized to act on the sponsor's behalf in both routine and emergency matters arising from the au pair's participation in their exchange program;

(6) Require that each local organizational representative maintain a record of all personal monthly contacts (or more frequently as required) with each au pair and host family for which he or she is responsible and issues or problems discussed;

(7) Require that all local organizational representatives contact au pair participants and host families twice monthly for the first two months following a placement other than the initial placement for which the au pair entered the United States.

(8) Require that local organizational representatives not devoting their full time and attention to their program obligations are responsible for no more than fifteen au pairs and host families; and

(9) Require that each local organizational representative is provided adequate support services by a regional organizational representative.

(d) Au pair selection. In addition to satisfying the requirements of §62.10(a), sponsors shall ensure that all participants in a designated au pair exchange program:

(1) Are between the ages of 18 and 26;

(2) Are a secondary school graduate, or equivalent;

(3) Are proficient in spoken English;

(4) Are capable of fully participating in the program as evidenced by the satisfactory completion of a physical;
(5) Have been personally interviewed, in English, by an organizational representative who shall prepare a report

of the interview which shall be provided to the host family; and

(6) Have successfully passed a background investigation that includes verification of school, three, non-family related personal and employment references, a criminal background check or its recognized equivalent and a personality profile. Such personality profile will be based upon a psychometric test designed to measure differences in characteristics among applicants against those characteristics considered most important to successfully participate in the au pair program.

(e) Au pair placement. Sponsors shall secure, prior to the au pair's departure from the home country, a host family placement for each participant. Sponsors shall not:

(1) Place an au pair with a family unless the family has specifically agreed that a parent or other responsible adult will remain in the home for the first three days following the au pair's arrival;

(2) Place an au pair with a family having a child aged less than three months unless a parent or other responsible adult is present in the home;

(3) Place an au pair with a host family having children under the age of two, unless the au pair has at least 200 hours of documented infant child care experience. An au pair participating in the EduCare program shall not be placed with a family having pre-school children in the home unless alternative full-time arrangements for the supervision of such pre-school children are in place;

(4) Place an au pair with a host family having a special needs child, as so identified by the host family, unless the au pair has specifically identified his or her prior experience, skills, or training in the care of special needs children and the host family has reviewed and acknowledged in writing the au pair's prior experience, skills, or training so identified;

(5) Place an au pair with a host family unless a written agreement between the au pair and the host family detailing the au pair's obligation to provide child care has been signed by both the au pair and the host family prior to the au pair's departure from his or her home country. Such agreement shall clearly state whether the au pair is an EduCare program participant or not. Such agreement shall limit the obligation to provide child care services to not more than 10 hours per day or more than 45 hours per week unless the au pair is an EduCare participant. Such agreement shall limit the obligation of an EduCare participant to provide child care service to not more than 10 hours per day or more than 30 hours per week.

(6) Place the au pair with a family who cannot provide the au pair with a suitable private bedroom; and

(7) Place an au pair with a host family unless the host family has interviewed the au pair by telephone prior to the au pair's departure from his or her home country.

(f) Au pair orientation. In addition to the orientation requirements set forth at §62.10, all sponsors shall provide au pairs, prior to their departure from the home country, with the following information:

(1) A copy of all operating procedures, rules, and regulations, including a grievance process, which govern the au pair's participation in the exchange program;

(2) A detailed profile of the family and community in which the au pair will be placed;

(3) A detailed profile of the educational institutions in the community where the au pair will be placed, including the financial cost of attendance at these institutions;

(4) A detailed summary of travel arrangements; and

(5) A copy of the Department of State's written statement and brochure regarding the au pair program.

(g) Au pair training. Sponsors shall provide the au pair participant with child development and child safety instruction, as follows:

(1) Prior to placement with the host family, the au pair participant shall receive not less than eight hours of child safety instruction no less than 4 of which shall be infant-related; and

(2) Prior to placement with the American host family, the au pair participant shall receive not less than twenty-four hours of child development instruction of which no less than 4 shall be devoted to specific training for children under the age of two.

(h) Host family selection. Sponsors shall adequately screen all potential host families and at a minimum shall:

(1) Require that the host parents are U.S. citizens or legal permanent residents;

(2) Require that host parents are fluent in spoken English;

(3) Require that all adult family members resident in the home have been personally interviewed by an organizational representative;

(4) Require that host parents and other adults living full-time in the household have successfully passed a background investigation including employment and personal character references;

(5) Require that the host family have adequate financial resources to undertake all hosting obligations;

(6) Provide a written detailed summary of the exchancge program and the parameters of their and the au pair's duties, participation, and obligations; and

(7) Provide the host family with the prospective au pair participant's complete application, including all references.

(i) Host family orientation. In addition to the requirements set forth at §62.10 sponsors shall:

(1) Inform all host families of the philosophy, rules, and regulations governing the sponsor's exchange program and provide all families with a copy of the Department of State's written statement and brochure regarding the au pair program;

(2) Provide all selected host families with a complete copy of Department of State-promulgated Exchange Visitor Program regulations, including the supplemental information thereto;

(3) Advise all selected host families of their obligation to attend at least one family day conference to be sponsored by the au pair organization during the course of the placement year. Host family attendance at such a gathering is a condition of program participation and failure to attend will be grounds for possible termination of their continued or future program participation; and

(4) Require that the organization's local counselor responsible for the au pair placement contacts the host family and au pair within forth-eight hours of the au pair's arrival and meets, in person, with the host family and au pair within two weeks of the au pair's arrival at the host family home.

(j) Wages and hours. Sponsors shall require that au pair participants:

(1) Are compensated at a weekly rate based upon 45 hours of child care services per week and paid in conformance with the requirements of the Fair Labor Standards Act as interpreted and implemented by the United States Department of Labor. EduCare participants shall be compensated at a weekly rate that is 75% of the weekly rate paid to non-EduCare participants;

(2) Do not provide more than 10 hours of child care per day, or more than 45 hours of child care in any one week. EduCare participants may not provide more than 10 hours of child care per day or more than 30 hours of child care in any one week;

(3) Receive a minimum of one and one half days off per week in addition to one complete weekend off each month; and

(4) Receive two weeks of paid vacation.

(k) Educational component. Sponsors must:

(1) Require that during their initial period of program participation, all EduCare au pair participants complete not less than 12 semester hours (or their equivalent) of academic credit in formal educational settings at accredited U.S. post-secondary institutions and that all other au pair participants complete not less than six semester hours (or their equivalent) of academic credit in formal educational settings at accredited U.S. post-secondary institutions. As a condition of program participation, host family participants must agree to facilitate the enrollment and attendance of au pairs in accredited U.S. post secondary institutions and to pay the cost of such academic course work in an amount not to exceed $1,000 for EduCare au pair participants and in an amount not to exceed $500 for all other au pair participants.

(2) Require that during any extension of program participation, all participants ( i.e. , Au Pair or EduCare) satisfy an additional educational requirement, as follows:

(i) For a nine or 12-month extension, all au pair participants and host families shall have the same obligation for coursework and payment therefore as is required during the initial period of program participation.

(ii) For a six-month extension, EduCare au pair participants must complete not less than six semester hours (or their equivalent) of academic credit in formal educational settings at accredited U.S. post-secondary institutions. As a condition of participation, host family participants must agree to facilitate the enrollment and attendance of au pairs at accredited U.S. post secondary institutions and to pay the cost of such academic coursework in an amount not to exceed $500. All other au pair participants must complete not less than three semester hours (or their equivalent) of academic credit in formal educational settings at accredited U.S. post-secondary institutions. As a condition of program participation, host family participants must agree to facilitate the enrollment and attendance of au pairs at accredited U.S. post secondary institutions and to pay the cost of such academic coursework in an amount not to exceed $250.

(l) Monitoring. Sponsors shall fully monitor all au pair exchanges, and at a minimum shall:

(1) Require monthly personal contact by the local counselor with each au pair and host family for which the counselor is responsible. Counselors shall maintain a record of this contact;

(2) Require quarterly contact by the regional counselor with each au pair and host family for which the counselor is responsible. Counselors shall maintain a record of this contact;

(3) Require that all local and regional counselors are appraised of their obligation to report unusual or serious situations or incidents involving either the au pair or host family; and

(4) Promptly report to the Department of State any incidents involving or alleging a crime of moral turpitude or violence.

(m) Reporting requirements. Along with the annual report required by regulations set forth at §62.17, sponsors shall file with the Department of State the following information:

(1) A summation of the results of an annual survey of all host family and au pair participants regarding satisfaction with the program, its strengths and weaknesses;

(2) A summation of all complaints regarding host family or au pair participation in the program, specifying the nature of the complaint, its resolution, and whether any unresolved complaints are outstanding;

(3) A summation of all situations which resulted in the placement of au pair participant with more than one host family;

(4) A report by a certified public accountant, conducted pursuant to a format designated by the Department of State, attesting to the sponsor's compliance with the procedures and reporting requirements set forth in this subpart;

(5) A report detailing the name of the au pair, his or her host family placement, location, and the names of the local and regional organizational representatives; and

(6) A complete set of all promotional materials, brochures, or pamphlets distributed to either host family or au pair participants.

(n) Sanctions. In addition to the sanctions provisions set forth at §62.50, the Department of State may undertake immediate program revocation procedures upon documented evidence that a sponsor has failed to:

(1) Comply with the au pair placement requirements set forth in paragraph (e) of this section;

(2) Satisfy the selection requirements for each individual au pair as set forth in paragraph (d) of this section; and

(3) Enforce and monitor host family's compliance with the stipend and hours requirements set forth in paragraph (j) of this section.

(o) Extension of program. The Department, in its sole discretion, may approve extensions for au pair participants beyond the initial 12-month program. Applications to the Department for extensions of six,

nine, or 12 months, must be received by the Department not less than 30 calendar days prior to the expiration of the exchange visitor's initial authorized stay in either the Au Pair or EduCare program ( i.e. , 30-calendar days prior to the program end date listed on the exchange visitor's Form DS–2019). The request for an extension beyond the maximum duration of the initial 12-month program must be submitted electronically in the Department of Homeland Security's Student and Exchange Visitor Information System (SEVIS). Supporting documentation must be submitted to the Department on the sponsor's organizational letterhead and contain the following information:

(1) Au pair's name, SEVIS identification number, date of birth, the length of the extension period being requested;

(2) Verification that the au pair completed the educational requirements of the initial program; and

(3) Payment of the required non-refundable fee (see 22 CFR 62.90) via Pay.gov.

(p) Repeat participation. A foreign national who enters the United States as an au pair Exchange Visitor Program participant and who has successfully completed his or her program is eligible to participate again as an au pair participant, provided that he or she has resided outside the United States for at least two years following completion of his or her initial au pair program.

[60 FR 8552, Feb. 15, 1995, as amended at 62 FR 34633, June 27, 1997; 64 FR 53930, Oct. 5, 1999. Redesignated at 64 FR 54539, Oct. 7, 1999; 66 FR 43087, Aug. 17, 2001; 71 FR 33238, June 8, 2006; 73 FR 34862, June 19, 2008]

## Addendum B - Visa information

Program participants should be aware of the terms and conditions under which the United States government issues the J-1 visa. Such visas are reserved for individuals participating in a bona fide cultural exchange opportunity.

**Definition of terms:**
**DS-2019:** The Department of State Certificate of Eligibility for Exchange Visitors J-1 Status.
This form is required by the United States Embassy or Consulate Office as proof of acceptance into a cultural exchange program. This white form will be stamped by Immigration inspectors upon entry into the United States. The au pair should keep this form in a safe place with her passport.

**J-1 Visa:** The document placed in the au pair's passport by the United States Embassy or Consulate Office upon approval for participation in a cultural exchange

program. This is the au pair's application to enter the United States.

The DS-2019 form should be valid for at least one year from the date the au pair entered the United States. This would be indicated by a stamp indicating the au pair's arrival date and the code "J-1 D/S". This stamp and code would be located in the middle of the I-94 card and in box number 6 of the DS-2019 form.

If the au pair leaves the United States, even for only one day, she must have her passport, DS-2019 form, When planning a trip outside the United States, the au pair should:

- Send her DS-2019 form to the Program Compliance Coordinator/Responsible Officer: Au Pair in America. Telephone (800) 727-2437 ext. 5027.

This form should be sent at least three weeks prior to travel plans outside the country. Au pairs should only send their DS-2019 form. Passports should never be sent to Au Pair in America or leave the property of the au pair.

- Include a letter with the DS-2019 form stating where the au pair will be going and dates of her trip. A self-addressed, stamped envelope should accompany all DS-2019 forms.

If there are less than three weeks before departure, an au pair can expedite the process by using Express Mail or Federal Express. If the au pair wishes to have her validated DS-2019 returned to her by UPS, she must include a check or money order for $10 payable to AIFS. A complete mailing address must accompany the check, as Au Pair in America cannot send mail overnight to a post office box number. Au pairs should also include their daytime telephone number with this information.

Understandably, not all travel plans (i.e. emergencies) can be made with advance notice. When an au pair schedules an out of country trip with insufficient time to send her DS-2019 form in for a signature, she must call the Stamford office to discuss the special circumstances. Under the au pair regulations and the terms of agreement the au pair and host family have with Au Pair in America, the au pair is to return home at the end of the program. After returning home, the au pair is free to apply for another visa to re-enter the United States.

Should the au pair remain in the United States beyond the months authorized by the program, Au Pair in America is required by Exchange Visitor Program Regulations to notify the immigration authorities. If the au pair's participation in the program is terminated either by the au pair or by Au Pair in America prior to the date listed on her DS-2019 form, Au Pair in America is required to notify the Department of State and the Department of Homeland Security of the date on which her participation was terminated.

If at any point an au pair is deported by Immigration, her chances of obtaining another visa in the future would be seriously jeopardized.

Au Pair in America will be offering the au pair a flight home at the end of her exchange. An au pair may remain in the United States for an additional month should she wish to travel to other regions of the United States. If this is the case, Au Pair in America will arrange a return flight home during the travel month. The au pair cannot leave and re-enter the U.S. during the travel month (for example Canada, Mexico).

## Important Links

## Resources

[1] Muscari, Ann and Morrone, Wendy Wardell, Child Care That Works—How Families Can Share Their Lives with Child Care and Thrive (NY: Doubleday, 1989), p. 83

[2] Stewart, Edward C. and Bennett, Milton J., American Cultural Patterns, A Cross-Cultural Perspective, (ME: Intercultural Press, 1985) p. 45

[3] King, Nancy and Huff, Ken, The Host Family Survival Kit, A Guide for American Host Families, (ME: Intercultural Press, 1985), p. 81

[4] Elliott, Ruth S. with Savage, Jim, Minding the Kids, A Practical Guide to Employing Nannies, Caregivers, Baby Sitters and Au Pairs, (Prentice Hall Press, 1990), p. 121

**<<<Back**

1  MATTHEW C. HELLAND (SBN 250451)
   *helland@nka.com*
2  NICHOLS KASTER, LLP
   235 Montgomery Street, Suite 810
3  San Francisco, CA 94104
   Telephone: (415) 277-7235
4  Facsimile: (415) 277-7238

5  PETER RUKIN (SBN 178336)
   *prukin@rukinhyland.com*
6  RUKIN HYLAND & RIGGIN LLP
   1939 Harrison Street, Suite 290
7  Oakland, CA 94612
   Telephone: (415) 421-1800
8  Facsimile: (415) 421-1700

9
   Attorneys for Plaintiff,
10 Isabella Savini Merante

11

12                    **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

13                          **COUNTY OF SAN FRANCISCO**

14  ISABELLA SAVINI MERANTE,              **CASE NO.:**
    individually and on behalf of all others
15  similarly situated,                   **(UNLIMITED CIVIL CASE)**

16            Plaintiffs,                 **EXHIBIT TO COMPLAINT FOR
                                          CIVIL PENALTIES PURSUANT TO
17       v.                               THE PRIVATE ATTORNEYS
                                          GENERAL ACT (LABOR CODE §2698,
18                                         *et seq.*)
    AMERICAN INSTITUTE FOR
19  FOREIGN STUDY, INC, a Connecticut     **DEMAND FOR JURY TRIAL**
    Company,
20
21            Defendant.

22

23

24

25

26

27

28

─────────────────────────────────
Exhibit to Complaint for Penalties

ELECTRONICALLY
**F I L E D**
*Superior Court of California,*
*County of San Francisco*

**03/15/2021**
**Clerk of the Court**
BY: RONNIE OTERO
Deputy Clerk

**CGC-21-590398**

# EXHIBIT C



# *2019 Program Support & Policies*

We know the important responsibility that you have as parents for the well being of your children. At the American Institute For Foreign Study, dba Au Pair in America (APIA) and herein referred to as APIA, we work in partnership with host parents and the international visitor who comes to live 'on par' with the family to help provide the information and support that all parties need to establish a mutually rewarding cultural experience and provide the safe and attentive care that children require.

## PROVISIONS FOR CHILD CARE

There may be occasions throughout the exchange, such as illness or scheduling conflicts, when your au pair is not available and alternate care arrangements will need to be made. The minimum weekly federal stipend is to be paid during these unavoidable periods.

Host families are encouraged to maintain a network of child care support services in the community for those times when back-up child care is needed. In particular, families in the EduCare program will need to consider care arrangements during their children's school vacation period as the care the companion provides is limited to 30 hours per week.

Due to special circumstances, such as serious illness, it may be necessary for the au pair to return home prior to completion of her year. In these cases, the program will use reasonable efforts to locate an alternate program participant for the family.

## CONCERNS OF COMPATIBILITY

Program participants make a commitment to a minimum 12-month exchange with an option to extend the duration of stay 6, 9 or 12 months. The local Community Counselor and Au Pair in America staff in the Stamford office are available to help with adjustment issues which, if not addressed, may prevent the completion of the commitment. Host Families are expected to bring problems which they believe could result in an alternate placement to the attention of the Community Counselor immediately. Every effort is to be made to work together to resolve differences.

If, on the advice of the Community Counselor and in the judgement of APIA the problems can only be resolved by removing the au pair from the host family's residence, program representatives will address the situation. The au pair is not to be asked to leave the home by the family without a Community Counselor's knowledge and involvement.

Where rematch is deemed appropriate, reasonable effort will be made to find alternate placements for all parties. ***The Host Family is responsible for hosting the au pair for up to two weeks until alternate arrangements can be made.*** The au pair is expected to continue to perform child care services during this period. The family is expected to pay the weekly minimum federal stipend even if the family prefers the au pair not perform child care duties during this time. [Note: the first month in the placement is viewed as an adjustment period during which time no change in placement is to be considered.]

## TERMS OF REPLACEMENT

Program fees will be assessed for the time the au pair is with the host family providing child care plus the orientation program au pairs attend when they first arrive in the United States. No change in placement will be considered during the first month after arrival, as this time is viewed as an adjustment period for both parties.

If a match is terminated after one month of placement and before nine months have elapsed, or if, in the judgment of APIA, a placement terminates for reasons beyond the host family's control after nine months from the date of the au pair arrival in the home, a replacement au pair will be offered. If a family chooses to withdraw after nine months with one au pair they forfeit refund privileges. ***It is not the policy of APIA to issue a refund of fees for time remaining on the contract in lieu of selecting a replacement.***

APIA cannot guarantee uninterrupted child care. Though we endeavor to provide smooth transitions between au pair placements, interim alternative care at your expense may be needed if a change of au pair is necessary.

If your replacement au pair's contract term is longer or shorter than the host family's contract term, a program fee adjustment will be made. In the case of a shorter contract, the host family will receive a credit (held for up to six months) or refund if requested which will be issued after the replacement contract term is complete, for each full week remaining in the initial contract period. In the case of a longer contract, the Host Family will be charged for additional time of the replacement's contract with payment due one month prior to the end of the initial contract period. No program fees will be assessed for any time a host family is without a placement.

## CONTINUANCE WITH THE PROGRAM

The program reserves the right to terminate a relationship with a host family in the event of a violation of law, government regulations and/or program policies, or if the program determines that it is inappropriate for the relationship to continue. Violations not tolerated include: not paying or reducing the au pair's minimum weekly stipend; not paying or reducing the au pair's educational funds; not allowing or reducing the au pair's free time; increasing responsibilities beyond the time and scope stipulated by the U.S. government regulations; or other failure to abide by program policies. The program may also terminate a relationship with a host family when the host family's program fees are more than 60 days in arrears, or in the program's determination, the host family is not in keeping with the cultural exchange spirit of the program. In such cases, the host family will not be granted a replacement au pair or refund of program fees.

## FINANCIAL INFORMATION AND REFUND POLICY

The application fee, match fee and program fee are nonrefundable except in these special circumstances:

- The $450 match fee is refundable if APIA is unable to arrange for the selected au pair to arrive in the U.S.
- A host family withdrawing from either the APIA program or the Extraordinaire program after selecting an au pair but before the au pair arrives in the U.S. is responsible for a $1,200 cancellation fee. A family on the EduCare program withdrawing after selecting a companion but before the companion arrives in the U.S. is responsible for a $1,000 cancellation fee. The match fee will not be refunded.
- If a host family wishes a replacement to complete or extend the family's contract year but APIA is unable to provide a replacement, the host family is entitled to a refund according to the program's refund calculation schedule (refer to Refund Calculation Schedule).
- If between one and nine months after arrival, the second au pair on the contract is found to be incompatible by the host family, the au pair will be removed within two weeks following the host family's decision to end the placement allowing time to identify alternate arrangements for the au pair. The family may then, subject to the approval of APIA, either (1) receive a refund under the terms of the program's refund policy or (2) receive a credit for the balance of the time on the contract that may be applied toward a new au pair and a new contract term.
- A family who withdraws after nine months of the exchange with an au pair will forfeit any refund privileges.
- If the host family has a serious change of circumstance (such as illness or relocation to an area where APIA does not have a Community Counselor within a one-hour drive) and is unable to continue in the 12-month program, APIA will hold the host family's credit balance for up to one year. The credit balance can only be applied to a future placement. In extreme situations, APIA in its sole discretion, may refund the family in accordance with the program's refund policy (refer to Refund Calculations Schedule) if a replacement host family is found for the au pair involved.
- Child Care Protection Plan:  If one, or both, of the hosting parent(s) or custodian(s) involuntarily loses a job that results in the loss of twenty-five percent (25%) or more of the combined incomes of the hosting parent(s) or custodian(s) after the au pair has arrived in the home, AIFS will refund the program fees, for the time remaining on the contract according to the program's refund calculation schedule.  The host family at their discretion may elect to either retain the au pair for the period of time remaining on her first 12-month term (or if job loss occurs during the extension term then for the period of time remaining in extension) or request that the program remove the au pair from the home and the program will make every reasonable effort to place the au pair with another family.  If the host family retains the au pair they agree to continue to abide by all program guidelines and policies and must continue to pay the au pair's weekly stipend and provide all applicable educational benefits.  APIA in its sole discretion will refund the family in accordance with the program's refund policy based on time remaining on the placement period with the au pair following job loss (and in consideration of any severance period) and a review of reasonable documentation proving the loss of income that must be furnished by the hosting parent(s) or custodian(s) to the program.

## REFUND CALCULATION SCHEDULE

These schedules apply to the first 12-month exchange. A new schedule will be provided to the family if the family and au pair elect to extend their duration of participation for 6, 9 or 12 months beyond the first year term.

The amount of refund due a host family who qualifies is upon the week in the month the contract is terminated. Refer to the Financial Information and Refund Policy section of this document on qualifying for a refund.

**Calculations for refund amount based on program fees paid in full prior to start of contract:**

| Contract month | 0 | 1st | 2nd | 3rd | 4th | 5th | 6th | 7th | 8th | 9th | 10th | 11th | 12th |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| $8,950 program fee Refund to Host Family | $7,320 | $6,710 | $6,100 | $5,490 | $4,880 | $4,270 | $3,660 | $3,050 | $2,440 | $1,830 | $1,220 | $610 | $0 |
| $9,985 program fee Refund to Host Family | $8,244 | $7,557 | $6,870 | $6,183 | $5,496 | $4,809 | $4,122 | $3,435 | $2,748 | $2,061 | $1,374 | $687 | $0 |
| $7,975 program fee Refund to Host Family | $6,300 | $5,775 | $5,250 | $4,725 | $4,200 | $3,675 | $3,150 | $2,625 | $2,100 | $1,575 | $1,050 | $525 | $0 |

*A host family with a match that extends beyond their original 12-month contract as a result of placement with two or more different au pairs would be subject to a comparable calculation.*

**Calculations for refund amount based on program fees paid under terms of Extended Payment Fee Plan:**

| Contract month | 0 | 1st | 2nd | 3rd | 4th | 5th | 6th | 7th | 8th | 9th | 10th | 11th | 12th |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Program Fee ($8,950) | $2,710 | | $1,040 | $1,040 | $1,040 | $1,040 | $1,040 | $1,040 | | | | | |
| Refund to Host Family | $1,080 | $470 | $900 | $1,330 | $1,760 | $2,190 | $2,620 | $3,050 | $2,440 | $1,830 | $1,220 | $610 | $0 |
| Program Fee ($9,85) | $3,265 | | $1,120 | $1,120 | $1,120 | $1,120 | $1,120 | $1,120 | | | | | |
| Refund to Host Family | $1,524 | $837 | $1,270 | $1,703 | $2,136 | $2,569 | $3,002 | $3,435 | $2,748 | $2,061 | $1,374 | $687 | $0 |
| Program Fee ($7,975) | $2,665 | | $885 | $885 | $885 | $885 | $885 | $885 | | | | | |
| Refund to Host Family | $990 | $465 | $825 | $1,185 | $1,545 | $1,905 | $2,265 | $2,625 | $2,100 | $1,575 | $1,050 | $525 | $0 |

*Note:  The Extended Payment Plan activator fee of $80 and service charge of $55 per payment are non-refundable.*

*\*A host family with a match that extends beyond their original 12-month contract as a result of placement with two or more different au pairs would be subject to a comparable calculation.*

**Note:** *For program fees paid by credit card: the approved returned amount will only be credited to the credit card from which the payment was charged.*

*The application fee, match fee and SEVIS Fee are non-refundable.*

## THE SEVIS FEE

A fee of $35 is charged each time the host family selects an au pair who will be applying for a visa to enter the country.

The Student and Exchange Visitor Information System (SEVIS) is a U.S. government internet based tracking system. The Bureau of Immigrations and Customs Enforcement (ICE) of the Department of Homeland Security (DHS) maintains the SEVIS database. It is through this system that all exchange programs request DS-2019 documents for nonimmigrants applying for a visa to enter the U.S. During the period of time a nonimmigrant is in the United States the organization sponsoring the nonimmigrant is required to update the database as information about the nonimmigrant's status and whereabouts changes throughout the year. Officers at U.S. ports of entry and exit also update the nonimmigrant's movement.

DHS is required by law to impose a fee that will pay for the continued operation of the SEVIS program. Rule, 8 CFR Part 103, 214, and 299, Authorizing Collection of the Fee Levied on F,J, and M Nonimmigrant Classifications Under Public Law 104-208 of the federal register dated October 27, 2003, requires that a payment be made to DHS before a nonimmigrant is able to apply for a visa. Nonimmigrants are required to show proof of SEVIS fee payment to the U.S. Consul at the time of appearing for a personal interview and submitting visa application documents. Nonimmigrants also submit a separate fee to the U.S. consul to cover processing of their visa documents.

The SEVIS fee for applicants entering the au pair program on a J-1 visa is currently $35 and subject to change. Au Pair in America makes a payment and secures the necessary proof of payment on behalf of the au pair at the time of placement. The fee is charged to the family who hosts upon her entry into the U.S. A family who serves as an alternate host for an au pair who has transitioned from her first host family will not be assessed a SEVIS fee.

## TRAVEL NOTICE

Program fees are based on airline/airport rates, taxes and associated travel fees in effect at time of printing. APIA reserves the right to pass along incremental surcharges or mandatory, new or increased taxes, if any, as levied on airline tickets at ports of entry/exit after January 1, 2019. Notification of additional fees, if any, will be sent to host families and will appear on the statement of fees due prior to the arrival of your au pair.

## PROGRAM REQUIREMENTS FOR WEEKLY STIPEND

As a government authorized program, policies are subject to modification as a result of legislative changes.

### Minimum Weekly Federal Stipend to Au Pair

Au Pairs on the au pair program are to be compensated by the host family at a weekly rate based upon 45 hours of child care services per week and paid in conformance with the Fair Labor Standards Act (FLSA) as interpreted and implemented by the U.S. Department of State.

EduCare participants are to be compensated at a rate that is 75% of the weekly rate established for those on the au pair program for up to 30 hours of child care services per week.

The minimum weekly federal stipend  of $195.75 for the standard participant for up to 45 hours per week child care services and $146.81 for the EduCare participant for up to 30 hours per week of child care services is calculated at the federal minimum wage less a  credit set by the Department of Labor for room and board.

Au pairs on the Au Pair Extraordinaire program are to be compensated at a weekly rate of no less than $250.00 as set by APIA for up to 45 hours per week of child care services.

**Note:**  Host families have the option to pay more than the required minimum standards, but under no circumstance may the host family pay less than the minimum.

## LEGISLATIVE BACKGROUND OF AU PAIR PROGRAMS

Au Pair in America and EduCare in America are programs designated by The Department of State to sponsor an au pair Exchange Visitor Program. The program is intended to provide its participants an opportunity to "learn about American culture, improve English language skills and to assist host families with child care while living with American families as a guest member 'on par' for a cultural exchange."

Since 1986, the program has evolved and legislative authorization remains an essential element which continues to distinguish this program from other in-home child care options. The government has issued regulations which establish the framework for recruitment, placement and monitoring of au pair and host family relationships. These regulations appear in the Host Family "Guideline for a Successful Year", a resource guide posted on the host family portal.

## EDUCATIONAL AND CULTURAL EXCHANGE OPPORTUNITIES

As an educational and cultural exchange program, participation requires a commitment on the part of all parties to take advantage of the educational and cultural offerings.

Au pairs are required to complete an educational component -- those on the standard or Extraordinaire program at to complete 6 semester hours (or their equivalent) of academic credit at an accredited U.S. post-secondary institution (12 semester hours for EduCare participants). As a condition of program participation, host families must agree to facilitate the enrollment and attendance of au pairs and to pay the cost of course work In an amount not to exceed $1,000 for EduCare participants and in an amount not to exceed $500 for au pair and Extraordinaire participants.

As a host family it is expected that you will encourage and give your care provider every opportunity to take advantage of the educational and cultural offerings in your community. Additionally, Community Counselors arrange cultural and social activities for the au pairs throughout the exchange.

For families, a host family workshop is provided annually. The workshop will be held in relative proximity to the cluster area. Attendance at an annual workshop is a requirement of program participation.

## ROLE OF THE DEPARTMENT OF STATE

Educational and cultural exchange activities have exposed millions of foreign nationals to the United States, its peoples, cultures, skills, business techniques, educational institutions and way of life. Such programs began pursuant to the provisions of the United States Information and Educational Exchange Act of 1948 (Smith-Mundt) and were subsequently incorporated into and broadened under the Fulbright-Hays Act in 1964.

The Fulbright-Hays Act mandates reciprocal exchange and Americans traveling abroad have, in similar fashion, developed an enhanced awareness of foreign people, their cultures and societies. Thus, Fulbright-Hays programs further one of the missions of The Department of State: increasing mutual understanding between Americans and others through people-to-people contact. Oversight of exchange activities occurring under the auspices of the Exchange Visitor Program had been the responsibility of the United States Information Agency until October 1, 1999, when USIA was merged into The Department of State.

## J-1 VISAS

The au pair/EduCare participant applies for the J-1 visa after being chosen by a host family. The documents and instructions to secure the visa are provided by APIA. The determination to issue the visa is made by the American Consul. APIA strives to pre-screen and select applicants who would meet the criteria to qualify for the J-1 visa. However, we are unable to guarantee that a visa would be issued to individual applicants prior to placement. In the event a candidate is denied a visa, the program will make every reasonable effort to assist the host family with the selection of an alternate candidate.

The J-1 visa permits the participant to reside legally in the United States for 12 months while caring for children in a program approved host family. Effective February 2004, The Department of State authorized program sponsors to apply for an extension of duration of stay for au pairs who have successfully completed the first 12-month program. Approval for a 6, 9 or 12-month extension is subject to approval by The Department of State and full details will be provided to the family and au pair by APIA approximately eight months into the exchange. The Program expects the host family to be aware of J-1 visa conditions and support the au pair/EduCare participant in meeting those conditions. Conditions stipulate the J-1 holder not accept paid employment outside of the family on an approved au pair sponsor program and return home at the end of the approved term.

APIA will notify the Department of Homeland Security (DHS) and The Department of State if an applicant leaves the program prior to the end of the approved term, but does not exit the country.

Providing child care beyond the approved term is illegal. The Department of Homeland Security (DHS) allows the holder to take an additional month at the conclusion of the exchange to travel in the United States. They are not permitted to provide child care during their travel month.

MATTHEW C. HELLAND (SBN 250451)
*helland@nka.com*
NICHOLS KASTER, LLP
235 Montgomery Street, Suite 810
San Francisco, CA 94104
Telephone: (415) 277-7235
Facsimile: (415) 277-7238

PETER RUKIN (SBN 178336)
*prukin@rukinhyland.com*
RUKIN HYLAND & RIGGIN LLP
1939 Harrison Street, Suite 290
Oakland, CA 94612
Telephone: (415) 421-1800
Facsimile: (415) 421-1700

Attorneys for Plaintiff,
Isabella Savini Merante

ELECTRONICALLY
**F I L E D**
*Superior Court of California,*
*County of San Francisco*

**03/15/2021**
**Clerk of the Court**
BY: RONNIE OTERO
Deputy Clerk

**CGC-21-590398**

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF SAN FRANCISCO

| | |
|---|---|
| ISABELLA SAVINI MERANTE, individually and on behalf of all others similarly situated,<br><br>          Plaintiffs,<br><br>     v.<br><br>AMERICAN INSTITUTE FOR FOREIGN STUDY, INC, a Connecticut Company,<br><br>          Defendant. | **CASE NO.:**<br><br>**(UNLIMITED CIVIL CASE)**<br><br>**EXHIBIT TO COMPLAINT FOR CIVIL PENALTIES PURSUANT TO THE PRIVATE ATTORNEYS GENERAL ACT (LABOR CODE §2698, *et seq.*)**<br><br>**DEMAND FOR JURY TRIAL** |

# EXHIBIT D



**Nichols Kaster**
ATTORNEYS AT LAW

**Matthew C. Helland**
Direct: (415) 277-7239
Fax: (415) 277-7238
helland@nka.com

235 Montgomery Street
Suite 810
San Francisco, CA 94104
(877) 777-0622

January 8, 2021

**VIA ELECTRONIC FILING:**

Labor and Workforce Development Agency
Attn: PAGA Administrator
1515 Clay Street, Suite 801
Oakland, CA 94612

**VIA CERTIFIED MAIL:**

American Institute for Foreign Study, Inc.
d/b/a Au Pair in America
1 High Ridge Park
Stamford, CT 06905

> **RE:  *PAGA Claims against American Institute for Foreign Study, Inc. d/b/a Au Pair in America***

Dear PAGA Administrator:

Pursuant to the Private Attorneys General Act of 2004 ("PAGA"), California Labor Code Sections 2698, *et seq.*, this letter is sent on behalf of Isabella Savini Merante  and on behalf of similarly situated individuals working as au pairs for American Institute For Foreign Study, Inc. d/b/a Au Pair in America ("Au Pair in America" or "Defendant"). Ms. Merante is represented by the undersigned, the law firm of Rukin Hyland & Riggin LLP, and the non-profit law firm Towards Justice.

Defendant Au Pair in America is a Connecticut company doing business in California. Defendant recruits, trains, and employs in-home childcare workers who work in the United States on J-1 au pair visas. According to the United States Department of State, approximately 2800 J1 visa au pairs work in California each year. A significant portion of these California au pairs are recruited, trained, placed, and employed by Defendant.

Defendant employs au pairs, including Ms. Merante, by, among other things, interviewing and selecting au pairs through a "multi-tiered screening process"  including a requirement the au pair "complete a four page application detailing occupational history, child care experience, educational interests hobbies and other personal information." Defendant also extensively trains au pairs, "take[ing] pride in exceeding the U.S. Government training standards," and requiring that "throughout the program au pairs gather for instructional sessions organized by their community counselors." The host family and au pair must have ongoing contact with Defendant's community counselor, and the counselor handles any disputes between

the au pair and family. Defendant reserves the exclusive right to terminate au pairs from the program, forbidding families from asking the au pair to leave the home without Defendant's knowledge and involvement and setting the standards for requesting a rematch. Further, Defendant reserves the right to terminate the host families' access to au pairs for violations such as not paying or reducing the au pairs minimum weekly stipend. Defendant also controls the scope of the au pairs' responsibilities and working conditions through detailed "Host Family Guidelines." This control over the terms and conditions of employment demonstrate that Defendant is an "employer" pursuant to Section 18 of the Labor Code and "employs" au pairs within the meaning of the Wage Order.

Defendant sets tiered pay based on the au pair's level of childcare experience. Defendant instructs host families to pay regular au pairs a minimum weekly "stipend" of $195.75 for and sets the pay at a minimum of $250.00 for au pairs participating in their "Au Pair Extraordinaire" program. The stipend did not include any payment for overtime. On top of this systemic illegal underpayment, Defendant (1) failed to provide uninterrupted meal periods; (2) took deductions or minimum wage credits— including for meals and housing—that are contrary to California law; (3) failed to keep records of time worked, breaks taken, or meal and housing credits taken against minimum wage as required by California law; and (4) failed to provide wage statements with required information about pay, deductions, and withholding.

Ms. Merante is one of Defendant's au pairs in California, where she has worked since May 2019. For approximately the first year, from May 2019 to June 2020, she received a weekly stipend of $200.00 per week. She would receive $15.00 additional for each hour she worked over 45. When she began with a new family she received $250.00 per week with no additional payments. She regularly works in the home for 10 hours in a day, and regularly works between 42-50 hours per week. She sometimes works over 10 hours in a day. She regularly works more than 6 hours continuously without being fully relieved of duty for a meal period.

Ms. Merante did not enter into any agreement to credit meals or lodging against Defendant's minimum wage obligations, as required by Wage Order No. 15. As such, the $200.00 and $250.00 stipends fell far below the minimum wage for 42-50 hours of work. To the extent Defendant seeks credit for the value of any room or board without Ms. Merante's agreement such credit would be an unlawful repayment of wages to the employer and/or an unlawful deduction from wages. Upon information and belief, Defendant did not maintain any records of Ms. Merante's hours worked, breaks taken, or the value of room and board provided. Defendant did not provide Ms. Merante with any wage statements whatsoever, much less a wage statement itemizing wages earned, hours worked, rates of pay, the name and address of the employer, deductions taken, net wages earned, the inclusive dates of the period, or the name of the employee.

Accordingly, Ms. Merante suffered from the systematic violations described above. Defendant's pay practices violate numerous provisions of Wage Order 15, the Minimum Wage Order, and the Labor Code. Defendant has:

*PAGA Administrator*
*Labor and Workforce Development Agency*
*December 11, 2020*
*Page 3*

    (1) Failed to pay minimum wage.[1]
    (2) Failed to pay overtime pay.[2]
    (3) Failed to provide meal periods.[3]
    (4) Failed to timely pay all wages owed.[4]
    (5) Made illegal deductions from wages, or took illegal credits against minimum wage, including for housing and meals.[5]
    (6) Failed to maintain records showing hours worked, breaks taken, and value of room and board provided.[6]
    (7) Failed to provide lawful wage statements.[7]

Plaintiff alleges that these violations are ongoing and continuing and that they affected and continue to affect current and former au pairs who work or have worked for Defendant in California at any time on or after the date that is one year prior to the filing of this letter.

On behalf of our client and similarly aggrieved former and current au pairs employed by Defendant, we request that the LWDA investigate the alleged violations, or provide timely notice to the undersigned if it chooses not to investigate the allegations. By copy of this letter, notice is being provided to Defendant at its corporate offices. Defendant is hereby notified of our client's intent to seek PAGA penalties in the event the LWDA declines to do so.

Please consider this letter as the notice required by California Labor Code § 2699.3.

Thank you for your attention to this matter.

Sincerely,

Matthew Helland, Esq.
**Nichols Kaster, LLP**

cc:    Alexander Hood, Esq., Towards Justice
       Peter Rukin, Esq., Rukin Hyland & Riggin LLP

---

[1] Labor Code Sections 1194, 1194.2, and 1194.5; Minimum Wage Order.
[2] Labor Code Sections 510, 1194, and 1454.
[3] Labor Code Section 512.
[4] Labor Code Section 204.
[5] Labor Code Sections 221 and 224; Wage Order 15.
[6] Labor Code Sections 226, 226.7, 512 and 1174; Wage Order 15.
[7] Labor Code Section 226; Wage Order 15.

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*
Matthew C. Helland
NICHOLS KASTER, LLP
235 Montgomery Street, Suite 810, San Francisco, CA 94104
TELEPHONE NO.: 415-277-7235     FAX NO. *(Optional):* 415-277-7238
ATTORNEY FOR *(Name):* Plaintiff Isabella Savani Merante

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN FRANCISCO**
STREET ADDRESS: 400 McAllister Street
MAILING ADDRESS:
CITY AND ZIP CODE: San Francisco, CA 94102
BRANCH NAME: Civic Center Courthouse

FOR COURT USE ONLY

**ELECTRONICALLY**
**F I L E D**
*Superior Court of California,*
*County of San Francisco*

**03/15/2021**
**Clerk of the Court**
BY: RONNIE OTERO
**Deputy Clerk**

CASE NAME:
Isabella Savani Merante, v. American Institute for Foreign Study, Inc. d/b/a Au Pair in America

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER: **CGC-21-590398** |
|---|---|---|---|---|
| [x] Unlimited (Amount demanded exceeds $25,000) | [ ] Limited (Amount demanded is $25,000) | [ ] Counter   [ ] Joinder | | |
| | | Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | | JUDGE: DEPT.: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
- [ ] Auto (22)
- [ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
- [ ] Asbestos (04)
- [ ] Product liability (24)
- [ ] Medical malpractice (45)
- [ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
- [ ] Business tort/unfair business practice (07)
- [ ] Civil rights (08)
- [ ] Defamation (13)
- [ ] Fraud (16)
- [ ] Intellectual property (19)
- [ ] Professional negligence (25)
- [ ] Other non-PI/PD/WD tort (35)

**Employment**
- [ ] Wrongful termination (36)
- [x] Other employment (15)

**Contract**
- [ ] Breach of contract/warranty (06)
- [ ] Rule 3.740 collections (09)
- [ ] Other collections (09)
- [ ] Insurance coverage (18)
- [ ] Other contract (37)

**Real Property**
- [ ] Eminent domain/Inverse condemnation (14)
- [ ] Wrongful eviction (33)
- [ ] Other real property (26)

**Unlawful Detainer**
- [ ] Commercial (31)
- [ ] Residential (32)
- [ ] Drugs (38)

**Judicial Review**
- [ ] Asset forfeiture (05)
- [ ] Petition re: arbitration award (11)
- [ ] Writ of mandate (02)
- [ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
- [ ] Antitrust/Trade regulation (03)
- [ ] Construction defect (10)
- [ ] Mass tort (40)
- [ ] Securities litigation (28)
- [ ] Environmental/Toxic tort (30)
- [ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
- [ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
- [ ] RICO (27)
- [ ] Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
- [ ] Partnership and corporate governance (21)
- [ ] Other petition *(not specified above)* (43)

2. This case [x] is   [ ] is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [x] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. [x] monetary   b. [ ] nonmonetary; declaratory or injunctive relief   c. [x] punitive
4. Number of causes of action *(specify):*
5. This case [ ] is   [x] is not   a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: March 15, 2021

Matthew C. Helland                                 ▶ /s/ Matthew C. Helland
(TYPE OR PRINT NAME)                                    (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]                    **CIVIL CASE COVER SHEET**                    Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
*www.courts.ca.gov*

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

CM-010

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the Civil Case Cover Sheet contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
  Asbestos Property Damage
  Asbestos Personal Injury/ Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
  Medical Malpractice– Physicians & Surgeons
  Other Professional Health Care Malpractice
Other PI/PD/WD (23)
  Premises Liability (e.g., slip and fall)
  Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
  Intentional Infliction of Emotional Distress
  Negligent Infliction of Emotional Distress
  Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
  Legal Malpractice
  Other Professional Malpractice *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
  Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
  Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
  Negligent Breach of Contract/ Warranty
  Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
  Collection Case–Seller Plaintiff
  Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally complex)* (18)
  Auto Subrogation
  Other Coverage
Other Contract (37)
  Contractual Fraud
  Other Contract Dispute

**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
  Writ of Possession of Real Property
  Mortgage Foreclosure
  Quiet Title
  Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
  Writ–Administrative Mandamus
  Writ–Mandamus on Limited Court Case Matter
  Writ–Other Limited Court Case Review
Other Judicial Review (39)
  Review of Health Officer Order
  Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
  Abstract of Judgment (Out of County)
  Confession of Judgment *(non-domestic relations)*
  Sister State Judgment
  Administrative Agency Award *(not unpaid taxes)*
  Petition/Certification of Entry of Judgment on Unpaid Taxes
  Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
  Declaratory Relief Only
  Injunctive Relief Only *(non-harassment)*
  Mechanics Lien
  Other Commercial Complaint Case *(non-tort/non-complex)*
  Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition *(not specified above)* (43)
  Civil Harassment
  Workplace Violence
  Elder/Dependent Adult Abuse
  Election Contest
  Petition for Name Change
  Petition for Relief From Late Claim
  Other Civil Petition

**CIVIL CASE COVER SHEET**

**For your protection and privacy, please press the Clear This Form button after you have printed the form.**

| Print this form | Save this form | | Clear this form |

CASE NUMBER: CGC-21-590398  ISABELLA SAVINI MERANTE VS. AMERICAN INSTITUTE F(

## NOTICE TO PLAINTIFF

A Case Management Conference is set for:

**DATE:**    **AUG-18-2021**

**TIME:**    **10:30AM**

**PLACE:**    **Department 610**
**400 McAllister Street**
**San Francisco, CA  94102-3680**

All parties must appear and comply with Local Rule 3.

> CRC 3.725 requires the filing and service of a case management statement form CM-110
> no later than 15 days before the case management conference.  However, it would facilitate
> the issuance of a case management order   **without an appearance**   at the case
> management conference if the case management statement is filed and served twenty-five
> days before the case management conference.

Plaintiff must serve a copy of this notice upon each party to this action with the summons and
complaint. Proof of service subsequently filed with this court shall so state.   **This case is
eligible for electronic filing and service per Local Rule 2.11.  For more information,
please visit the Court's website at www.sfsuperiorcourt.org under Online Services.**

**[DEFENDANTS: Attending the Case Management Conference does not take the place
of filing a written response to the complaint. You must file a written response with the
court within the time limit required by law. See Summons.]**

### ALTERNATIVE DISPUTE RESOLUTION REQUIREMENTS

> **IT IS THE POLICY OF THE SUPERIOR COURT THAT EVERY CIVIL CASE SHOULD PARTICIPATE IN
> MEDIATION, ARBITRATION, NEUTRAL EVALUATION,  AN EARLY SETTLEMENT CONFERENCE, OR
> OTHER APPROPRIATE FORM OF ALTERNATIVE DISPUTE RESOLUTION PRIOR TO A TRIAL.**
>
> (SEE LOCAL RULE 4)

Plaintiff **must** serve a copy of the Alternative Dispute Resolution (ADR) Information Package
on each defendant along with the complaint.  (CRC 3.221.) The ADR package may be
accessed at www.sfsuperiorcourt.org/divisions/civil/dispute-resolution or you may request a
paper copy from the filing clerk.  All counsel must discuss ADR with clients and opposing
counsel and provide clients with a copy of the ADR Information Package prior to filing
the Case Management Statement.

**Superior Court Alternative Dispute Resolution Administrator**
**400  McAllister Street, Room 103-A**
**San Francisco, CA  94102**
**(415) 551-3869**

**See Local Rules 3.3, 6.0 C and 10 B re stipulation to judge pro tem.**

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

American Institute for Foreign Study, Inc. d/b/a Au Pair in America

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

Isabella Savini Merante, individually and on behalf of all others similarly situated.

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is: *(El nombre y dirección de la corte es):* | CASE NUMBER: *(Número del Caso):* **CGC-21-590398** |
|---|---|

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is: *(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*

Matthew C. Helland, NICHOLS KASTER, LLP 235 Montgomery St., Suite 810, San Francisco, CA 94104

DATE: March 15, 2021
*(Fecha)* 03/29/2021

Clerk, by **RONNIE OTERO** , Deputy
*(Secretario)* *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served

1. ☐ as an individual defendant.

2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*

under: ☐ CCP 416.10 (corporation)      ☐ CCP 416.60 (minor)
☐ CCP 416.20 (defunct corporation)      ☐ CCP 416.70 (conservatee)
☐ CCP 416.40 (association or partnership)      ☐ CCP 416.90 (authorized person)
☐ other *(specify):*

4. ☐ by personal delivery on *(date):*

Page 1 of 1

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-100  [Rev. July 1, 2009] | **SUMMONS** | Code of Civil Procedure §§ 412.20, 465<br>*www.courts.ca.gov* |
|---|---|---|

**For your protection and privacy, please press the Clear This Form button after you have printed the form.**

[ Print this form ]  [ Save this form ]      [ Clear this form ]

# EXHIBIT B

**CM-010**

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*<br>Matthew C. Helland<br>NICHOLS KASTER, LLP<br>235 Montgomery Street, Suite 810, San Francisco, CA 94104<br>TELEPHONE NO.: 415-277-7235    FAX NO. *(Optional):* 415-277-7238<br>ATTORNEY FOR *(Name):* Plaintiff Isabella Savani Merante | **FOR COURT USE ONLY**<br><br>ELECTRONICALLY<br>**F I L E D**<br>*Superior Court of California,*<br>*County of San Francisco*<br>**03/15/2021**<br>Clerk of the Court<br>BY: RONNIE OTERO<br>Deputy Clerk |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN FRANCISCO
STREET ADDRESS: 400 McAllister Street
MAILING ADDRESS:
CITY AND ZIP CODE: San Francisco, CA 94102
BRANCH NAME: Civic Center Courthouse

CASE NAME:
Isabella Savani Merante, v. American Institute for Foreign Study, Inc. d/b/a Au Pair in America

| **CIVIL CASE COVER SHEET** | **Complex Case Designation** | CASE NUMBER: |
|---|---|---|
| [x] **Unlimited** (Amount demanded exceeds $25,000)   [ ] **Limited** (Amount demanded is $25,000) | [ ] Counter   [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | **CGC-21-590398**<br>JUDGE:<br>DEPT.: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
- [ ] Auto (22)
- [ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
- [ ] Asbestos (04)
- [ ] Product liability (24)
- [ ] Medical malpractice (45)
- [ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
- [ ] Business tort/unfair business practice (07)
- [ ] Civil rights (08)
- [ ] Defamation (13)
- [ ] Fraud (16)
- [ ] Intellectual property (19)
- [ ] Professional negligence (25)
- [ ] Other non-PI/PD/WD tort (35)

**Employment**
- [ ] Wrongful termination (36)
- [x] Other employment (15)

**Contract**
- [ ] Breach of contract/warranty (06)
- [ ] Rule 3.740 collections (09)
- [ ] Other collections (09)
- [ ] Insurance coverage (18)
- [ ] Other contract (37)

**Real Property**
- [ ] Eminent domain/Inverse condemnation (14)
- [ ] Wrongful eviction (33)
- [ ] Other real property (26)

**Unlawful Detainer**
- [ ] Commercial (31)
- [ ] Residential (32)
- [ ] Drugs (38)

**Judicial Review**
- [ ] Asset forfeiture (05)
- [ ] Petition re: arbitration award (11)
- [ ] Writ of mandate (02)
- [ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
- [ ] Antitrust/Trade regulation (03)
- [ ] Construction defect (10)
- [ ] Mass tort (40)
- [ ] Securities litigation (28)
- [ ] Environmental/Toxic tort (30)
- [ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
- [ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
- [ ] RICO (27)
- [ ] Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
- [ ] Partnership and corporate governance (21)
- [ ] Other petition *(not specified above)* (43)

2. This case [x] is   [ ] is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [x] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. [x] monetary   b. [ ] nonmonetary; declaratory or injunctive relief   c. [x] punitive
4. Number of causes of action *(specify):*
5. This case [ ] is   [x] is not   a class action suit.
6. If there are any known related cases, file and serve a notice of related cases. *(You may use form CM-015.)*

Date: March 15, 2021

Matthew C. Helland
_____
(TYPE OR PRINT NAME)

▶ /s/ Matthew C. Helland
_____
(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| | | |
|---|---|---|
| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. July 1, 2007] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10<br>*www.courts.ca.gov* |

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET
<span style="float:right">CM-010</span>

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the Civil Case Cover Sheet contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property
Damage/Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*
**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
Asbestos Property Damage
Asbestos Personal Injury/ Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
Medical Malpractice– Physicians & Surgeons
Other Professional Health Care Malpractice
Other PI/PD/WD (23)
Premises Liability (e.g., slip and fall)
Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
Intentional Infliction of Emotional Distress
Negligent Infliction of Emotional Distress
Other PI/PD/WD
**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
Legal Malpractice
Other Professional Malpractice *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)
**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
Negligent Breach of Contract/ Warranty
Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
Collection Case–Seller Plaintiff
Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally complex)* (18)
Auto Subrogation
Other Coverage
Other Contract (37)
Contractual Fraud
Other Contract Dispute
**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
Writ of Possession of Real Property
Mortgage Foreclosure
Quiet Title
Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*
**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*
**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
Writ–Administrative Mandamus
Writ–Mandamus on Limited Court Case Matter
Writ–Other Limited Court Case Review
Other Judicial Review (39)
Review of Health Officer Order
Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)
**Enforcement of Judgment**
Enforcement of Judgment (20)
Abstract of Judgment (Out of County)
Confession of Judgment *(non-domestic relations)*
Sister State Judgment
Administrative Agency Award *(not unpaid taxes)*
Petition/Certification of Entry of Judgment on Unpaid Taxes
Other Enforcement of Judgment Case
**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
Declaratory Relief Only
Injunctive Relief Only *(non-harassment)*
Mechanics Lien
Other Commercial Complaint Case *(non-tort/non-complex)*
Other Civil Complaint *(non-tort/non-complex)*
**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition *(not specified above)* (43)
Civil Harassment
Workplace Violence
Elder/Dependent Adult Abuse
Election Contest
Petition for Name Change
Petition for Relief From Late Claim
Other Civil Petition

For your protection and privacy, please press the Clear This Form button after you have printed the form.

[ Print this form ]   [ Save this form ]   [ Clear this form ]

CASE NUMBER: CGC-21-590398  ISABELLA SAVINI MERANTE VS. AMERICAN INSTITUTE F(

## NOTICE TO PLAINTIFF

A Case Management Conference is set for:

| | |
|---|---|
| **DATE:** | **AUG-18-2021** |
| **TIME:** | **10:30AM** |
| **PLACE:** | **Department 610** |
| | **400 McAllister Street** |
| | **San Francisco, CA  94102-3680** |

All parties must appear and comply with Local Rule 3.

CRC 3.725 requires the filing and service of a case management statement form CM-110 no later than 15 days before the case management conference.  However, it would facilitate the issuance of a case management order **without an appearance** at the case management conference if the case management statement is filed and served twenty-five days before the case management conference.

Plaintiff must serve a copy of this notice upon each party to this action with the summons and complaint. Proof of service subsequently filed with this court shall so state.   **This case is eligible for electronic filing and service per Local Rule 2.11.  For more information, please visit the Court's website at www.sfsuperiorcourt.org under Online Services.**

**[DEFENDANTS: Attending the Case Management Conference does not take the place of filing a written response to the complaint. You must file a written response with the court within the time limit required by law. See Summons.]**

## ALTERNATIVE DISPUTE RESOLUTION REQUIREMENTS

IT IS THE POLICY OF THE SUPERIOR COURT THAT EVERY CIVIL CASE SHOULD PARTICIPATE IN MEDIATION, ARBITRATION, NEUTRAL EVALUATION,  AN EARLY SETTLEMENT CONFERENCE, OR OTHER APPROPRIATE FORM OF ALTERNATIVE DISPUTE RESOLUTION PRIOR TO A TRIAL.

(SEE LOCAL RULE 4)

Plaintiff **must** serve a copy of the Alternative Dispute Resolution (ADR) Information Package on each defendant along with the complaint.  (CRC 3.221.) The ADR package may be accessed at www.sfsuperiorcourt.org/divisions/civil/dispute-resolution or you may request a paper copy from the filing clerk. All counsel must discuss ADR with clients and opposing counsel and provide clients with a copy of the ADR Information Package prior to filing the Case Management Statement.

**Superior Court Alternative Dispute Resolution Administrator**
**400  McAllister Street, Room 103-A**
**San Francisco, CA  94102**
**(415) 551-3869**

**See Local Rules 3.3, 6.0 C and 10 B re stipulation to judge pro tem.**

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

*FOR COURT USE ONLY*
*(SOLO PARA USO DE LA CORTE)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

American Institute for Foreign Study, Inc. d/b/a Au Pair in America

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

Isabella Savini Merante, individually and on behalf of all others similarly situated.

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):*

CASE NUMBER: *(Número del Caso):*
~~CGC-21-590398~~

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is: *(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*

Matthew C. Helland, NICHOLS KASTER, LLP 235 Montgomery St., Suite 810, San Francisco, CA 94104

DATE: March 15, 2021
*(Fecha)* 03/29/2021

Clerk, by RONNIE OTERO , Deputy
*(Secretario)* *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

SUPERIOR COURT OF CALIFORNIA COUNTY OF SAN FRANCISCO

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*
   under: ☐ CCP 416.10 (corporation)       ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation) ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
*www.courts.ca.gov*

For your protection and privacy, please press the Clear This Form button after you have printed the form.

| Print this form | Save this form | | Clear this form |

# EXHIBIT C

BRIAN D. BERRY, CA Bar No. 229893
brian.berry@ogletree.com
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
One Embarcadero Center, Suite 900
San Francisco, CA  94111
Telephone:     415.442.4810
Facsimile:     415.442.4870

Attorneys for Defendant
AMERICAN INSTITUTE FOR FOREIGN
STUDY, INC.

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF SAN FRANCISCO

| | |
|---|---|
| ISABELLA SAVINI MERANTE, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>AMERICAN INSTITUTE FOR FOREIGN STUDY, INC.,<br><br>Defendant. | Case No. CGC-21-590398<br><br>**DEFENDANT AMERICAN INSTITUTE FOR FOREIGN STUDY, INC.'S ANSWER TO PLAINTIFF'S COMPLAINT**<br><br>Action Filed: March 15, 2021<br>Trial Date:  None Set |

Defendant American Institute for Foreign Study, Inc. ("Defendant") hereby answers the unverified Complaint for Civil Penalties Pursuant to the Private Attorneys General Act (Labor Code §2698, *et seq.* ("Complaint") that Plaintiff Isabella Savini Merante ("Plaintiff") filed in the above-captioned action on March 15, 2021, as follows:

## GENERAL DENIAL

Pursuant to Section 431.30(d) of the California Code of Civil Procedure, Defendant denies generally and specifically each and every allegation contained in Plaintiff's Complaint, and denies further that Plaintiff has been injured in the amount or manner alleged, or in any other manner whatsoever. As used throughout this Answer, including in the General Denial herein and in the Affirmative and Other Defenses below, the term "Plaintiff" refers to Plaintiff Isabella Savini Merante and all persons whom Plaintiff purports to represent on a representative basis with regard to any claims alleged in the Complaint.

## AFFIRMATIVE AND OTHER DEFENSES

Without admitting that it carries the burden of proof as to any of the issues raised thereby, and without prejudice to Defendant's right to argue that Plaintiff bears the burden of proof with respect to any one or more of these defenses, Defendant asserts the following separate and distinct defenses to Plaintiff's Complaint and each purported cause of action therein and prays for judgment as set forth below:

## FIRST DEFENSE

### (**Failure to State a PAGA Claim**)

1. As a separate defense to Plaintiff's Complaint and to each purported cause of action alleged therein, the alleged Private Attorney General Act ("PAGA") claims in the Complaint are overbroad, ambiguous, conclusory, lack the required community of interest, and are not precise, objective, or readily ascertainable, and any representative PAGA action would be unmanageable.

## SECOND DEFENSE

### (**Defendant Not an Employer**)

2. As a separate defense to Plaintiff's Complaint and to each purported cause of action alleged therein, Defendant alleges that it is not and was not the "employer," whether single or joint,

1  of Plaintiff under California law.

## THIRD DEFENSE

### (Failure to Exhaust Administrative Remedies)

3.      As a separate defense to Plaintiff's Complaint and to each purported cause of action alleged therein, Defendant alleges that the claims alleged in the Complaint are barred, in whole or in part, to the extent Plaintiff has failed to satisfy the jurisdictional and/or statutory prerequisites for her causes of action, and/or has failed to exhaust all administrative remedies and/or failed to timely exhaust those remedies as required by law, including but not limited to those provided by Cal. Labor Code § 2699.3.

## FOURTH DEFENSE

### (No Standing)

4.      As a separate defense to Plaintiff's Complaint and to each purported cause of action alleged therein, Defendant alleges that the claims alleged in the Complaint are barred, in whole or in part, to the extent that Plaintiff lacks standing to assert some or all of the claims asserted.

## FIFTH DEFENSE

### (Estoppel)

5.      As a separate defense to Plaintiff's Complaint and to each purported cause of action alleged therein, Defendant alleges that the claims alleged in the Complaint are barred, in whole or in part, by the doctrine of estoppel and that Plaintiff, by his own conduct and actions, is estopped, as a matter of law, from pursuing the claims alleged in the Complaint.

## SIXTH DEFENSE

### (No Willful Conduct)

6.      As a separate defense to Plaintiff's Complaint and to each purported cause of action alleged therein, Defendant alleges that the penalties sought by the Complaint are barred because at all relevant times, Defendant did not willfully, knowingly, or intentionally fail to comply with any provision of the California Labor Code, or any other law related to the matters alleged in the Complaint, but rather acted in good faith and had reasonable grounds for believing that it did not violate those provisions.

**SEVENTH DEFENSE**

**(Excessive Penalties)**

7.      As a separate defense to Plaintiff's Complaint and to each purported cause of action alleged therein, Defendant alleges that the penalties and damages sought by the Plaintiff are barred insofar as they would be excessive and disproportionate to the harm alleged, and further, Defendant alleges that the imposition of any penalties would violate Defendant's constitutional rights under the provisions of the United States and California Constitutions, including the Due Process clauses of the Fifth and Fourteenth Amendments of the United States Constitution, the Excessive Fines and the Cruel and Unusual Punishment clauses of the Eighth Amendment of the United States Constitution, and the Due Process and Excessive Fines clauses contained in the California Constitution.

**EIGHTH DEFENSE**

**(Laches)**

8.      As a separate defense to Plaintiff's Complaint and to each purported cause of action alleged therein, Defendant alleges that the claims alleged in the Complaint are barred, in whole or in part, by the doctrine of laches because Plaintiff exercised inexcusable delay in commencing this action and Defendant was unduly prejudiced by the delay.

**NINTH DEFENSE**

**(Unclean Hands)**

9.      As a separate defense to Plaintiff's Complaint and to each purported cause of action alleged therein, Defendant alleges that the claims alleged in the Complaint are barred, in whole or in part, by the doctrine of unclean hands.

**TENTH DEFENSE**

**(Release, Settlement, and/or Offset)**

10.      As a separate defense to Plaintiff's Complaint and to each purported cause of action alleged therein, Defendant alleges that the claims alleged in the Complaint are barred, in whole or in part, by the doctrines of release, settlement, and/or offset.

**ELEVENTH DEFENSE**

**(Preemption)**

11.     As a separate defense to Plaintiff's Complaint and to each purported cause of action alleged therein, Defendant alleges that the claims asserted by Plaintiff in the Complaint are preempted by federal law.

**TWELFTH DEFENSE**

**(Good Faith Reliance)**

12.     As a separate defense to Plaintiff's Complaint and to each purported cause of action alleged therein, Defendant alleges that assuming *arguendo* that Defendant is or was an employer of the Plaintiff, which Defendant expressly denies, the claims asserted by Plaintiff in the Complaint are barred because all acts or omissions were in good faith conformity with and reliance on the written administrative regulations, orders, rulings, approvals, guidance, and/or interpretations of the United States Department of State, the Administrator of the Wage and Hour Division of the United States Department of Labor, the California Attorney General, the California Department of Industrial Relations, and/or the California Labor and Workforce Development Agency.

**THIRTEENTH DEFENSE**

**(Waiver)**

13.     As a separate defense to Plaintiff's Complaint and to each purported cause of action alleged therein, Defendant alleges that the claims alleged in the Complaint are barred, in whole or in part, by the doctrine of waiver insofar as Plaintiff, by his own conduct and actions, has waived the right, if any, to assert the claims alleged in the Complaint.

**FOURTEENTH DEFENSE**

**(Statute of Limitations)**

14.     As a separate defense to Plaintiff's Complaint and to each purported cause of action alleged therein, Defendant alleges that the claims alleged in the Complaint are barred, in whole or in part, by the applicable statute(s) of limitations including, without limitation, California Code of Civil Procedure Section §340(a)-(c).

1

## FIFTEENTH DEFENSE

2

### (Avoidable Consequences)

3
15.     As a separate defense to Plaintiff's Complaint and to each purported cause of action

4
alleged therein, Defendant alleges that the claims alleged in the Complaint are barred, in whole or

5
in part, by the doctrine of avoidable consequences.

6

## SIXTEENTH DEFENSE

7

### (Duplicative Penalties)

8
16.     As a separate defense to Plaintiff's Complaint and to each purported cause of action

9
alleged therein, the claims alleged in the Complaint are barred, in whole or in part, to the extent

10
that multiple duplicative penalties or remedies are sought for the same conduct.

11

## SEVENTEENTH DEFENSE

12

### (Unjust, Arbitrary, Oppressive or Confiscatory Penalties)

13
17.     As a separate defense to Plaintiff's Complaint and to each purported cause of action

14
alleged therein, the Plaintiff and/or the alleged aggrieved employees are not entitled to recover any

15
award of penalties as alleged in the Complaint, including, without limitation, any alleged penalties

16
under the PAGA, to the extent that such an award would be unjust, arbitrary, oppressive, or

17
confiscatory.

18

## EIGHTEENTH DEFENSE

19

### (Unmanageability)

20
18.     As a separate defense to Plaintiff's Complaint and to each purported cause of action

21
alleged therein, Defendant alleges that Plaintiff cannot maintain a representative action under

22
PAGA because the claims are unmanageable.

23

## NINETEENTH DEFENSE

24

### (Claim Preclusion)

25
19.     As a separate defense to Plaintiff's Complaint and to each purported cause of action

26
alleged therein, Defendant alleges that Plaintiff's claims are barred by the doctrine of res judicata,

27
collateral estoppel, and/or claim preclusion.

28

## TWENTIETH DEFENSE

### (Meal Break Waivers)

20.    As a separate defense to Plaintiff's Complaint and to each purported cause of action alleged therein, Defendant alleges that Plaintiff's meal break claims are barred to the extent they are subject to valid waivers.

## TWENTY-FIRST DEFENSE

### (De Minimis Time)

21.    As a separate defense to Plaintiff's Complaint and to each purported cause of action alleged therein, Defendant alleges that Plaintiff's claims for wages, rest break and meal break violations are barred to the extent any alleged violation arises from a *de minimis* increment of time.

## TWENTY-SECOND DEFENSE

### (No Acts or Omissions)

22.    As a separate defense to Plaintiff's Complaint and to each purported cause of action alleged therein, Defendant alleges that any failure to take a meal or rest break, any shortened meal or rest break, and any untimely meal or rest break, was due to Plaintiff and the allegedly aggrieved employee's election and not any acts or omissions by Defendant.

## RIGHT TO ADD ADDITIONAL DEFENSES

23.    As Defendant has not completed its investigation and the parties have not engaged in discovery regarding the facts and claims asserted by Plaintiff, Defendant cannot fully anticipate all defenses that may be applicable to this action.  Accordingly, Defendant expressly reserves, without waiver or limitation, the right to assert any and all additional defenses at any time.

## PRAYER

WHEREFORE, Defendant prays as follows:

1.    That Plaintiff take nothing by way of the Complaint;

2.    That the Complaint be dismissed in its entirety with prejudice;

3.    That the Court enter judgment for Defendant and against Plaintiff;

4.    That the Court award Defendant its costs of suit and reasonable attorneys' fees, including but not limited to costs and attorney fees pursuant to California Labor Code section 218.5;

1    and

2        5.      That the Court grant Defendant such other and further relief as the Court deems just

3    and proper.

4

5    DATED:  April 30, 2021            OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.

6

7

8                                     By: _____
                                          BRIAN D. BERRY
9

10                                    Attorneys for Defendant
                                      AMERICAN INSTITUTE FOR FOREIGN STUDY, INC.
11
                                                                    46978275.1
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PROOF OF SERVICE**
*Isabella Savini Merante v. American Institute For Foreign Study, Inc.*
California Superior Court, County of San Francisco
Case No. CGC-21-590398

I am and was at all times herein mentioned over the age of 18 years and not a party to the action in which this service is made. At all times herein mentioned I have been employed in the County of San Francisco in the office of a member of the bar of this court at whose direction the service was made. My business address is One Embarcadero Center, Suite 900, San Francisco, CA 94111.

On April 30, 2021, I served the following document(s):

**DEFENDANT AMERICAN INSTITUTE FOR FOREIGN STUDY, INC.'S ANSWER TO PLAINTIFF'S COMPLAINT**

on the person(s) and address(es) listed directly below by the method indicated:

Matthew C. Helland, Esq.                         Attorneys for Plaintiff
NICHOLS KASTER, LLP
235 Montgomery Street, Suite 810
San Francisco, Ca 94104
Telephone: (415) 277-7235
Facsimile:  (415) 277-7238
helland@nka.com

Peter Rukin, Esq.
RUKIN HYLAND & RIGGIN LLP
1939 Harrison Street, Suite 290
Oakland, CA 94612
Telephone: (415) 421-1800
Facsimile:  (415) 321-1700
prukin@rukinhyland.com

☐ **BY MAIL:** I placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with the practice of Ogletree, Deakins, Nash, Smoak & Stewart, P.C.'s practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

☐ **BY OVERNIGHT DELIVERY:** I placed the sealed envelope(s) or package(s) designated by the express service carrier for collection and overnight delivery by following the ordinary business practices of Ogletree, Deakins, Nash, Smoak & Stewart P.C., San Francisco, California. I am readily familiar with Ogletree, Deakins, Nash, Smoak & Stewart P.C.'s practice for collecting and processing of correspondence for overnight delivery, said practice being that, in the ordinary course of business, correspondence for

overnight delivery is deposited with delivery fees paid or provided for at the carrier's express service offices for next-day delivery.

☒   **BY E-MAIL OR ELECTRONIC TRANSMISSION:**  Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the documents to be sent to the person[s] at the e-mail address[es] listed on this Proof of Service. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.  My electronic address is Jessica.Libbey@ogletree.com.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.  Executed on April 30, 2021 at Antioch, California.

_____

Jessica E. Libbey

46977984.1

Case No. CGC-21-590398

PROOF OF SERVICE

Case 3:21-cv-03234-EMC Document 1 Filed 04/30/21 Page 103 of 106

## File & ServeXpress Transaction Receipt

| | |
|---|---|
| **File & ServeXpress Transaction ID:** | 66562960 |
| **Submitted by:** | Hector Meza, Nationwide Legal File & Serve Inc |
| **Authorized by:** | Brian Berry, Ogletree Deakins Nash Smoak & Stewart PC-San Francisco |
| **Authorize and file on:** | Apr 30 2021 11:31AM PDT  ℹ |
| **Time received by San Francisco County:** | Pending ℹ |

| | |
|---|---|
| **Court:** | CA Superior Court County of San Francisco-Civil |
| **Division/Courtroom:** | N/A |
| **Case Class:** | Civil-General Civil-Unlimited - $25,001+ |
| **Case Type:** | Other Non-Exempt Complaints (Civil 3) |
| **Case Number:** | CGC-21-590398 |
| **Case Name:** | Isabella Merante v. American Institute for Foreign Study, Inc. d/b/a Au Pair in America |

| | |
|---|---|
| **Transaction Option:** | File and Serve |
| **Billing Reference:** | SF44704 |
| **Read Status for e-service:** | N/A |

**Documents List**

**1 Document(s)**

**Attached Document, 10 Pages**

| Document Type:<br>Answer (Original) | Access:<br>Public | Statutory Fee:<br>$450.00 | Linked: |
|---|---|---|---|

| Document title:<br>DEFENDANT AMERICAN INSTITUTE FOR FOREIGN STUDY, INC.'S ANSWER TO PLAINTIFF'S COMPLAINT |
|---|

Expand All

☐ **Sending Parties (1)**

☐ **Recipients (3)**

  ☐ Service List (1)

  ☐ Additional Recipients (2)

☐ Case Parties

| Party | Party Type | Attorney | Firm | Attorney Type |
|---|---|---|---|---|
| American Institute For Foreign Study Inc | Defendant | No Answer on File | Firm TBD | Attorney in Charge |
| American Institute for Foreign Study, Inc. d/b/a Au Pair in America | Defendant | No Answer on File | Firm TBD | N/A |
| Merante, Isabella | Plaintiff | Helland, Matthew C | Nichols Kaster LLP | Attorney in Charge |
| Merante, Isabella Savini | Plaintiff | Helland, Matthew C | Nichols Kaster LLP | Attorney in Charge |

Close

**About File & ServeXpress (http://www.fileandservexpress.com/about-us)** | Resource Center
**(https://resourcecenter.fileandservexpress.com/resourcecenterwebui/default.aspx?ut=TP)** | FAQs
**(/FSXMasterPage/FAQ)** | Terms & Conditions (https://secure.fileandservexpress.com/agreement.htm?
**v=20200905)** | Privacy (http://www.fileandservexpress.com/privacy)
**Client Support**
© 2021 File & ServeXpress, LLC. All rights reserved.
☎ 1-888-529-7587

# EXHIBIT D

1    BRIAN D. BERRY, CA Bar No. 229893
     brian.berry@ogletree.com
2    Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
     One Embarcadero Center, Suite 900
3    San Francisco, CA  94111
     Telephone:    415.442.4810
4    Facsimile:    415.442.4870

5    Attorneys for Defendant
     AMERICAN INSTITUTE FOR FOREIGN
6    STUDY, INC.

7

8               **UNITED STATES DISTRICT COURT**

9             **NORTHERN DISTRICT OF CALIFORNIA**

10

11    ISABELLA SAVINI MERANTE,        Case No.
     individually and on behalf of all others
12    similarly situated,             **DECLARATION OF JEAN M. QUINN IN**
                           **SUPPORT OF DEFENDANT AMERICAN**
13               Plaintiffs,        **INSTITUTE FOR FOREIGN STUDY, INC.'S**
                           **NOTICE OF REMOVAL OF CIVIL**
14          vs.                     **ACTION TO FEDERAL COURT**

15    AMERICAN INSTITUTE FOR FOREIGN
     STUDY, INC.,                  (San Francisco Superior Court
16                                     Case No. CGC-21-590398)
              Defendant.
17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF JEAN M. QUINN IN SUPPORT OF DEFENDANT'S NOTICE OF REMOVAL OF CIVIL
ACTION TO FEDERAL COURT

**I, Jean M. Quinn, depose and state as follows:**

1.      I am over the age of 18, and I understand and believe in the obligations of an oath. I make this Declaration of my own free will, and based on my own first-hand information and my own personal observations.

2.      I am Senior Vice President of American Institute For Foreign Study, Inc. ("AIFS") and Director of the Au Pair in America ("APIA") program. AIFS is a Delaware corporation with its principal place of business located in Stamford, Connecticut.  AIFS does not have its headquarters, executive offices, or principal place of business anywhere in the State of California.

3.      I have reviewed the records maintained by AIFS, in the ordinary course of its business, concerning Plaintiff Isabella Savini Merante. Those records show that (i) Ms. Merante is a current participant in the au pair program administered by APIA and regulated by the United States Department of State, (ii) Ms. Merante currently possesses a non-immigrant J-1 Visa, which enables her temporary residence in the United States, (iii) Ms. Merante's participation in the au pair program is scheduled to conclude on May 12, 2021, and (iv) Ms. Merante has expressed an interest in extending her participation in the program beyond May 12, 2021 for an additional six (6) months.

Signed under the penalties of perjury this 29th day of April, 2021.

/s/    *Jean M. Quinn*

JEAN M. QUINN

46957649.1

DECLARATION OF JEAN M. QUINN IN SUPPORT OF DEFENDANT'S NOTICE OF REMOVAL OF CIVIL ACTION TO FEDERAL COURT